UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| BULLION EXCHANGE LLC, | Case No. 24-CV-00467 |
| Plaintiff, | |
| v. | **COMPLAINT** |
| BULLION SHARK, LLC and EKATERINA OVODOVA, | [Demand for a Jury Trial] |
| Defendants. | |

Plaintiff Bullion Exchange LLC ("Bullion Exchange" or "Plaintiff"), by and through its attorneys, Turman Legal Solutions PLLC, brings this Complaint against Defendants Bullion Shark, LLC ("Bullion Shark") and Ekaterina Ovodova ("Ovodova") (collectively, the "Defendants"), and states as follows:

## PRELIMINARY STATEMENT

1.      This is an action for injunctive relief and damages arising from Defendants' misappropriation of Bullion Exchange's confidential information and trade secrets, including customer lists, marketing strategies, and other proprietary business information.

2.      Bullion Exchange and Bullion Shark are both businesses that own websites and online storefronts where they buy, sell and trade rare coins, precious metals, bullion, bills, and trading cards to customers throughout the United States.

3.      Between December 29, 2018 and September 15, 2023, Ovodova was the Director of Marketing for Bullion Exchange.  As its Director of Marketing, Ovodova had access to Bullion Exchange's customer lists, marketing strategy and other highly confidential trade secrets.

4.      On September 6, 2023, Ovodova gave notice of her resignation from Bullion Exchange, which became effective on September 15, 2023.  At the time she gave notice to Bullion

Exchange of her resignation, she falsely informed Bullion Exchange that she would be taking a marketing position with a company outside of Bullion Exchange's industry.

5.     Without Bullion Exchange's knowledge or consent, Ovodova had, in fact, entered into an inappropriate business relationship with Bullion Shark while she was still employed as Bullion Exchange's Director of Marketing.

6.     In particular, on August 23, 2023, Ovodova interviewed with Bullion Shark for a position as its Head of eCommerce.  As a condition for receiving an offer as Head of eCommerce with a substantial salary increase, Bullion Shark asked Ovodova to prepare a marketing strategy that would improve Bullion Shark's sales and market share.

7.      Between August 24 and 25, 2023, Ovodova used Bullion Exchange's confidential marketing strategy, including Bullion Exchange's market research, to create a marketing strategy for Bullion Shark.

8.     In August 2023, Ovodova provided this marketing strategy to Bullion Shark. Bullion Shark accepted the marketing strategy from Ovodova.  Bullion Shark then extended Ovodova the offer to work as its Head of eCommerce, which she accepted.

9.     With Bullion Shark's encouragement, on September 6, 2023, Ovodova made unauthorized and illegal copies of Bullion Exchange's customer lists which she sent to her personal email account (eovodova@gmail.com) from her Bullion Exchange email account (katia@bullionexchanges.com).

10.    On September 7, 2023, Ovodova informed Bullion Exchange that she would be resigning, effective September 15, 2023.  At the time she gave notice of her resignation, Ovodova falsely advised Bullion Exchange that she was taking a job outside of Bullion Exchange's industry.

11.     In October 2023, Bullion Exchange discovered that Ovodova was working as the Head of eCommerce for Bullion Shark—a direct competitor.

12.     After further investigation, Bullion Exchange also discovered that Ovodova and Bullion Shark are using Bullion Exchange's marketing strategy, customer list and other trade secrets to drive Bullion Exchange's customers and business opportunities to Bullion Shark.

13.     The Defendants' conduct constitutes a misappropriation of trade secrets in violation of the Defend Trade Secrets Act, 18 U.S.C. § 1836 et seq. ("DTSA").  The Defendants are also in violation of New York common law, including: (i) trade secret misappropriation; (ii) unfair competition; (iii) breach of fiduciary duty; (iv) aiding and abetting breach of fiduciary duty; (v) and unjust enrichment.  Bullion Exchange seeks injunctive relief, compensatory damages, consequential damages, restitution, attorneys' fees and costs, and all other appropriate remedies available under the DTSA and New York state law.

## THE PARTIES

14.     Plaintiff Bullion Exchange is a Delaware limited liability company with its principal place of business located in New York, NY.   It operates both brick and mortar and online sales portals that trade, buy, and sell rare coins, bullion, and precious metals.

15.     Defendant Bullion Shark is a New York limited liability company with its principal place of business located at 400 Post Road, Suite 103, Westbury, New York, 11590.

16.     Defendant Ovodova is, upon information and belief, a resident of New York that is currently employed by Bullion Shark as its Head of eCommerce.

## JURISDICTION AND VENUE

17.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 because Bullion Exchange brings claims under 18 U.S.C. § 1836 et seq. (the Defend Trade

Secrets Act (the "DTSA"), which is a federal statute. The Court has supplemental jurisdiction over Bullion Exchange's state law claims pursuant to 28 U.S.C. § 1367.

