UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| BULLION EXCHANGE LLC,<br><br>         Plaintiff,<br><br>    v.<br><br>BULLION SHARK, LLC, and EKATERINA OVODOVA,<br><br>         Defendants. | Case No. 24-CV-00467 (DG)<br><br>**DECLARATION OF ERNEST GOZENPUT IN SUPPORT OF PLAINTIFF'S MOTION FOR A TEMPORARY RESTRAINING ORDER, PRELIMINARY INJUNCTION AND PERMANENT INJUNCTION** |

ERNEST GOZENPUT[1] declares, pursuant to 28 U.S.C. § 1746, that the following is true and correct:

1.   I am a member and the Chief Executive Officer of Plaintiff, Bullion Exchange LLC ("Bullion Exchange" or "Plaintiff"). I have personal knowledge of the facts set forth herein based on my personal knowledge and review of Bullion Exchange's records, which are maintained in the ordinary course of business.

2.   I respectfully submit this Declaration in support of Bullion Exchange's motion, brought by order to show cause, for a temporary restraining order and preliminary injunction against Defendants Bullion Shark, LLC ("Bullion Shark") and Ekaterina Ovodova ("Ovodova") (Bullion Shark and Ovodova shall be referred to collectively as the "Defendants"). Bullion Exchange respectfully requests that an order be entered temporarily restraining and preliminarily enjoining the Defendants from using, disseminating, and benefitting from trade secrets and confidential information that they misappropriated from Bullion Exchange. The Defendants'

---

[1] Although my legal name is Ernest Gazenput, I am referred to professionally and by friends and family as Eric.

misappropriation of Bullion Exchange's trade secrets will continue to cause irreparable harm to Bullion Exchange if this relief is not granted.

### A. Bullion Exchange's Background

3. Bullion Exchange is a limited liability company formed under the laws of the state of Delaware on November 6, 2012, and was registered as a foreign limited liability company authorized to transact business in the state of New York on December 14, 2012. Since its formation, Bullion Exchange has maintained offices in New York City's Diamond District. Over the past twelve (12) years, Bullion Exchange has grown to become one of the largest online retail dealers of rare coins, gold, silver, platinum, and palladium in a variety of forms, including bars, coins, and jewelry. Bullion Exchange transacts business with customers throughout the United Sates and world using a number of different websites that it owns and operates.

4. In January 2013, Bullion Exchange opened a virtual storefront on eBay under the name "bullion.exchanges". Bullion Exchange's eBay store has grown to become one of the largest sellers of precious metals, bullion, and rare coins on eBay. As of October 31, 2023, Bullion Exchange has sold more than 1,000,000 items on eBay and has over 34,000 followers.

### B. Bullion Shark's Background

5. Bullion Shark is a limited liability company formed under the laws of the state of New York on May 12, 2014. Upon information and belief, Bullion Shark has an office located in Westbury, Long Island. Bullion Shark competes against Bullion Exchange for sales of rare coins, bullion, and precious metals in the online space. Bullion Shark sells rare coins, bullion, bills, precious metals and trading cards to customers throughout the United States.

6. On February 10, 2014, Bullion Shark opened a competing eBay store under the name "bullionsharkllc". As of October 31, 2023, bullionsharkllc has sold approximately 98,000 items on eBay and has approximately 3,900 followers.

7. Although Bullion Shark has been in competition with Bullion Exchange for almost ten (10) years, it has only been able to generate ten (10%) percent of Bullion Exchange's sales. Moreover, unlike Bullion Exchange, Bullion Shark does not keep a large inventory of rare coins, bullion and precious metals. Instead, it sells these goods on consignment and through drop shipping from third-party suppliers. In short, Bullion Shark has a much smaller market share than Bullion Exchange, and its assets have limited value.

C. **The High Cost of Converting Customers**

8. To attract potential customers, all online retailers in our industry invest considerable time, money and resources in expensive online marketing campaigns that are necessary to attract new potential customers, make sales and grow our respective client lists.

9. For example, most online retailers use Google Ads and similar platforms to drive traffic to their websites and other online sales platforms like eBay, Amazon Marketplace, Walmart etc. Google Ads and other similar platforms offer pay-per-click, targeted cost-per-action, and other marketing campaign options that companies like Bullion Exchange and Bullion Shark use to drive traffic to our websites and other online sales platforms. Unfortunately, these services are expensive, time-consuming and produce inconsistent results. On average, the cost for each newly converted customer can vary considerably by industry, but we estimate our cost for conversions rates vary between $25.00 to $60.00 to per customer for the rare coin, bullion, and precious metals industry.