18.     This Court has personal jurisdiction over all parties because, at all relevant times, they either reside in or conduct business in the state of New York.

19.     Venue is proper in this District under 28 U.S.C. § 1391(b)(1) and (2) because Bullion Shark's office is located in this District and a substantial portion of the events giving rise to the claims occurred in this District.

## FACTUAL BACKGROUND

20.     Bullion Exchange has been in business for twelve (12) years and has grown to become one of the largest sellers of rare coins, bullion, precious metals, notes, bills, trading cards, and other collectibles. Bullion Exchange operates a number of websites, including www.bullionexchanges.com, and also transacts business through its eBay store and other online marketplaces. Using these online storefronts, Bullion Exchange transacts business with customers throughout the United States.

21.     As of October 31, 2023, Bullion Exchange generated more than one million (1,000,000) sales of rare coins, bullion, and precious metals on eBay alone and has over 34,000 followers on eBay.

22.     Bullion Exchange's sales success is driven largely by its proprietary marketing strategies, extensive customer lists, and special vendor contracts.

23.     Bullion Shark has been in business for approximately ten (10) years. It also operates websites, including www.bullionsharks.com, and an eBay store where it buys, sells and trades rare coins, bullion, precious metals, notes, bills, trading cards, and other collectibles to customers throughout the United States.

**A.  Bullion Exchange's Customer Lists**

24.     As of September 6, 2023, Bullion Exchange had customer lists that contain the contact information for more than 384,000 customers that have a history of transacting business with Bullion Exchange.

25.     Bullion Exchange uses its customer lists and the marketing research compiled using the sales data from these customers as a key component of its marketing strategy.

26.     This information is not available to the general public, including Bullion Exchange's competitors.   This information provides Bullion Exchange with a competitive advantage.

27.     It took considerable time, effort and financial investment in online marketing and other advertising to generate sales to customers that are identified on Bullion Exchange's customer lists.

28.     Bullion Exchange's competitors, including Bullion Shark, would have to spend many years and at least $10,000,000.00 to compile a customer list of the size, quality, and value of Bullion Exchange's customer list.

**B.     Bullion Exchange Takes Strong Measures to Safeguard its Trade Secrets**

29.      Bullion Exchange retained the services of an online security specialist to design a data security system and protocols to safeguard its trade secrets, networks, and computer workstations from internal and external attacks.

30.     In particular, Bullion Exchange invested in the construction of a secure, encrypted physical server that is maintained in its New York City office to protect its business data and information.

31.     Bullion Exchange's employees are required to work in Bullion Exchange's office where their activity can be monitored and recorded.  To the extent employees are able to access the secure network remotely, that access is limited to virtual desktop environment that can be monitored by Bullion Exchange's management.   This virtual desktop environment prevents employees from downloading or printing data from Bullion Exchange's secure network on their personal computers and printers.

32.     In addition to implementing the electronic measures and policies to protect its trade secrets and other confidential information, Bullion Exchange restricts access to its trade secrets on its internal network to those key employees that require access to this data to perform the essential functions of their job.

33.     In addition, all of Bullion Exchange's employees are also required to sign an Employee Handbook and a separate Theft Policy, whereby they acknowledge their duty to protect Bullion Exchange's confidential information and trade secrets, with the understanding that failure to protect this information may result in severe penalties, including termination and various legal consequences.

**C.      Ovodova's Employment with Bullion Exchange**

34.     On or about February 9, 2015, Bullion Exchange hired Defendant Ovodova to work in its shipping department—which is an entry-level position within the company.

35.     On October 28, 2015, Ovodova signed Bullion Exchange's Employee Handbook.

36.     Pursuant to Section 6.2 of the Employee Handbook, Ovodova acknowledged and agreed that: "[n]o previous or current employee may disclose or give access to confidential Company information, in any way or at any time, unless otherwise authorized by Management."

37.     On or about October 28, 2015, Ovodova also executed an acknowledgement of Bullion Exchange's Employee Theft Policy, wherein Ovodova recognized that Bullion Exchange will not tolerate monetary or property theft of any type, including the unauthorized use of Bullion Exchange's services, facilities, products, or company materials—none of which can be removed from Bullion Exchange's offices without the company's consent.

**D.  Ovodova Helped Build Bullion Exchange's Customer Lists**

38.     Over the next several years, Ovodova took an interest in graphic design and marketing.  To encourage her growth as an employee, Bullion Exchange moved her from the shipping department to its marketing department.

39.     On or about January 9, 2017, Ovodova was promoted to the position of Head of Graphic Design for Bullion Exchange, which is a mid-level position within the marketing department.

40.     On or about December 29, 2018, Bullion Exchange promoted Ovodova to the position of Director of Marketing.  As Bullion Exchange's Director of Marketing, Ovodova was a trusted employee that required access to Bullion Exchange's customer lists, market research, sales data, vendor contracts, and other sensitive and confidential trade secrets to perform the essential functions of her job.