10. Since its formation, Bullion Exchange has kept detailed records of its customers' contact information, transaction history, and other data that can be used exclusively by Bullion Exchange for sales and marketing purposes. Between 2012 and September 6, 2023, Bullion Exchange's customer lists had the complete contact information and transaction history for more than 384,000 customers. The marketing costs incurred by Bullion Exchange to convert these customers and compile this list easily exceeds $10,000,000.00. Next to its inventory of rare coins, bullion and precious metals, these customer lists are Bullion Exchange's most valuable assets. Bullion Exchange has never sold any of its customers information to third-parties and has strict measures to protect its customer lists, marketing and sales data, and other confidential information as described below

**D.  Bullion Exchange Made Reasonable Efforts to Protect its Trade Secrets**

11. To protect our customer lists and other trade secrets, Bullion Exchange retained the services of an online security specialist and information technology consultant named Steven Kogan, who is the President of Mr. Fix IT Technologies, Inc. Mr. Kogan helped Bullion Exchange design a data security system and protocols to safeguard its trade secrets, networks, and computer workstations from internal and external attacks. A Declaration from Mr. Kogan, dated November 28, 2023 (the "Kogan Declaration"), is being contemporaneously submitted to the Court.

12. In the Kogan Declaration, Mr. Kogan explains the electronic security measures that Bullion Exchange implemented to protect its trade secrets and discusses how Ovodova misappropriated Bullion Exchange's trade secrets on Bullion Shark's behalf. I have reviewed the Kogan Declaration and can confirm that the statements made by Mr. Kogan in that declaration are true and accurate.

13. Based on Mr. Kogan's advice and guidance, Bullion Exchange's critical data, including, including its trade secrets, are stored on its own secure servers that are accessible only through its internal network. Bullion Exchange's marketing customer lists are, however, stored on secure, encrypted cloud-based platform hosted by Constant Contact, which is used by Bullion Exchange as a customer relationship management system and as a digital marketing platform used to manage and run email marketing campaigns.

14. Bullion Exchange further secures its confidential information and trade secrets by limiting remote access to its data for all employees. Although employees can work remotely when necessary, remote access is limited to a virtual office desktop that can be monitored by the company and they cannot download data from the secured server to a computer outside of Bullion Exchange's office nor can they print documents from Bullion Exchange's secured server to a printer outside of our office.

15. In addition to digital security measures, the only people with permission to access trade secrets, like the customer lists, are Bullion Exchange's owners and certain key trusted employees that require access to these trade secrets to perform the essential functions of their jobs. In this case, Ovodova had access to Bullion Exchange's market research and customer lists because, as its former Director of Marketing, Ovodova required access to this information in order to create marketing campaigns for Bullion Exchange.

16. All of Bullion Exchange's employees are required to sign an Employee Handbook and a separate Theft Policy, whereby they acknowledge their duty to protect Bullion Exchange's confidential information and trade secrets, with the understanding that failure to protect this information may result in severe penalties, including immediate termination.

### E. <u>Ovodova Joins Bullion Exchange</u>

17. On or about February 9, 2015, Bullion Exchange hired Ovodova to work in its shipping department—which is an entry-level position in our company. On October 28, 2015, Ovodova signed Plaintiff's Employee Handbook. (A copy of Ovodova's signed Employee Handbook is annexed as **Exhibit 1**).

18. Pursuant to the Section 6.2 of the Employee Handbook, Ovodova acknowledged and agreed that: "[n]o previous or current employee may disclose or give access to confidential Company information, in any way or at any time, unless otherwise authorized by Management."

19. On or about October 28, 2015, Ovodova also executed an acknowledgement of Plaintiff's Employee Theft Policy, in which Ovodova acknowledged:

> Bullion Exchanges will not tolerate monetary or property theft of any type. We consider property theft to include the unauthorized use of Company services or its facilities, as well as the taking of any products or company materials. No item purchased or supplied by Bullion Exchanges should ever be removed from the Company Premises without the expressed authorization of the managing partners, Eric Gozenput & Ben Tseytlin. Employees that violate this policy will be subject to discipline up to and including possible dismissal and prosecution.

(A copy of the signed Employee Theft Policy is attached hereto as **Exhibit 2**).

20. Although Ovodova was initially hired to work in our shipping department, we discovered that Ovodova was a talented graphic designer and had taken classes in marketing. At her request, we transferred Ovodova to our marketing department.