41.     At all relevant times, Ovodova understood that Bullion Exchange's customer lists were valuable trade secrets.

**E.  Bullion Shark and Ovodova Formed an Inappropriate Business Relationship While Ovodova Was Employed as Director of Marketing for Bullion Exchange**

42.     In August 2023, Bullion Shark suffered a significant loss when, upon information and belief, four of its employees misappropriated Bullion Shark's customer lists and other trade secrets which they are allegedly using to operate a competing business, Flip A Coin Bullion LLC.

43.     To mitigate the loss Bullion Shark incurred, Bullion Shark conducted a search in August 2023 for new employees that could immediately boost sales and drive traffic to its websites and online marketplaces.

44.     Upon information and belief, on or about August 23, 2023, Ovodova met with Nicholas Adamo, the founder of Bullion Shark, and other Bullion Shark executives to discuss Ovodova's prospective employment as Head of eCommerce for Bullion Shark.

45.     Upon information and belief, as Head of eCommerce for Bullion Shark, Ovodova would provide Bullion Shark with substantially the same services that she was providing to Bullion Exchange as Director of Marketing.

46.     During Bullion Shark's August 23, 2023 meeting with Ovodova, Bullion Shark asked Ovodova to prepare a marketing strategy that would help drive customer traffic to Bullion Shark.

47.     At the time Bullion Shark made this request of Ovodova, it knew or should have known that Ovodova was still employed as Director of Marketing for Bullion Exchange.

48.     On August 23, 2023, Ovodova agreed to prepare a marketing strategy for Bullion Shark.

49.     On or about August 24, 2023, Ovodova accessed the Google Drive account provided to her by Bullion Exchange to make a copy of Bullion Exchange's marketing strategy.

50.     Between August 24 and 25, 2023, Ovodova used Bullion Exchange's marketing strategy as a template to create a marketing strategy for Bullion Shark (the "Proprietary Marketing Strategy").

51.     The Proprietary Marketing Strategy is essentially the same as the Bullion Exchange Marketing strategy, with Ovodova simply changing the name "Bullion Exchange" in the document

to "Bullion Shark", while leaving Bullion Exchange's trade secrets and proprietary information unchanged.

52.     For sections of the Proprietary Marketing Strategy that relate to specific products sold by Bullion Exchange, Ovodova used Bullion Exchange's search engine optimization tools to create and optimize proposed links to Bullion Shark's products.  Ovodova inserted the links she prepared for Bullion Shark into the Proprietary Marketing Strategy in place of links to Bullion Exchange's products.

53.     Bullion Shark and Ovodova knew or should have known that Ovodova had no right or authority to use Bullion Exchange's information and facilities to create the Proprietary Marketing Strategy.

54.     Nevertheless, Bullion Shark actively encouraged Ovodova to create the Proprietary Marketing Strategy.

55.     Upon information and belief, Ovodova provided the Proprietary Marketing Strategy to Bullion Shark in late August 2023.

56.     Upon information and belief, in late August 2023, Bullion Shark offered Ovodova the position of Head of eCommerce, which she accepted.

57.     As the current Head of eCommerce for Bullion Shark, Ovodova is now helping Bullion Shark implement the Proprietary Marketing Strategy.

**F.     Ovodova Steals Bullion Exchange's Customer Lists For Bullion Shark**

58.     Upon information and belief, Bullion Shark encouraged Ovodova to misappropriate Bullion Exchange's customer lists before she gave Bullion Exchange notice of her resignation.

59.     To further aid Bullion Shark and to benefit herself, on September 6, 2023, Ovodova made unauthorized copies of Bullion Exchange's customer lists using her workstation in Bullion Exchange's New York City office.

60.     In particular, on September 6, 2023, Ovodova exported Bullion Exchange's two largest customer lists from Bullion Exchange's Constant Contact account to .csv files that can be opened using Microsoft Excel,  Google Sheets, and other compatible software.

61.     Ovodova saved these two (2) .csv files to the desktop of her Bullion Exchange workstation.

62.     Ovodova then attached those two (2) .csv files to an email she created using her Bullion Exchange email account (katia@bullionexchanges.com).

63.     At 3:55pm on September 6, 2023, Ovodova sent an email with the two .csv files containing Bullion Exchange's client lists to her personal email account (eovodova@gmail.com).

64.     Immediately after sending the email with Bullion Exchange's customer lists attached, Ovodova attempted to permanently delete her sent emails from her Bullion Exchange account.

65.     The client lists that Ovodova downloaded and emailed to herself contain the contact information for more than 384,000 customers that transacted business with Bullion Exchange over the past twelve (12) years.

66.     These verified customers are prized targets for any of Bullion Exchange's competitors, including Bullion Shark.

67.     Bullion Exchange invested years of time and millions of dollars in marketing and advertising to compile its customer lists.

68.     Bullion Exchange's customer lists cannot be reversed engineered, nor can customer lists be recreated through any publicly available source.