21. Over the years, Ovodova worked hard in our marketing department. We grew to trust and rely upon her.

22. On or about January 9, 2017, I promoted Ovodova to the position of Head of Graphic Design, which was a mid-level position within the marketing department. This promotion provided Ovodova with an opportunity to demonstrate her talents and leadership ability.

23. On December 29, 2018, I promoted Ovodova to the position of Director of Marketing. As Director of Marketing, Ovodova was responsible for managing our entire marketing team. In this position, she had a staff that reported directly to her. Ovodova, in turn, reported directly to me. Outside of the company's members and officers, Ovodova was one of Bullion Exchange's highest ranking and most trusted employees. Ovodova was also one of the few employees that required full access to Bullion Exchange's customer lists, marketing data and research in order to perform the essential functions of her job.

F. **Ovodova Resigns As Head of Marketing on September 15, 2023**

24. On September 7, 2023, Ovodova informed me she was resigning from Bullion Exchange effective September 15, 2023. When Ovodova approached me on September 7 to inform me of her resignation, I tried to talk her out of leaving our company. She told that, while she appreciated her time with Bullion Exchange, but she taking a marketing position with another company outside of the rare coin, bullion, and precious metals industry that would allow her to work remotely. I specifically asked her where she was going to be working, but she declined to say.

G. **Discovery of Ovodova's Deception**

25. In October 2023, I discovered that Ovodova had updated her LinkedIn profile to show she was employed as Head of eCommerce for Bullion Shark, which is a direct competitor of Bullion Exchange.

26. Clearly, Ovodova had not been truthful with me. Had Ovodova been honest with me about her plans, I would have asked her to immediately pack her personal belongings and leave the office. Her access to Bullion Exchange's data and accounts would have been immediately removed and we would have reviewed her workstation, logs, email account and saved documents to ensure that she had not removed any data that could be used to harm Bullion Exchange. Unfortunately, Ovodova's dishonesty delayed our review of her pre-resignation actions by more than a month.

27. After I learned of Ovodova's employment with Bullion Shark, I called Mr. Kogan to ask for his help with an investigation to determine if Ovodova had engaged in any inappropriate conduct before resigning. A detailed discussion of the sources and data reviewed is set forth in the Kogan Declaration.

28. As a result of this investigation, Mr. Kogan and I discovered that, before Ovodova resigned, she attempted to permanently delete the first page of her sent email records, along with all of the files in the Google Drive account Bullion Exchanged provided for Ovodova's use—all of which is Bullion Exchange's property. Ovodova also deleted her browser history and logs of her online activities records that are used to track her use of her workstation in Bullion Exchange's office.

29. Although Ovodova successfully deleted an unknown amount of data from our system, Mr. Kogan was able to recover some of this deleted data. From the recovered data, we were shocked to discover Ovodova had engaged in a series disloyal and illegal actions for her own personal benefit and for the benefit of Bullion Shark.

### H. While Still Employed by Bullion Exchange, Ovodova Created a Comprehensive Proprietary Marketing Strategy for Bullion Shark

30. Upon information and belief, on or about August 23, 2023, Ovodova had a meeting with Bullion Shark to discuss possible employment of Ovodova as its Head of eCommerce. During that meeting, Bullion Shark asked Ovodova to prepare a marketing strategy for it to use to increase its sales and market share.

31. Mr. Kogan and I recovered a deleted Google Sheets document from Ovodova's company Google Drive that Ovodova created and edited between August 24 and 25, 2023. This document is a marketing strategy Ovodova created for Bullion Shark (the "Proprietary Proprietary Marketing Strategy"), but this document is really nothing more than a copy of Bullion Exchange's marketing strategy, with Ovodova merely changing the name "Bullion Exchange" to "Bullion Shark" or "Sharks". Ovodova left Bullion Exchange's proprietary information and data unchanged. For sections of the strategy that relate to specific products sold, Ovodova tweaked the Proprietary Marketing Strategy to include links to Bullion Shark's products that Ovodova optimized using Bullion Exchange's search engine optimization tools. (A copy of select excerpts from the Proprietary Marketing Strategy created by Ovodova is annexed as **Exhibit 3**).[2]

32. Based on this evidence, it is apparent Ovodova had formed an inappropriate business relationship with Bullion Shark weeks before she gave Bullion Exchange notice of her resignation.

33. Upon information and belief, in late August 2023, Bullion Shark offered Ovodova a position as its Head of eCommerce. Ovodova accepted this offer.

---

[2] The selected excerpts from the Bullion Exchange Proprietary Marketing Strategy are intended to reflect the types of changes Ovodova made to Bullion Exchange's marketing strategy without disclosing confidential information and trade secrets.