69.     In her position as Director of Marketing for Bullion Exchange, Ovodova had permission to use Bullion Exchange's Customer Lists for Bullion Exchange's benefit, but she did not have permission to send copies of these customer lists to her personal email account or otherwise remove these customer lists from Bullion Exchange's secure network.

70.     There is no justifiable reason for Ovodova to email herself copies of our client lists ever, let alone the day before she gave Bullion Exchange notice of her resignation.

**E.  Ovodova Resigns From Bullion Exchange**

71.     On or about September 7, 2023, Ovodova informed Bullion Exchange that she would be resigning from her position as Director of Marketing for Bullion Exchange, effective September 15, 2023.

72.     On September 7, 2023, Ovodova told Bullion Exchange she would be taking a marketing position with a company outside of the rare coin, bullion, and precious metals industry.

73.     Ovodova's resignation as Director of Marketing for Bullion Exchange became effective on September 15, 2023.

**F.     Bullion Exchange Discovers that Ovodova is Working in Bullion Shark's Marketing Department**

74.     In October 2023, Bullion Exchange discovered that Ovodova had updated her LinkedIn profile to reflect her new employment as Head of eCommerce for Bullion Shark, one of Bullion Exchange's competitors.  Based on Ovodova's social media post, it was apparent that Ovodova had lied to Bullion Exchange about her new employer in September 2023.

75.     This discovery prompted Bullion Exchange to conduct an investigation to determine whether Ovodova had taken any material containing trade secrets and other confidential information from Bullion Exchange before her departure from Bullion Exchange.

76.     This investigation led to Bullion Exchange's discovery of Ovodova's misconduct.

77.     In particular, Ovodova attempted to delete all of the contents from the Google Drive account provided to her by Bullion Exchange and the emails that she sent in August and September 2023.

**G.     Bullion Exchange Has Been Irreparably Harmed by the Defendants' Actions**

78.     As the current Head of eCommerce for Bullion Shark, Ovodova is now using Bullion Exchange's customer lists and marketing strategy to divert Bullion Exchange's customers to Bullion Shark and deprive Bullion Exchange of these business opportunities.

79.     In addition to using Bullion Exchange's customer lists to market Bullion Shark's products to Bullion Shark's customers, Bullion Exchange's customer lists have independent value to other competitors in the rare coin, bullion, and precious metals industry.

80.     Bullion Shark and/or Ovodova could easily sell Bullion Exchange's customer lists to other competitors of Bullion Exchange—if they have not done so already.  Should this occur, it would be extremely difficult for Bullion Exchange to discover this misconduct and prevent further harm and economic loss.

81.     Defendants' conduct has caused and continues to cause Bullion Exchange irreparable harm.   Bullion Exchange will continue to be irreparably harmed until the Defendants are enjoined from using, disseminating, and benefiting from Bullion Exchange's customer lists and other trade secrets to gain an unfair advantage over Bullion Exchange and profit at Bullion Exchange's expense.

## COUNT I

### Misappropriation of Trade Secrets Under The DTSA

### 18 U.S.C. § 1836 *et seq.*

### (Against Both Defendants).

82.     Bullion Exchange realleges and incorporates all preceding paragraphs of this Complaint as if set forth at length herein.

83.     Bullion Exchange and Bullion Shark both use websites they own and other online sales platforms, including eBay, to buy, sell, and trade rare coins, bullion, precious metals, bills, and trading cards to customers throughout the United States

84.      Bullion Exchange and Bullion Shark are direct business competitors.

85.     Bullion Exchange is the owner of trade secrets as that term is defined by 18 U.S.C. § 1839(3).

86.     These trade secrets include Bullion Exchange's customer lists, marketing strategies and materials, special vendor contract terms, and other confidential business information.

87.     These trade secrets are used in connection with Bullion Exchange's online business selling rare coins, bullion, and precious metals to customers throughout the United States.

88.     The trade secrets derive independent economic value from not being generally known or readily ascertainable to Bullion Exchange's competitors.

89.     Bullion Exchange takes reasonable measures to protect the secrecy of these trade secrets.  In particular, Bullion Exchange implemented advanced digital security protocols to limit and control employee access to trade secrets.  Working in conjunction with these security software

solutions is a secure hardware infrastructure that was built for Bullion Exchange to prevent bad actors from penetrating its networks.

90.    Bullion Exchange also limits employee access to trade secrets to those employees that require such access to perform the essential functions of their jobs.   Bullion Exchange employees that do not have permission to access certain data (including trade secrets) cannot open files or drives on the server that contain trade secrets and other confidential information.

91.    Bullion Exchange also limits employees' remote access to its secure network to a virtual desktop environment that can be monitored by the Bullion Exchange at all times.   This virtual desktop environment allows employees to remotely access their desktops at work but prohibits employees from downloading documents and data to their personal computers outside of Bullion Exchange's secure network.