I. **Ovodova Steals Bullion Exchange's Customer Lists for Bullion Shark's Benefit**

34. In addition to recovering the Proprietary Marketing Strategy, we also discovered that, on September 6, 2023 (*one day before she gave me notice of her resignation!*), Ovodova exported our customer lists from Bullion Exchange's Constant Contact account to .csv files that can be opened using Microsoft Excel, Google Sheets, and other software. Ovodova saved the customer lists to the desktop on her Bullion Exchange workstation, before attaching these files to an email that she sent from her Bullion Exchange email account (katia@bullionexchanges.com) to her personal email account (eovodova@gmail.com). (A copy of the email Ovodova sent to herself on September 6, 2023, with the client lists attached is annexed hereto as **Exhibit 4**).

35. The customer lists that Ovodova downloaded and emailed to herself contain the contact information for 384,085 of Bullion Exchange's verified customers—all of whom have a history of successful transactions with Bullion Exchange. These verified customers would be prized targets for any of Bullion Exchange's competitors, including Bullion Shark. In some case, she even neglected to change the name from Bullion Exchange to Bullion Shark. Bullion Exchange invested many years and millions of dollars in marketing, advertising, and time spent earning customers' trust to compile its customer lists. Our customer lists cannot be reversed engineered, nor can customer lists with our verified customers be found through any publicly available source.

36. In her position as Director of Marketing, Ovodova had permission to use Bullion Exchange's Customer Lists for Bullion Exchange's benefit. She did *not* have permission to send a copy of these lists to her personal email account. There is no justifiable reason for Ovodova to email herself copies of our client lists ever, let alone the day before she gave me notice of her resignation.

37. Our customer lists and marketing strategy also have independent value to any other competitor in the rare coin, bullion, and precious metals industry. Bullion Shark and/or Ovodova could easily sell our customer lists to other competitors. ***Should this occur, it would be extremely difficult for Bullion Exchange to discover this misconduct and prevent further irreparable harm and economic loss.***

## EMERGENCY RELIEF REQUESTED

38. Unless a temporary restraining order and preliminary injunction are granted preventing Bullion Shark from using our customer lists, marketing strategy, and other trade secrets to compete unfairly with Bullion Exchange or, worse yet, sell our customer lists to other competitors, Bullion Exchange will be irreparably harmed.

39. It is apparent Bullion Shark caused, encouraged, and induced Ovodova to repurpose Bullion Exchange's proven, successful marketing strategy in August 2023, while Ovodova was still working as Director of Marketing for Bullion Exchange. Ovodova was not working late at night in August on a marketing strategy for Bullion Shark without expecting to receive some consideration for her effort. It is also no coincidence that Ovodova misappropriated Bullion Exchange's customer lists the day before she gave notice of her resignation. This action was clearly intended to benefit Bullion Shark and Ovodova personally at Bullion Exchange's expense.

40. Granting the relief requested in Bullion Exchange's motion will help mitigate the harm caused by the Bullion Shark and Ovodova's misappropriation of Bullion Exchange's trade secrets. Neither Bullion Shark nor Ovodova have a right to use, disseminate or benefit from Bullion Exchange's trade secrets. Injunctive relief preventing their continued use, dissemination and benefit of Bullion Exchange's trade secrets will cause them no harm because it would only require them to stop using information, they are not legally entitled to possess in the first place.

**WHEREFORE**, I respectfully request that the Court grant Plaintiff's motion for a temporary restraining order and preliminary injunction.

I declare under penalty of perjury that all of the forgoing is true and correct.

Dated: January 18, 2024
   New York, New York

*Ernest Gozenput*
_____
Ernest Gozenput

# Declaration of Eric Gozenput (011824)
Final Audit Report 2024-01-18



## "Declaration of Eric Gozenput (011824)" History

- Document created by Stephen Turman (sturman@turmanlegal.com)
  2024-01-18 - 4:54:05 PM GMT

- Document emailed to Ernest Gozenput (eric@bullionexchanges.com) for signature
  2024-01-18 - 4:54:09 PM GMT

- Email viewed by Ernest Gozenput (eric@bullionexchanges.com)
  2024-01-18 - 4:55:48 PM GMT

- Document e-signed by Ernest Gozenput (eric@bullionexchanges.com)
  Signature Date: 2024-01-18 - 8:09:05 PM GMT - Time Source: server

- Agreement completed.
  2024-01-18 - 8:09:05 PM GMT

Adobe Acrobat Sign