92.    Bullion Exchange also has policies in place to protect its trade secrets from employee misconduct.   In particular, Bullion Exchange requires that its employees sign an employee handbook and theft policy that warns employees of the severe consequences that may result from the misuse or theft of Bullion Exchange's property.

93.    As Director of Marketing for Bullion Exchange, Ovodova was provided with access to Bullion Exchange's customer lists, marketing research, marketing strategies and other sensitive data which she needed to perform the essential functions of her job.

94.    Bullion Exchange's customer lists, marketing research, marketing strategies and other sensitive financial information are trade secrets as that term is defined in 18 U.S.C. § 1839(3).

95.    Upon information and belief, prior to August 23, 2023, Ovodova met with Bullion Shark's management to discuss an open position to work as Head of eCommerce for Bullion Shark.

96.     Upon information and belief, before Bullion Shark would extend this offer to Ovodova, Bullion Shark asked her during the August 23, 2023 meeting to prepare a marketing strategy that Bullion Shark could use to increase sales and improve its market position.

97.     Although Ovodova was still employed as Director of Marketing for Bullion Exchange, she agreed to prepare the Proprietary Marketing Strategy for Bullion Shark.

98.     Between August 24 and 25, 2023, Ovodova used Bullion Exchange's marketing strategy as a template to create the Proprietary Marketing Strategy.      In particular, she made a copy of Bullion Exchange's marketing strategy on the Google Drive provided to Ovodova by Bullion Exchange.  Ovodova then replaced "Bullion Exchange" with "Bullion Shark" or "Shark" throughout the document, leaving Bullion Exchange's market research and data points unchanged.

99.     Where Bullion Exchange's marketing strategy includes optimized links to Bullion Exchange's products, Ovodova used Bullion Exchange's search engine optimization tools to create optimized links to Bullion Shark's products.  Ovodova inserted the optimized links for Bullion Shark's products into the Proprietary Marketing Strategy in place of the links to Bullion Exchange's products.

100.    Upon information and belief, in late August 2023, Ovodova gave the Proprietary Marketing Strategy to Bullion Shark.   In turn, Bullion Shark offered Ovodova the position as its Head of eCommerce, along with a substantial salary increase.

101.    Upon information and belief, in late August or early September 2023, Bullion Shark also encouraged Ovodova to make copies of Bullion Exchange's customer lists before she gave notice of her resignation.

102.    On September 6, 2023, Ovodova downloaded Bullion Exchange's customer lists to her workstation in Bullion Exchange's office.   Ovodova then used her company email account to

send Bullion Exchange's customer lists to her personal email account without Bullion Exchange's knowledge or consent.

103.   After emailing Bullion Exchange's customer lists to her personal email account, Ovodova immediately attempted to permanently delete all sent emails from her sent email folder for August and September 2023.  This was clearly an attempt by Ovodova to conceal her misappropriation of Bullion Exchange's customer lists.

104.   Ovodova's actions on September 6, 2023, were a clear violation of Bullion Exchange's policies and a breach of its trust.

105.   On September 7, 2023, Ovodova gave Bullion Exchange notice of her resignation, which became effective on September 15, 2023.  At the time she gave her notice of resignation, Ovodova falsely informed Bullion Exchange that she would be taking a marketing position outside of Bullion Exchange's industry.

106.   At all relevant times, Bullion Shark and Ovodova knew or should have known that the Bullion Exchange's marketing strategy and customer lists where valuable trade secrets.

107.   Upon information and belief, Ovodova, as Head of eCommerce for Bullion Shark, is now using the Proprietary Marketing Strategy and Bullion Exchange's customer lists to drive business to Bullion Shark and improve Bullion Shark's brand recognition and market share.

108.   Bullion Shark and Ovodova are both benefiting from their misappropriation of Bullion Exchange's trade secrets.

109.   As a direct and proximate result of the Defendants' misappropriation of Bullion Exchange's trade secrets, Bullion Exchange has been irreparably harmed and will continue to be irreparably harmed unless injunctive relief is granted in Bullion Exchange's favor.

110.    Under the DTSA, Bullion Exchange is entitled to a judgment: (i) enjoining Defendants from any actual or threatened misappropriation of Bullion Exchange's trade secrets and prohibiting Defendant's unauthorized use and/or disclosure of Bullion Exchange's trade secrets pursuant to 18 U.S.C. § 1836(b)(3)(A); (ii) directing Defendants to immediately return all trade secrets Defendants' misappropriated from Bullion Exchange and destroy any remaining copies, notes or derivatives created from those trade secrets pursuant to 18 U.S.C. § 1836(b)(2)(A); (iii) awarding Bullion Exchange compensatory damages for actual losses and unjust enrichment caused by Defendants' misappropriation of Bullion Exchange's trade secrets pursuant to 18 U.S.C. § 1836(b)(3)(B); (iv) awarding Bullion Exchanges exemplary damages against Defendants equal to two (2) times the amount of compensatory damages awarded for Defendants' willful and malicious misappropriation of Bullion Exchange's trade secrets pursuant to 18 U.S.C. § 1836(b)(3)(C); (v) award Bullion Exchange interest, including pre-judgment interest; and (vi) awarding Bullion Exchange reasonable attorneys' fees and costs pursuant to 18 U.S.C. § 1836(b)(2)(A).

## COUNT II

**Misappropriation of Trade Secrets Under New York Common Law**

**(Against Both Defendants)**

111.    Bullion Exchange realleges and incorporates all preceding paragraphs of this Complaint as if set forth at length herein.

112.    Under New York common law, Bullion Exchange invested considerable time, effort, and money to create extensive customer lists, market research and other marketing materials that are not known to the general public and cannot be recreated using generally available public information—each of which qualifies as a trade secret under New York law.

113.   Bullion Exchange's trade secrets derive independent economic value from not being generally known or readily ascertainable by proper means by others who could obtain value from the use or disclosure of this information.

114.   Defendants have misappropriated trade secrets owned by Bullion Exchange, including customer lists, marketing research, and other confidential business information and trade secrets.

115.   As a direct result, Bullion Exchange has been damaged and suffered irreparable harm under New York common law.

116.   Bullion Exchange is entitled to injunctive relief, damages (including exemplary damages), an award for attorneys' fees, and interest (including pre-judgement interest) against Defendants.

## COUNT III

### Unfair Competition Under New York Common Law

### (Against Both Defendants)

117.   Bullion Exchange realleges and incorporates all preceding paragraphs of this Complaint as if set forth at length herein.

118.   Defendants improperly acquired and used Bullion Exchange's trade secrets to gain an unfair competitive advantage over Bullion Exchange.

119.   In particular, Ovodova used her position as Bullion Exchange's Director of Marketing to make unauthorized copies of Bullion Exchange's Proprietary Marketing Strategy and customer lists, which she provided to Bullion Shark.

120.   Ovodova then attempted to delete computer records and files to conceal her misconduct before she informed Bullion Exchange that she would be resigning.

121.    When she gave notice of her resignation to Bullion Exchange, Ovodova falsely informed Bullion Exchange that she would be taking a marketing position with a company outside of Bullion Exchange's industry.  This was a further attempt by Ovodova to conceal Bullion Shark's misconduct as well as her own misconduct.

122.    Defendants have engaged in unfair competition under New York common law through their misappropriation of Bullion Exchange's trade secrets and confidential information.

123.    Defendants are using Bullion Exchange's confidential information and trade secrets to market Bullion Shark's products and services to Bullion Exchange's customers.

124.    As a direct and proximate result of Defendants' unlawful conduct, Bullion Exchange has lost customers and business opportunities.

125.    Bullion Exchange is entitled to injunction relief and damages against Defendants for its losses.

## COUNT IV

**Breach of Fiduciary Duty—Faithless Servant Doctrine**

**(Against Defendant Ovodova)**

126.    Bullion Exchange realleges and incorporates all preceding paragraphs of this Complaint as if set forth at length herein.

127.    Bullion Exchange trusted Ovodova and promoted her to the position of Director of Marketing in 2018, which is an upper-level management position within the company.

128.    As Director of Marketing for Bullion Exchange, Ovodova had access to Bullion Exchange's customer lists and other trade secrets that were necessary for Ovodova to perform the essential duties of her employment.

129.    Ovodova owed Bullion Exchange a fiduciary duty and duty of loyalty to protect its trade secrets and confidential information.

130.    Ovodova knew or should have known that Bullion Exchange's client lists took years to compile and would have substantial value to Bullion Exchange's competitors.

131.    Ovodova knew or should have known that Bullion Exchange's customer lists were among its most valuable assets.

132.    Ovodova's breach of her fiduciary duties by, among other things, making unauthorized copies of Bullion Exchange's trade secrets and giving them to Bullion Shark.

133.    In particular, Ovodova breached her fiduciary duty to Bullion Exchange by making an unauthorized copy of its marketing strategy in August 2023 to create a marketing strategy for Bullion Shark while she was still employed as Director of Marketing for Bullion Exchange.

134.    Ovodova also breached her fiduciary duty to Bullion Exchange when she made unauthorized copies of Bullion Exchange's customer lists on September 6, 2023, that she transmitted to her personal email account using her company email account.

135.    Ovodova knew or should have known that Bullion Exchange's market research and reports were trade secrets.

136.    Ovodova breached her duty of loyalty to Bullion Exchange by: (a) using its resources, trade secrets and proprietary market research to create a marketing strategy for Bullion Shark; and (b) by stealing Bullion Exchange's customer lists.

137.    Bullion Exchange is entitled to injunctive relief against Ovodova, compensatory damages in an amount to be determined, and to the disgorgement of salary and benefits paid to Ovodova during the time she was a faithless servant to Bullion Exchange.

## COUNT V

### Aiding and Abetting Breach of Fiduciary Duty

### (Against Defendant Bullion Shark)

138.    Bullion Exchange realleges and incorporates all preceding paragraphs of this Complaint as if set forth at length herein.

139.    As Bullion Exchange's head of marketing, Ovodova held a position of trust and had access to Bullion Exchange's customer lists, which she knew or should have known were valuable trade secrets.

140.    As Bullion Exchange's head of marketing, Ovodova owed Bullion Exchange a fiduciary duty to protect Bullion Exchange's trade secrets from disclosure to competitors.

141.    Bullion Shark also knew that Ovodova owed a fiduciary duty and duty of loyalty to Bullion Exchange and that she had access to Bullion Exchange's customer lists.

142.    Bullion Shark provided substantial assistance to Ovodova by encouraging her to make unauthorized copies of Bullion Exchange's customer lists and to provide those lists to Bullion Shark.  In fact, on August 23, 2023, Bullion Shark asked Ovodova to prepare a marketing strategy for Bullion Shark before it would offer her the position as its Head of eCommerce.

143.    Upon information and belief, to induce Ovodova to prepare this marketing strategy while she was still employed as Bullion Exchange's Director of Marketing, Bullion Shark promised Ovodova a substantial increase in salary from the salary was receiving from Bullion Exchange.

144.    Although Bullion Shark and Ovodova both knew or should have known Ovodova owed Bullion Exchange a fiduciary duty and duty of loyalty to act in its best interest at all times,

Ovodova used Bullion Exchange's marketing strategy as the template used to create the Proprietary Marketing Strategy that she gave to Bullion Shark.

145.    Upon information and belief, Bullion Shark also encouraged Ovodova to misappropriate Bullion Exchange's customer lists before she gave Bullion Exchange notice of her resignation.

146.    As Bullion Shark's Head of eCommerce, Ovodova is now using the Proprietary Marketing Strategy that she created while still employed as the Director of Marketing for Bullion Exchange along with the customer lists that she misappropriated from Bullion Exchange to drive Bullion Exchange's customers to Bullion Shark.

147.    Defendant Bullion Shark knowingly induced, participated in, or enabled Ovodova's breach of her fiduciary duties to Bullion Exchange by acquiring Bullion Exchange's trade secrets and confidential information from Ovodova and encouraging Ovodova to work for Bullion Shark while she was employed as Director of Marketing for Bullion Exchange.

148.    As a direct result of Bullion Shark and Ovodova's actions, Bullion Exchange has suffered damages and has been irreparably harmed.  Bullion Shark is, therefore, liable for aiding and abetting Ovodova's breach of fiduciary duty.

## COUNT VI

### Unjust Enrichment

### (Against Both Defendants)

149.    Bullion Exchange realleges and incorporates all preceding paragraphs of this Complaint as if set forth at length herein.

150.    By misappropriating Bullion Exchange's trade secrets and confidential information, Defendants have unjustly enriched themselves at Bullion Exchange's expense.

151.    Defendants have used Bullion Exchange's trade secrets to gain unfair business advantages and receive financial benefits without giving compensation to Bullion Exchange.

152.    Defendants' enrichment at the expense of Bullion Exchange is unjust and inequitable.

153.    Bullion Exchange is entitled to restitution and disgorgement of all profits and benefits Defendants have unjustly obtained through use of Bullion Exchange's trade secrets and confidential information.

## RESERVATION OF RIGHTS

154.    Bullion Exchange hereby specifically reserves the right to bring any and all other causes of action that it may maintain against any and all of the named Defendants and any other parties, including, without limitation, causes arising out of the same transaction(s) set forth herein, to the extent discovery in this action or further investigation reveals such further causes of action.

## DEMAND FOR A JURY TRIAL

155.    Bullion Exchange hereby demands a trial by jury in this proceeding on all counts so triable.

**WHEREFORE**, Bullion Exchange LLC prays for judgment granting the relief set forth below against Defendants Bullion Shark, LLC, and Ekaterina Ovodova:

a.    With respect to Bullion Exchange's First Count, as a result of the Defendants Ovodova and Bullion Shark's misappropriation of trade secrets in violation of the Defense of Trade Secrets Act of 2016 (18 U.S.C. § 1836 et seq.), Bullion Exchange is entitled to a judgment: (i) permanently enjoining Defendants from any actual or threatened misappropriation of Bullion Exchange's trade secrets and prohibiting Defendant's unauthorized use and/or disclosure of Bullion Exchange's trade secrets pursuant to 18 U.S.C. § 1836(b)(3)(A); (ii) permanently enjoining the Defendants from using, disseminating, or otherwise benefitting from the trade secrets they misappropriated from Bullion Exchange; (iii) directing Defendants to immediately return all trade secrets Defendants' misappropriated from Bullion Exchange and destroy any remaining copies, notes or derivatives created from those trade secrets pursuant to 18 U.S.C. §

1836(b)(2)(A); (iv) awarding Bullion Exchange compensatory damages for actual losses and unjust enrichment caused by Defendants' misappropriation of Bullion Exchange's trade secrets pursuant to 18 U.S.C. § 1836(b)(3)(B); (iv) awarding Bullion Exchanges exemplary damages against Defendants equal to two (2) times the amount of compensatory damages awarded for Defendants' willful and malicious misappropriation of Bullion Exchange's trade secrets pursuant to 18 U.S.C. § 1836(b)(3)(C); and (vi) awarding Bullion Exchange reasonable attorneys' fees and costs pursuant to 18 U.S.C. § 1836(b)(2)(A);

b.   With respect to Bullion Exchange's Second Count, as a result of the Defendants Ovodova and Bullion Shark's misappropriation of trade secrets in violation of New York common law, Bullion Exchange is entitled to a judgment: (i) enjoining Defendants from any actual or threatened misappropriation of Bullion Exchange's trade secrets and prohibiting Defendant's unauthorized use and/or disclosure of Bullion Exchange's trade secrets; (ii) directing Defendants to immediately return all trade secrets Defendants' misappropriated from Bullion Exchange and destroy any remaining copies, notes or derivatives created from those trade secrets; (iii) awarding Bullion Exchange compensatory damages in an amount to be determined at trial, but not less than $20,000,000.00.00; and (iv) awarding Bullion Exchange punitive damages in an amount to be determined at trial;

c.   With respect to Bullion Exchange's Third Count, as a result of the Defendants' unfair competition, Bullion Exchange is entitled to a judgment: (i) permanently enjoining the Defendants Bullion Shark and Ovodova from continuing to possess, access, use, market and sell Bullion Exchange's trade secrets, including Bullion Exchange's customer lists and marketing strategy; (ii) directing Defendants Bullion Shark to return Bullion Exchange's customer lists and other trade secrets and destroy all copies of Bullion Exchange's customer lists and other trade secrets; (iii) awarding Bullion Exchange compensatory damages in an amount to be determined at trial, but in no case less than $20,000,000.00; (iv) disgorging all profits earned by Defendant Bullion Shark from its unauthorized use of Bullion Exchange's customer lists and other trade secrets; (v) awarding punitive damages to Bullion Exchange in an amount to be determined at trial; and (vi) awarding Bullion Exchange attorneys' fees and costs;

d.   With respect to Bullion Exchange's Fourth Count, as a result of Defendant Ovodova's wrongful, willful, and malicious breach of her fiduciary duty and duty of loyalty, Bullion Exchange is entitled to: (i) damages in an amount to be determined at trial, but not less than $20,000,000.00.00; (ii) disgorgement of all salary, bonuses, benefits and compensation paid to Defendant Ovodova by Bullion Exchange for the period during which Ovodova was a faithless servant; and (iii) punitive damages in an amount to be determined at trial;

e.   With respect to Bullion Exchange's Fifth Count, as a result of the Defendants'

Bullion Shark's efforts to aid and abet Defendant Ovodova's breach of her fiduciary duty and duty of loyalty to Bullion Exchange, Bullion Exchange is entitled to a judgment: (i) permanently enjoining the Defendants Bullion Shark from continuing to possess, access, use, market and sell Bullion Exchange's trade secrets, including Bullion Exchange's client lists; (ii) directing that Defendant Bullion Shark return the client lists to Bullion Exchange and destroy all copies of Bullion Exchange's client lists; (iii) granting Bullion Exchange compensatory damages against Defendant Bullion Shark in an amount to be determined at trial, but in no case less than $20,000,000.00, and (iv) granting Bullion Exchange an award for punitive damages in an amount to be determined at trial;

f.   With respect to Bullion Exchange's Sixth Cause of Action, as a result of the Defendants' unjust enrichment at Bullion Exchange's expense, Bullion Exchange is entitled to judgment: (i) awarding Bullion Exchange restitution from the Defendants, (ii) disgorging all profits and benefits Defendants have unjustly obtained through use of Bullion Exchange's trade secrets and confidential information; and (iii) imposing a constructive trust on all benefits the Defendants improperly received from the use of Bullion Exchange's trade secrets;

g.   Awarding Bullion Exchange's reasonable attorneys' fees and costs;

h.   for interest on any damages awarded, including pre-judgment interest; and

i.   for such other and further relief as this Court deems just and proper.

Dated: Uniondale, New York
       January 22, 2024

                **TURMAN LEGAL SOLUTIONS PLLC**
                *Counsel for Plaintiff Bullion Exchange LLC*

            By: *Stephen Turman*
                Stephen E. Turman
                626 RXR Plaza, 6th Floor
                Uniondale, New York 11556
                (516) 266-6101
                sturman@turmanlegal.com