**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

DUMBO MOVING & STORAGE, INC.,

                    Plaintiff,

       v.

PIECE OF CAKE MOVING & STORAGE LLC, SIMPLY MOVING LLC, SIMPLY MOVING & STORAGE LLC, VOJIN POPOVIC, STEFAN MARCALI and VOLODYMYR PLOKHYKH,

                    Defendants.

Case No. 22-CV-05138 (ER)

---

**MEMORANDUM OF LAW IN SUPPORT OF THE PLAINTIFF'S MOTION FOR AN ORDER TEMPORARILY RESTRAINING AND PRELIMINARILY ENJOINING DEFENDANTS EKATERINA OVODOVA AND BULLION SHARK, LLC FROM USING, DISSEMINATING OR OTHERWISE BENEFITTING FROM PLAINTIFF'S TRADE SECRETS AND TURNING OVER AND DESTROYING ALL COPIES OF PLAINTIFF'S TRADE SECRETS**

---

**TURMAN LEGAL SOLUTIONS PLLC**
Stephen E. Turman, Esq.
626 RXR Plaza, 6th Floor
Uniondale, NY 11556
Ph: (516) 266-6106
Email: sturman@turmanlegal.com

*Counsel for Plaintiff Bullion Exchange LLC*

TABLE OF CONTENTS

TABLE OF CONTENTS…………………………………………………………………… i
TABLE OF AUTHORITIES ...................................................................................................ii
I.    PRELIMINARY STATEMENT ................................................................................... 1
II.   STATEMENT OF FACTS ........................................................................................... 3
   A.   Bullion Exchange and Bullion Shark ...................................................................... 3
   B.   Bullion Exchange Made Reasonable Efforts to Protect its Trade Secrets ................. 4
   C.   Ovodova Signs Bullion Exchanges Employee Handbook and Theft Policy .............. 4
   D.   Ovodova Becomes Bullion Exchange's Director of Marketing ................................ 5
   E.   Discovery of Defendants' Trade Secret Misappropriation ..................................... 5
III.  LEGAL ARGUMENT .................................................................................................. 7
   A.   Standard of Review ............................................................................................... 7
   B.   Injunctive Relief is Warranted Under the Defense Trade Secrets Act ..................... 8
   C.   Bullion Exchange Will Suffer irreparable Harm if this Court Does Not Grant Injunctive Relief
        9
   D.   Bullion Exchange is Likely to Succeed on the Merits of Its Underlying Claim .................... 13
      1.   The DTSA Claim ............................................................................................. 13
      2.   New York's Trade Secret Law .......................................................................... 15
      3.   Unfair competition .......................................................................................... 16
      4.   Breach of Duty of Loyally ................................................................................ 17
      5.   Aiding and Abetting Breach of Fiduciary Duty .................................................. 18
      6.   Unjust enrichment ........................................................................................... 19
   E.   The Balance of Hardships Tips in Bullion Exchange's Favor ................................. 20
IV.   CONCLUSION ...........................................................................................................21

## <u>TABLE OF AUTHORITIES</u>

Page(s)

Cases

Ashland Mgmt. Inc. v. Janittn.,
82 N.Y.2d 395 (1993)..................................................................................... 15

*Baron v Galasso,*
83 A.D.3d 626 (2d Dept 2011)........................................................................ 19

*BDO Seidman v Hirshberg,*
93 N.Y.2d 382 (1999)..................................................................................... 17

*Brenntag Int'l Chems, Inc. v. Bank of India,*
175 F.3d 245 (2d Cir. 1999) ........................................................................... 12

*Broker Genius, Inc. v. Zalta,*
280 F. Supp. 3d 495 (S.D.N.Y. 2017) ............................................................ 13

*Caprer v Nussbaum,*
36 A.D.3d 176 (2nd Dep't 2006) .................................................................... 19

*Capstone Logistics Holdings, Inc.,*
*2021 WL 5630910 (E.D.N.Y. Dec. 1, 2021)*...................................................*15*

*Citigroup Glob. Mkts., Inc. v. VCG Special Opportunities Master Fund Ltd.,*
598 F.3d 30 (2d Cir. 2010) ......................................................................... 7, 13

Council, Inc.,
555 U.S. 7 (2008)......................................................................................... 7, 8

Eastern Bus. Sys., Inc. v. Specialty Bus. Solutions,
292 A.D.2d 336, (2d Dept. 2002)................................................................... 15

Estee Lauder Cos. v. Batra,
430 F. Supp. 2d 158 (S.D.N.Y. 2006) ......................................................10, 11

*Fairfield Cty. Med. Ass'n v. United Healthcare of New Eng.,*
985 F. Supp. 2d 262 (D. Conn. 2013) ............................................................. 8

*Fairfield Fin. Mtg. Group, Inc. v Luca,*
584 F.Supp.2d 479 (EDNY 2008)................................................................... 17

*Faiveley Transp. v Wabtec Corp.,*
559 F3d 110 (2d Cir 2009)............................................................................. 10

FMC Corp. v, Taiwain Tainan Giant Indus. Co., Ltd.,
730 F.2d 61 (2d Cir. 1984) ............................................................................ 10

Free Country Ltd v. Drennen,
235 F.Supp.3d 559 (S.D.N.Y. 2016) .............................................................. 13

*Geritrex Corp. v. Dermarite Indus., LLC,*
910 F.Supp. 955 (S.D.N.Y. 1996) ................................................................. 10

Grand River E,
nter, Six Nations. Ltd v. Pryor, 481 F.3d 60 (2d Cir. 2007) ............................ 9

*Harry R. Defler Corp. v. Kleeman,*
19 AD2d 396 (4th Dep't 1963) ...................................................................... 17

Henry Schein, Inc. v. Coak,
191 F.Supp.3d 1072 (N.D. Cal. 2016) ......................................................... 8, 9

Jackson Dairy, Inc. v. H.P. Hood & Sons, Inc.,
  596 F.2d 70 (2d Cir. 1979) ................................................................................ 7
Johnson Controls, Inc. v. A.P.T. Critical Systems, Inc.,
  323 F. Supp. 2d 525 (S.D.N.Y. 2004) ............................................................. 16
Juergensen Def. Corp. v. Carleton Techs. Inc.,
  No. 08-CV-959A, 2010 WL 2671339 (W.D.N.Y. June 21, 2010) ................... 21
Kaufman v Cohen,
  307 A.D.2d 113 (1st Dept 2003) ................................................................ 18, 19
Kelly v. Evolution Mkts., Inc.,
  626 F. Supp. 2d 364 (S.D.N.Y. 2009) ............................................................. 16
Lamdin v Broadway Surface Adv. Corp.,
  272 N.Y. 133 (1936)......................................................................................... 17
Marblegate Asset Mgmt., LLC v. Educ. Mgmt. Fin. Corp.,
  846 F.3d 1 (2d Cir. 2017) ................................................................................ 12
Maritime Fish v. World Wide,
  100 A.D.2d 81 (1st Dep't 1984)................................................................... 17, 18
Mazzaro de Abreu v. Bank of Am. Corp.,
  525 F. Supp. 2d 381 (S.D.N.Y. 2007) ............................................................. 20
Mickey's Linen v. Fischer,
  No. 17 C 2154, 2017 WL 3970593 (N.D. Ill. September 8, 2017) ................... 9
Mission Capital Advisors LLC v. Romaka,
  No. 15 Civ 5878, 2016 WL 11517040 (S.D.N.Y. July 22, 2016) ..................... 8
Mister Softee, Inc. v. Diaz,
  2020 U.S. Dist. LEXIS 118979 (E.D.N.Y. July 2, 2020)................................. 10
Monaghan v Ford Motor Co.,
  71 A.D.3d 848 (2d Dept 2010)................................................................... 18, 19
N. Am. Soccer League, LLC v. U.S. Soccer Fed'n, Inc.,
  883 F.3d 32 (2d Cir. 2018) ................................................................................ 8
New York ex rel. Schneiderman v. Actavis PLC,
  787 F.3d 638 (2d Cir. 2015) .............................................................................. 8
New York v. Joseph L. Balkan, Inc.,
  656 F.Supp. 536 (E.D.N.Y. 1987) .................................................................... 17
North Atlantic Instruments, Inc. v. Haber,
  188 F.3d 38.................................................................................................. 10, 16
Roll-Krafi v. Grimes.,
  177 F.Supp.2d 859 (N.D. Ill. 2001) ................................................................. 14
Samuel M. Feinberg Testamentary Trust v Carter,
  652 F.Supp. 1066 (SDNY 1987) ...................................................................... 18
Sandford/Kissena Owners Corp. v Daral Props., LLC,
  84 A.D.3d 1210 (2d Dept 2011) ....................................................................... 19
Schroeder v. Pininterest Inc.,
  133 A.D.3d 12 (1st Dep't 2015)........................................................................ 16
Weil v. Stenzler,
  2019 N.Y. Slip. Op. 30966 (Sup. Ct. N.Y. Cnty. April 5, 2019) .................... 16

Plaintiff Bullion Exchange LLC ("Bullion Exchange") respectfully submits this Memorandum of Law in support of its motion brought by order to show cause for a temporary restraining order ("TRO") and preliminary injunction against Defendants Bullion Shark, LLC ("Bullion Shark") and Ekaterina Ovodova ("Ovodova") (Bullion Shark and Ovodova shall be referred to collectively as the "Defendants").

## I.      PRELIMINARY STATEMENT

Bullion Exchange seeks the Court's urgent intervention to immediately enjoin Defendants' unauthorized use of Bullion Exchange's trade secrets and other confidential information to halt their ongoing unauthorized use of Bullion Exchange's trade secrets and confidential business information, which is causing ongoing, serious, and irreparable harm to Bullion Exchange's business operations and market position.

Bullion Exchange is one of the largest retail dealers rare coins, bullion, bills, and precious metals in the United States, operating a brick-and-mortar location in the Diamond District of Manhattan and multiple websites, and online storefronts that transact business throughout the world. Since it was formed in 2012, Bullion Exchange has amassed a large volume of proprietary market research and compiled valuable list over its twelve (12) years of operation with the complete contact information and sales history for than 384,000 customers.

Bullion Shark is a direct competitor to Bullion Exchange that is based in Westbury, New York.  Bullion Shark also sells rare coins, bullion, bills, and precious metals through websites and online sales portals that it owns and operates.

On or about August 23, 2023, Bullion Shark interviewed Ovodova, who was Bullion Exchange's Director of Marketing, for a position its Head of eCommerce.  As Bullion Exchange's Director of Marketing, Ovodova had access to Bullion Exchange's most valuable trade secrets, including its market research and its customers lists.  During the interview, Bullion Shark asked Ovodova to prepare a marketing strategy that it could use to improve its market position and increase sales.  Without Bullion Exchange's knowledge or consent, between August 24 and 25,

1

2023, Ovodova made a copy of Bullion Exchange's marketing strategy (the "Proprietary Marketing Strategy"), which she lightly modified by replacing the term "Bullion Exchange" with "Bullion Shark" or "Shark". As part of the Proprietary Marketing Strategy, Ovodova also updated the product listings to include links to Bullion Shark's products in place of Bullion Exchange's products, after first optimizing those links using Bullion Exchange's search engine optimization tools. After Bullion Shark received the Proprietary Marketing Strategy from Ovodova in August 2023, it offered Ovodova the position of Head of eCommerce—which she accepted.

With Bullion Shark's encouragement, on September 6, 2023, Ovodova downloaded a copy of Bullion Exchange's customer lists to her workstation in Bullion Exchange's NYC office. Without the express consent of Bullion Exchange's Chief Executive Officer, Ernest "Eric" Gozenput ("Mr. Gozenput") and in violation of Bullion Exchange's Employee Handbook and Employee Theft Policy, at 3:55pm on September 6, 2023, Ovodova used her Bullion Exchange email account (katia@bullionexchanges.com) to send a copy of Bullion Exchange's customer lists to her own personal email account (eovodova@gmail.com). In short, Ovodova misappropriated the Bullion Exchange's customer lists. To cover her tracks, Ovodova attempted to permanently delete records of her transfer of trade secrets and confidential information.

On September 7, 2023 (the day after she sent herself a copy of Bullion Exchange's customer lists), Ovodova gave Bullion Exchange one (1) weeks' notice of her resignation. That day, Ovodova falsely informed Mr. Gozenput she had accepted a marketing position with a company outside of Bullion Exchange's industry. Nevertheless, in October 2023, Mr. Gozenput discovered that Ovodova was, in fact, working as the Head of eCommerce for Bullion Shark. This prompted Bullion Exchange to conduct a security review of Ovodova's computer activity, which revealed her misappropriation of trade secrets on behalf of herself and Bullion Shark in violation of the Defend Trade Secrets Act, 18 U.S.C. § 1836 et seq. ("DTSA") and New York common law.

Bullion Exchange now commences this action and moves by order to show cause pursuant to Fed. R. Civ. P. 65 and 18 U.S.C. §1836(b)(3) for a temporary restraining order and preliminary injunction enjoining Ovodova and Bullion Shark from using, disseminating, and benefiting from

Bullion Exchange's secret and confidential trade secrets.[1]  Bullion Exchange also requests the Court also: (i) grant expedited discovery to Bullion Exchange; (ii) direct Defendants to turn over all physical and electronic copies of Bullion Exchange's misappropriated trade secrets and documents and material derived from Bullion Exchange's trade secrets; and (iii) direct Defendants to destroy all electronically stored information containing or derived from Bullion Exchange's trade secrets.[2]

## II.   STATEMENT OF FACTS

The facts underpinning this motion are detailed in the Declarations of Earnest Gozenput (January 18, 2024), Steven Kogan (November 27, 2023), and Stephen E. Turman, Esq. (January 22, 2024), with relevant exhibits attached thereto, all of which are incorporated by reference herein and are summarized as follows:

### A.   Bullion Exchange and Bullion Shark

Bullion Exchange, recognized as one of the largest U.S. retailers in rare coins, bullion, and precious metals, has, over a twelve  (12) year period, compiled a customer list that include complete contact information for over 384,000 customers, along with their transaction history.  It cost Bullion Exchange at least $10,000,000.00 in advertising and marketing expenses to compile this list.  (Gozenput Decl., ¶ 10).

---

[1] On or about, November 27, 2023, Bullion Exchange (through counsel) sent a letter to counsel for Bullion Shark and Ovodova asking if he would accept service of Bullion Exchange's complaint and order to show cause for a temporary restraining order and preliminary injunction.  On November 29, 2023, Bullion Shark sent a letter in response inviting Bullion Exchange to try to resolve this dispute amicably before commencing litigation.   Bullion Exchange attempted to negotiate a pre-litigation agreement with Bullion Shark, but those negotiations came to an impasse on January 15, 2023.  This information is provided to explain Bullion Exchange's delay in bringing this action and making the instant motion.  (Turman Decl., ¶¶ 4-8).

[2] Bullion Exchange reserves the right to file a subsequent application for an order of seizure of the misappropriated materials pursuant to 18 U.S.C. § 1836(b)(2).

Bullion Shark was formed in 2014 and emerged as a direct competitor to Bullion Exchange, including its operation of competing websites and a virtual storefront on eBay. (Gozenput Decl., ¶¶ 5-6).

**B.      Bullion Exchange Made Reasonable Efforts to Protect its Trade Secrets**

In a proactive measure to safeguard its trade secrets, including the aforementioned customer lists, Bullion Exchange enlisted Steven Kogan, a specialist in online security and IT, to design a robust data security system.  This system was aimed at protecting the company's networks and computer workstations from both internal and external threats (Gozenput Decl., ¶¶ 11-12; Kogan Decl., ¶¶ 2-3).  As per Mr. Kogan's recommendations, all critical data, including the client lists and other trade secrets, were secured on Bullion Exchange's own servers, accessible solely through its internal network.  These measures also extended to encrypted cloud-based storage solutions for marketing materials and customer lists, integral to Bullion Exchange's online operations (Gozenput Decl., ¶ 13).  Access to this sensitive information was strictly limited, with remote access being tightly controlled and monitored through a virtual office desktop system (Gozenput Decl., ¶ 14).

**C.      Ovodova Signs Bullion Exchanges Employee Handbook and Theft Policy**

To provide further protection of its trade secrets, Bullion Exchange requires that all employees sign its Employee Handbook and Theft Policy.  (Gozenput Decl., ¶ 16).  On October 28, 2015, Ovodova signed Bullion Exchange's Employee Handbook.   (Gozenput Decl, ¶ 17, Exhibit 1).  Pursuant to the Section 6.2 of the Employee Handbook, Ovodova acknowledged and agreed that: "[n]o previous or current employee may disclose or give access to confidential Company information, in any way or at any time, unless otherwise authorized by Management." (*Id.* at Exhibit 1).

4

On or about October 28, 2015, Ovodova also executed an acknowledgement of receipt and consent to Bullion Exchange's Employee Theft Policy, whereby Bullion Exchange recognized:

> Bullion Exchanges will not tolerate monetary or property theft of any type. We consider property theft to include the unauthorized use of Company services or its facilities, as well as the taking of any products or company materials. No item purchased or supplied by Bullion Exchanges should ever be removed from the Company Premises without the expressed authorization of the managing partners, Eric Gozenput & Ben Tseytlin. Employees that violate this policy will be subject to discipline up to and including possible dismissal and prosecution.

(Gozenput Decl., ¶ 19, Exhibit 2).

### D.  Ovodova Becomes Bullion Exchange's Director of Marketing

Between 2015 and 2018, Ovodova moved up the ranks within Bullion Exchange—gaining the trust of its management.  On December 29, 2018, Ovodova was promoted to the position of Director of Marketing.  (Gozenput Decl., ¶ 23).  As Director of Marketing, Ovodova was responsible for managing Bullion Exchange's marketing team and had a staff that reported directly to her.  Ovodova in turn, reported directly to Gozenput, Bullion Exchange's Chief Executive Officer.  Outside of the company's officers, Ovodova was one of Bullion Exchange's highest ranking and most trusted employees.  She was also one of very few employees trusted with full access to Bullion Exchange's customer lists and other confidential trade secrets.   This level of trust and access was necessary to enable Ovodova to perform the essential functions of her job. (Gozenput Decl., ¶ 23).

### E.  Discovery of Defendants' Trade Secret Misappropriation

On September 7, 2023, Ovodova informed Bullion Exchange she was resigning effective September 15, 2023.  (Gozenput Decl., ¶ 24).  At the time she gave notice of her resignation,

Ovodova informed Bullion Exchange she had had been offered a marketing position with another company outside of Bullion Exchange's industry.  (*Id.*).

On or about October 1, 2023, Bullion Exchange discovered that Ovodova had lied about her future employment plans.  (Gozenput Decl., ¶ 26).  She had, in fact, accepted the position as Head of eCommerce for Bullion Shark, which is a direct competitor of Bullion Exchange with its main office located in Westbury, New York.  (*Id.*).  The discovery of Ovodova's false and misleading representations about her employments plans caused Bullion Exchange to open an investigation to determine if Ovodova had engaged in any misconduct prior to her resignation. (Gozenput Decl., ¶ 27).

Working with its IT security consultant, Bullion Exchange soon discovered that, Ovodova made a copy of a Google Sheet document containing Bullion Exchange's marketing strategy on August 24, 2023, to the Proprietary Marketing Strategy.  (Gozenput Decl., ¶ 31).  To create the Proprietary Marketing Strategy, Ovodova used Bullion Exchange's network, office workstation, access to Bullion Exchange's trade secrets, and Bullion Exchange's licenses for marketing services to turn Bullion Exchange's marketing strategy into the Proprietary Marketing Strategy.  (Gozenput Decl., ¶ 31, Exhibit 3).  For the most part, Ovodova simply changed the name "Bullion Exchange" on the document to "Bullion Shark", leaving Bullion Exchange's proprietary information and data unchanged.   (Gozenput Decl., ¶ 31).

In addition to creating the Bullion Exchange Marketing Strategy in August 2023, on September 6, 2023 (the day before she gave notice of her resignation), Ovodova downloaded Bullion Exchange's customer lists to her workstation and used her company email to send copies of Bullion Exchange's customer lists to her personal email account with Bullion Exchange's knowledge or consent.  (Gozenput Decl., ¶¶ 34, Exhibit 4).  Ovodova attempted to permanently

delete this email from her sent email box.  (Kogan Decl., ¶ 9).  It is clear from the timing of Ovodova's actions that she sent unauthorized copies of the customer lists to herself for Bullion Shark's benefit.  (Gozenput Decl., ¶¶ 38-39).

Based on the forgoing, it is apparent the Defendants engaged in a calculated series of actions to misappropriate trade secrets for the direct benefit of Ovodova and Bullion Shark, undermining the substantial investments and protective measures implemented by Bullion Exchange. The timing and nature of these actions point to a deliberate strategy to use Bullion Exchange's proprietary information to bolster the competitive position of Bullion Shark's business and gain an unfair business advantage over Bullion Exchange.

### III.    LEGAL ARGUMENT

#### A.    Standard of Review

Injunctive relief is appropriate where the party seeking the injunction shows "(a) irreparable harm and (b) either (1) likelihood of success on the merits or (2) sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly toward the party requesting the preliminary relief." *Citigroup Glob. Mkts., Inc. v. VCG Special Opportunities Master Fund Ltd*., 598 F.3d 30, 35 (2d Cir. 2010)(quoting *Jackson Dairy, Inc. v. H.P. Hood & Sons, Inc.*, 596 F.2d 70, 72 (2d Cir. 1979)).  Additionally, injunctions are typically warranted only where the balance of equities tips in the moving party's favor and where an injunction is in the public interest.  *See Winter v. Nat. Hus. Def Council, Inc.*, 555 U.S. 7, 20 (2008).  For the reasons set forth below, Bullion Exchange has satisfied these requirements, in addition to those required for relief 18 U.S.C. § 1836(b)(3).  The Court should grant a TRO and Preliminary Injunction to prevent the Defendants from continuing to possess and cause further damage to Bullion Exchange as a result of their unauthorized possession of Bullion Exchange's trade secrets and proprietary and confidential information.

**B.      Injunctive Relief is Warranted Under the Defense Trade Secrets Act**

In the Second Circuit, the standard for granting a TRO is the same as the standard for a preliminary injunction:

> A party seeking a preliminary injunction must show: (1) irreparable harm; (2) either a likelihood of success on the merits or both serious questions on the merits and a balance of hardships decidedly favoring the moving party; and (3) that a preliminary injunction is in the public interest.

*N. Am. Soccer League, LLC v. U.S. Soccer Fed'n, Inc.*, 883 F.3d 32, 37 (2d Cir. 2018); *New York ex rel. Schneiderman v. Actavis PLC*, 787 F.3d 638, 650 (2d Cir. 2015); *Fairfield Cty. Med. Ass'n v. United Healthcare of New Eng.*, 985 F. Supp. 2d 262, 270 (D. Conn. 2013), aff'd, 557 Fed. Appx. 53 (2d Cir. 2014); *see also* Fed. R. Civ. P. 65.  Injunctions are typically warranted where the balance of equities tips in the moving party's favor and where an injunction is in the public interest.  *See Winter v. Nat. Hus. Def Council, Inc.*, 555 U.S. 7, 20 (2008).

The DTSA includes its own separate legal basis for awarding injunctive relief.  Congress expressly intended for parties asserting claims under the DTSA to have a right to injunctive relief to:

> ***[P]revent any actual or threatened misappropriation . . . on such terms as the court deems reasonabl****e, provided the order does not (1) prevent a person from entering into an employment relationship, and that conditions placed on such employment shall be based on evidence of threatened misappropriation and not merely on the information the person knows; or (2) otherwise conflict with an applicable state law prohibiting restraints on the practice of a lawful profession, trade or business; [and] if determined appropriate by the court, requiring affirmative actions to be taken to protect the trade secret.

18 U.S.C. § 1836(3)(A)(I) (emphasis added); *see, e.g., AUA Private Equity Partners. LLC v. Solo*, No. 17 Civ 803, (S.D.N.Y. November 6, 2017)(granting plaintiffs ex parte motion for temporary restraining order finding that plaintiff will likely succeed on the merits of its DTSA claim); *Mission Capital Advisors LLC v. Romaka*, No. 15 Civ 5878, 2016 WL 11517040 (S.D.N.Y. July 22, 2016) (same); *Henry Schein, Inc. v. Coak*, 191 F.Supp.3d 1072 (N.D. Cal. 2016) (granting a temporary

restraining order and preliminary injunction preventing a consultant from accessing, using or sharing confidential data that she stole from her former employer before leaving the company in violation of the DTSA and employment agreement); *Mickey's Linen v. Fischer*, No. 17 C 2154, 2017 WL 3970593 (N.D. Ill. September 8, 2017)(granting injunctive relief finding that defendant would inevitably use or disclose the plaintiff company's trade secrets if was not enjoined from doing so, such that the plaintiff demonstrated a likelihood of success on its trade secrets claims under the DTSA).

Bullion Exchange seeks to secure the immediate and complete return of its trade secrets and other confidential information that was misappropriated by and is in the possession and control of the Defendants.  Bullion Exchange also seeks to prevent the Defendants from disseminating its trade secrets to other competitors.

**C.    Bullion Exchange Will Suffer irreparable Harm if this Court Does Not Grant Injunctive Relief**

Bullion Exchange will suffer irreparable harm if this Court does not grant injunctive relief. Courts in the Second Circuit have long acknowledged that "[p]erhaps the single most important prerequisite for the issuance of a preliminary injunction is a demonstration that, if it were not granted the applicant is likely to suffer irreparable harm before a decision on the merits can be granted." *Payment All. Inl'l, Inc. v. Ferreira*, 530 Supp. 2d 477. 480 (S.D.N.Y. 2007) (citation omitted).  To satisfy this requirement, Bullion Exchange must show that it will suffer "an injury that is neither remote nor speculative, but actual and imminent and one that cannot he redressed through a monetary award."  *Id.* (quoting *Grand River Enter, Six Nations. Ltd v. Pryor*, 481 F.3d 60, 66 (2d Cir. 2007)).

When considering the use of injunction relief to protect rights in cases involving trade secret misappropriate, the Second Circuit Court of Appeals, in a pre-DTSA case, held:

> A rebuttable presumption of irreparable harm might be warranted
> in cases where there is a danger that, unless enjoined, a
> misappropriator of trade secrets will disseminate those secrets to a

> wider audience or otherwise irreparably impair the value of those
> secrets. Where a misappropriator seeks only to use those secrets
> —without further dissemination or irreparable impairment of
> value—in pursuit of profit, no such presumption is warranted
> because an award of damages will often provide a complete
> remedy for such an injury. Indeed, once a trade secret is
> misappropriated, the misappropriator will often have the same
> incentive as the originator to maintain the confidentiality of the
> secret in order to profit from the proprietary knowledge. As Judge
> Conner has observed, where there is no danger that a
> misappropriator will disseminate proprietary information, "the
> only possible injury that [the] plaintiff may suffer is loss of sales
> to a competing product . . . [which] should be fully compensable
> by money damages." *Geritrex Corp. v. Dermarite Indus., LLC,*
> 910 F.Supp. 955, 966 (S.D.N.Y. 1996) (Conner, J.).

*Faiveley Transp. v Wabtec Corp.*, 559 F3d 110, 118-19 (2d Cir 2009).   Appropriately-tailored injunctions can be useful to protect plaintiffs from the effects of misappropriated trade secrets. *See id.*

   In general, the imminent use of a trade-secret constitutes irreparable harm.   *See id.*; *North Atlantic Instruments, Inc. v. Haber*, 188 F.3d 38. 49 (2d Cir. 1999); *FMC Corp. v, Taiwain Tainan Giant Indus. Co., Ltd.*, 730 F.2d 61, 63 (2d Cir. 1984) ("[a] trade secret once lost is, of course, lost forever" and, as a result, such a loss "cannot be measured in monetary damages."); *Estee Lauder Cos. v. Batra*, 430 F. Supp. 2d 158, 174 (S.D.N.Y. 2006) ("Even where a trade secret has not yet been disclosed, irreparable harm may be found based upon a finding that trade secrets will inevitably be disclosed. . . .").

   Here, Defendants have unquestionably misappropriated Bullion Exchange's customer lists and marketing research, with Bullion Shark, with Ovodova's help, using Bullion Exchange's customer lists and marketing data to unfairly compete against Bullion Exchange, with Ovodova's help.   There is also a significant risk that Ovodova or Bullion Shark will sell Bullion Exchange's customer lists to other competitors. The Defendants' course of conduct has caused and will continue to cause Bullion Exchange irreparable injury as Bullion Exchange stands to lose market share and valuable business that it has spent years building at a substantial cost. *See Mister Softee, Inc. v. Diaz*, 2020 U.S. Dist. LEXIS 118979 at **16-17 (E.D.N.Y. July 2, 2020)(irreparable injury

established where the plaintiffs alleged that, as a result of defendant's infringement, business will be diverted).  Injunctive relief is necessary to obtain the return of and prevent the continued unlawful use of Bullion Exchange's trade secrets.

Second, injunctive relief is necessary to obtain the return of and prevent the unlawful use of Bullion Exchange's trade secrets and confidential and proprietary information.  Trade secrets can be any "compilation of information which is used in one's business, and which gives [the owner) the opportunity to obtain an advantage over competitors who do not know or use it." *Estee Lauder Cos.*, 430 F. Supp. 2d at 175 (quoting Restatement (First) of Torts § 757, cmt. b (1939)).

The DTSA definition of trade secrets provides even broader protection to such information, and includes: "[a]ll forms and types of financial, business, scientific, technical, economic, or engineering information, including patterns, plans, compilations, program devices, formulas, designs, prototypes, methods, techniques, processes, procedures, programs, or codes, whether tangible or intangible, and whether or how stored, compiled, or memorialized physically, electronically, graphically, photographically, or in writing. . . ." 18 USC § 1839.  Such information is considered a "trade secret" if:

> (A) the owner thereof has taken reasonable measures to keep such information secret: and (B) the information derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means by another person who can obtain economic value from the disclosure or use of the information.

18 USC § 1839(3).[3]

Bullion Exchange's confidential procedures of business operation including, among other things, key customer lists, vendor agreements (including fees and scope of services), vendor fees, technical data, methods and procedures of business operations, financial data and scope of products

---

[3] A number of other factors also bear on whether information is truly a trade secret, including: "(1) the extent to which the information is known outside of the business: (2) the extent to which it is known by employees and others involved in the business; (3) the extent of measures taken by the business to guard the secrecy of information; (4) the value of the information to the business and its competitors; (5) the amount of effort or money expended by the business in developing the information: and (6) the ease or difficulty with which the information could be properly acquired or duplicated by others."  *Estee Lauder Cos.*, 430 F. Supp.2d. at 175.

and services are the highly confidential trade information that allows Bullion Exchange maintain a strong position in a highly competitive industry. This information certainly constitutes trade secrets under either definition, but certainly under the DTSA. Indeed, this information is the product of a vast amount of Bullion Exchange's time, effort and resources and would be highly useful to a competitor like Bullion Shark—and any other competitor to whom Ovodova and Bullion Shark would sell this data. Such trade secret information could be used by competitors to lure customers away from the Bullion Exchange, giving those competitors an unfair advantage to target an undercut Bullion Exchange without incurring the costs required to build a client list of size and quality of Bullion Exchange's list.

Bullion Exchange took pains to maintain the confidentiality of its trade secrets, including ensuring all computer files and emails are password protected, requiring acknowledgement of the confidentiality of Bullion Exchange's data each and every time an individual accessed Bullion Exchange's computer system, a confidentiality policy in the Employee Handbook, and in the Employee Theft Policy. (See Gozenput Decl. at ¶¶ 17-19, Exhibits 1 and 2). This confidential, proprietary and trade secret information is extraordinarily valuable to Bullion Exchange, as it would be to Bullion Exchange's competitors because such data could be used as a "roadmap" for targeting customers with a known interest and history of actually purchasing rare coins, bullion, an precious metals.

Absent restraint, Bullion Exchange's damages associated with losing its trade secrets would alone be difficult. Moreover, even if a judgment were entered Bullion Shark and Ovodova, neither Defendant has sufficient assets to make Bullion Exchange whole. *See Marblegate Asset Mgmt., LLC v. Educ. Mgmt. Fin. Corp.*, 846 F.3d 1, 21 (2d Cir. 2017)("We have held that a company's complete inability to pay a monetary judgment constitutes a risk of irreparable harm when a company is nearly insolvent in the context of preliminary injunctions")(citing *Brenntag Int'l Chems, Inc. v. Bank of India*, 175 F.3d 245, 249-50 (2d Cir. 1999)).

Here, the Defendants, armed with Bullion Exchange's confidential proprietary and trade secret information, are in a prime position to cause further irreparable harm to Bullion Exchange's

12

business and reputation.  Bullion Exchange could not possibly track what business opportunities have been, and will be, lost and money damages thus would prove an inadequate remedy.

**D.     Bullion Exchange is Likely to Succeed on the Merits of Its Underlying Claim**

The Second Circuit has adopted a flexible standard with regard to the "likelihood of success" requirement, allowing a party seeking a preliminary injunction to show either a likelihood of success on the merits or "sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly toward the party requesting the preliminary relief." *Citigroup Glob. Markets, Inc. v. VCG Special Opportunities Master Fund Ltd.*, 598 F.3d 30, 35 (2d Cir. 2010). To establish a likelihood of success on the merits, a plaintiff "need not show that success is an absolute certainly. [It] need only make a showing that the probability of his prevailing is better than fifty percent." *Broker Genius, Inc. v. Zalta*, 280 F. Supp. 3d 495, 509 (S.D.N.Y. 2017) (citation omitted).

As discussed below, Bullion Exchange will likely succeed on the merits of its claims for violation of the DTSA, state law trade secret misappropriation, unfair competition, breach of fiduciary duty, aiding and abetting breach of fiduciary duty, and unjust enrichment.

**1.     The DTSA Claim**

The DTSA amended the Federal Economic Espionage Act (the "EEA") (18 U.S.C. § 1831, et. seq.) and creates a federal cause of action for the misappropriation of trade secrets used in interstate commerce.  The DTSA requires plaintiffs to establish "an unconsented disclosure or use of a trade secret by one who (i) used improper means to acquire the secret, or (ii) at the time of disclosure, knew or had reason to know that the trade secret was acquired through improper means, under circumstances giving rise to a duly to maintain the secrecy of the trade secret, or derived from or through a person who owed such a duly." *Free Country Ltd v. Drennen*, 235 F.Supp.3d 559, 565 (S.D.N.Y. 2016); *see also* 18 U.S.C. § 1839(5).  The DTSA's definition of "improper

means" includes "misrepresentation, [and] breach or inducement of a breach of a duty to maintain secrecy," but expressly excludes "reverse engineering" and "independent derivation." 18 U.S.C. § 1839(6)(A)-(B).

As set forth above, the material misappropriated by Defendants through their calculated and systematic actions, fall squarely within the scope of the DTSA.  *See AUA Private Equity Partners, LLC v. Solo*, No. 17-8035, 2018 WL 2684339, *7 (S.D.N.Y. April 5, 2018)(holding that complaint plausibly alleges violation of the DTSA as defendant was alleged to have emailed plaintiff's trade secrets from her work laptop to her personal cloud-based storage without plaintiff's permission); *RKI, Inc., d/b/o Roll-Kraft v. Grimes.*, 177 F.Supp.2d 859, 875-77 (N.D. Ill. 2001) (finding sufficient evidence of acquisition of theft when employee downloaded or copied trade secrets from work computer to home computer).

First, Bullion Shark either hired or commissioned Ovodova to provide services to it while she was still employed as the Director of Marketing for Bullion Exchange.  In particular, on or about August 23, 2023, Bullion Shark asked Ovodova to prepare the Marketing Strategy it would use to improve its sales and market penetration. Bullion Shark knew or should have known Ovodova would use her resources from Bullion Exchange to prepare this Marketing Strategy. Between August 24 and 25, 2023, Ovodova used Bullion Exchange's office, computers, and data to prepare a marketing strategy for Bullion Shark.  Following its receipt of the Marketing Strategy, Bullion Shark hired Ovodova as its Head of eCommerce in late August 2023.

Second, on September 6, 2023 (the day before she gave notice of her resignation), Ovodova used her workstation in Bullion Exchange's office to copy Bullion Exchange's customer lists and then used her work email account to send those customer lists to her personal email account, which is sufficient to show a misappropriation of Bullion Exchange's trade secrets.  *See RKL Inc.*, 177 F. Supp. 2d at 875-77.

Third, the information Defendants misappropriated from Bullion Exchange is not readily ascertainable.  No one can reverse engineer Bullion Exchange's customer lists or Marketing Strategy using any public resources.  The customer list and Marketing Strategy is the product of

years of hard-fought sales to Bullion Exchange's customers.  With Ovodova's help, Bullion Shark now has an unfair competitive edge over Bullion Exchange and will be able to build its business faster than it could have had it not caused Ovodova to steal Bullion Exchange's trade secrets.

Fourth, Bullion Exchange vigilantly safeguarded its confidential information and trade secrets by using highly secured networks and procedures to prevent the disclosure of its trade secrets to unauthorized people and entities.   Even internally, Bullion Exchange limited access to its trade secrets only to those employees that required access to this information to perform the essential functions of their jobs.  Nevertheless, trade secrets have no value if a company cannot let its own senior employees use those trade secrets to the company's advantage.  Bullion Exchange trusted Ovodova with trade secrets including its customer lists and market research—information that Ovodova required to perform her job as Bullion Exchange's Director of Marketing.

Defendants should not be permitted to take unfair advantage of Bullion Exchange's trade secrets which they can use to interfere with the relationships and goodwill Bullion Exchange enjoys with its customers, particularly where those relationships and goodwill were cultivated at Bullion Exchange's considerable expense.  *See Capstone Logistics Holdings, Inc.*, 2021 WL 5630910 at *1 (E.D.N.Y. Dec. 1, 2021).  Bullion Exchange is, therefore, likely to succeed on the merits of its DTSA claims.

### 2.    New York's Trade Secret Law

Bullion Exchange is also likely to succeed under the New York Trade Secret law, for which it will demonstrate: (1) that Defendant possessed a trade secret; and (2) that Defendant used that trade secret in breach of an agreement, confidential relationship or duly, or as a result of discovery by improper means. For the reasons set forth above in support of its DTSA claim, Bullion Exchange also satisfies the foregoing elements.   *See Eastern Bus. Sys., Inc. v. Specialty Bus. Solutions*, 292 A.D.2d 336, 337-38, (2d Dept. 2002)(client and potential client names, addresses, contact names compiled through considerable effort over several years and not available to the public arc trade secrets warranting protection); *Ashland Mgmt. Inc. v. Janittn*. 82 N.Y.2d 395, 407

(1993)("[Confidential proprietary data relating to pricing, costs, systems, and methods are protected by trade secret law."); *N. All. Instruments, Inc. v. Haber*, 188 F.3d 38, 44 (2d Cir. 1999) ("Numerous cases applying New York law have held that where . . . it would be difficult to duplicate a customer list because it reflected individual customer preferences, trade secrets protection should apply.")

Courts applying New York law also hold that an employer may have a protectable interest in confidential information even if it does not rise to the level of a trade secret. *See Kelly v. Evolution Mkts., Inc.*, 626 F. Supp. 2d 364, 373 (S.D.N.Y. 2009) (granting injunctive relief and finding that an employer had a protectable interest in its confidential information); *Johnson Controls, Inc. v. A.P.T. Critical Systems, Inc.*, 323 F. Supp. 2d 525, 537 (S.D.N.Y. 2004) ("even where the information would not otherwise qualify as a trade secret, the unauthorized physical taking and exploitation of internal company documents, including detailed customer information by an employee . . . is to be enjoined as unfair competition.").

### 3.     Unfair competition

To establish a cause of action for unfair competition in connection with the misappropriation of trade secrets in New York, Bullion Exchange must prove: (i) it possessed a trade secret, (ii) the defendant(s) used that trade secret in breach of an agreement, confidential relationship, or duty, or as a result of discovery by improper means, and (iii) the defendant's actions constituted bad faith misappropriation of a commercial advantage belonging exclusively to the plaintiff. *See Schroeder v. Pininterest Inc.*, 133 A.D.3d 12, 27 (1st Dep't 2015); *see also Weil v. Stenzler*, 2019 N.Y. Slip. Op. 30966 (Sup. Ct. N.Y. Cnty. April 5, 2019)(citing *Schroeder*).

Here, Bullion Exchange easily establishes a likelihood of success on the merits because, on August 24 and 25, 2023, Ovodova made copies of Bullion Exchange's marketing research and materials and replaced Bullion Exchange's name with Bullion Shark's name.  On September 6, 2023 (the day before she gave notice of her resignation), Ovodova also made unauthorized copies of Bullion Exchange's customer lists which emailed from her company email account to her

16

personal email account.  Based on the timing of these actions, it is highly likely that Ovodova misappropriated these trade secrets to give Bullion Shark a competitive advantage and impress her new employer.

### 4.    Breach of Duty of Loyalty

Bullion Exchange will prevail on its claim against Ovodova for breach of her fiduciary duty to Bullion Exchange and for being a faithless servant.  "New York law establishes that the employee-employer relationship is fiduciary." *Fairfield Fin. Mtg. Group, Inc. v Luca,* 584 F.Supp.2d 479, 485 (EDNY 2008) (citing *New York v. Joseph L. Balkan, Inc.,* 656 F.Supp. 536, 548 (E.D.N.Y. 1987)).  It is a firmly established principle under New York law that:

> [An employee] is prohibited from acting in any manner inconsistent with his agency or trust and is at all times bound to exercise the utmost good faith and loyalty in the performance of [her] duties.  Not only must the employee or agent account to his principal for secret profits but he also forfeits his right to compensation for services rendered by him if he proves disloyal.

*Maritime Fish v. World Wide*, 100 A.D.2d 81, 87 (1st Dep't 1984)(citing *Lamdin v Broadway Surface Adv. Corp.*, 272 N.Y. 133, 138 (1936)).

It is also well established:

> [t]hat an employee, who has had entrusted to confidential information pertaining to the . . . clientele of [her] employer's business which [she] would not have obtained were it not for [her] status as a trusted employee and which affords [her] an advantage over other competitors to whom the information is not available, may not subsequently use that information to further [her] own ends. . . . This restriction arises because of the confidential nature of the employment relationship and is not dependent upon the presence in the employment agreement or a provision limiting activities after cessation of employment.

*Harry R. Defler Corp. v. Kleeman*, 19 AD2d 396, 401 (4th Dep't 1963).  An employer has "a legitimate interest in preventing former employees from exploiting or appropriating the goodwill of a client or customer, which had been created and maintained at the employer's expense, to the employer's competitive detriment."  *BDO Seidman v Hirshberg,* 93 N.Y.2d 382, 392 (1999).

As recognized by the courts that, "[an employee] is prohibited from acting in any manner inconsistent with his agency or trust and is at all times bound to exercise the utmost good faith and loyalty in the performance of his duties. Not only must the employee or agent account to his principal for secret profits but he also forfeits his right to compensation for services rendered by him if he proves disloyal." *Maritime Fish Prod., Inc.*,100 A.D.2d at 88.

Here, there is no question that Ovodova was a trusted employee that owed Bullion Exchange a fiduciary duty and duty to exercise the utmost good faith and loyalty in the performance of her duties.  Instead, Ovodova, while employed by Bullion Exchange, used Bullion Exchange's time, computer system, and office facilities to make unauthorized copies of Bullion Exchange's customer lists and then used her company email account to send those unauthorized copies to her own personal email account.  Ovodova also used Bullion Exchange's office, computers, and proprietary information to create a marketing strategy for Bullion Shark weeks before resigning from Bullion Exchange.

Ovodova clearly breached her fiduciary duties and duties of loyalty that she owed Bullion Exchange.  Bullion Exchange has established that is likely to succeed on the merits of its claim against Ovodova for breach of fiduciary duty and duty of loyalty.

### 5.    Aiding and Abetting Breach of Fiduciary Duty

Bullion Exchange will also prevail on its claim against Bullion Shark for aiding and abetting Ovodova's breach of fiduciary duty.  Under New York law, to establish a claim for aiding and abetting a breach of fiduciary duty, a plaintiff must allege: (1) the existence of a fiduciary relationship; (2) breach of that relationship; (3) knowing participation and substantial assistance in the breach by a defendant who is not a fiduciary; and (4) damages proximately caused by the breach.  *See Monaghan v Ford Motor Co.,* 71 A.D.3d 848, 850 (2d Dept 2010);  *Kaufman v Cohen,* 307 A.D.2d 113, 125 (1st Dept 2003);  *Samuel M. Feinberg Testamentary Trust* v *Carter,* 652 F.Supp. 1066, 1082 (SDNY 1987).

In addition, "[o]ne who aids and abets a breach of a fiduciary duty is liable for that breach as well, even if he or she had no independent fiduciary obligation to the allegedly injured party, if the alleged aider/abettor rendered 'substantial assistance' to the fiduciary in the course of effecting the alleged breaches of duty." *Caprer v Nussbaum,* 36 A.D.3d 176, 193 (2nd Dep't 2006). Substantial assistance occurs when a defendant affirmatively assists, helps conceal or fails to act, when required to do so, thereby enabling the breach to occur.  *See Sandford/Kissena Owners Corp. v Daral Props., LLC,* 84 A.D.3d 1210, 1212 (2d Dept 2011) (citing *Monaghan v Ford Motor Co.*, 71 AD3d at 850; *Kaufman,* 307 A.D.2d at 126).  It is well settled that "'[substantial assistance' requires an affirmative act on the defendant's part; 'mere inaction' can constitute substantial assistance 'only if the defendant owes a fiduciary duty directly to the plaintiff.'" *Id.* (citing *Baron v Galasso,* 83 A.D.3d 626, 629 (2d Dept 2011)).

Ovodova did not prepare a marketing strategy for Bullion Shark three weeks before she resigned from her position with Bullion Exchange without having already established an improper business relationship with Bullion Shark.  Bullion Shark, as Ovodova's secret second employer, knew that Ovodova was breaching her fiduciary duty and duty of loyalty to Bullion Exchange, but encouraged and induced her to steal Bullion Exchange's trade secrets for its own benefit.  In fact, it appears Bullion Shark required that Ovodova provide it with the Marketing Strategy as condition for giving her the offer to work as its Head of eCommerce.  Clearly, Ovodova was already working for Bullion Shark while she was still employed by Bullion Exchange—without Bullion Exchange's knowledge and prior to giving Bullion Exchange notice of her resignation.

Given the totality of the circumstances, Bullion Exchange has established that it is likely to succeed on the merits of its cause of action against Bullion Shark for aiding and abetting Ovodova's breach of her fiduciary duty and duty of loyalty to Bullion Exchange.

### 6.    Unjust enrichment

"To state a claim for unjust enrichment under New York law, a plaintiff must allege that: (1) the defendant benefited; (2) the benefit was at the expense of the plaintiff; and (3) that equity

and good conscience require restitution." *Mazzaro de Abreu v. Bank of Am. Corp.*, 525 F. Supp. 2d 381, 397 (S.D.N.Y. 2007).

Here, Bullion Exchange has invested substantial time, money, and effort in developing and maintaining its customer list and marketing research.  Through their brazen acts of misappropriation, the Defendants have used and continue to use Bullion Exchange's trade secrets to unfairly compete with Bullion Exchange and to funnel Bullion Exchange's business opportunities away to Defendants.

As a result of Defendants' use of Bullion Exchange's customer lists and marketing research, Defendants have been enriched at Bullion Exchange's expense, by, among other things, generating revenues through sales to Bullion Exchange's customers.  Equity and good conscience require restitution to Bullion Exchange. Accordingly, Bullion Exchange is likely to succeed on its unjust enrichment claim.

### E.    The Balance of Hardships Tips in Bullion Exchange's Favor

Bullion Exchange's legitimate interest in protecting against Defendants' exploitation of its marketing materials, customer lists and its long-standing relationships and goodwill with its customers outweighs Defendants' interest in misappropriating Bullion Exchanges customer lists and other trade secrets.

First, the Defendants have no legitimate interest in, or claim to, Bullion Exchange's trade secrets and proprietary information.  In fact, the DTSA expressly precludes the acquisition of trade secrets by improper means—which is exactly what Defendants have done here. Moreover, given the direct evidence of misappropriation, there is no question that Plaintiff will likely succeed on the merits.

Second, Ovodova's dissemination of the misappropriated trade secrets will have a significant detrimental impact on Bullion Exchange and will irreparably damage its goodwill in the market place it its lists are used by its competitors to steal sales and erode its market position unfairly.   These losses, especially by defendants that lack the financial resources to make Bullion

Exchange whole, cannot not be remediated by money damages alone. *See Juergensen Def. Corp. v. Carleton Techs. Inc.*, No. 08-CV-959A, 2010 WL 2671339 (W.D.N.Y. June 21, 2010) (finding that balance of equities and public interest favored injunction where disclosure of trade secrets would harm plaintiffs).  In contrast, an injunction would have no significant impact on the Defendants because it would simply require them to stop using information belonging to Bullion Exchange to gain an unfair advantage they are not entitle to have in the first place.

### IV.    CONCLUSION

For all of the foregoing reasons, Bullion Exchange respectfully requests that this Court issue a temporary restraining order, and a preliminary injunction and such other and further relief as this Court deems just and proper against Defendant. Bullion Exchange reserves the right to petition the Court for a seizure order should Defendant fail to abide by the Orders of this Court pertaining to locating, isolating, and returning to Bullion Exchange its misappropriated material.

Dated:  Uniondale, New York
         January 23, 2023

**TURMAN LEGAL SOLUTIONS PLLC**

By: *Stephen Turman*
         Stephen E. Turman
         626 RXR Plaza
         Uniondale, NY 11556
         Ph: (516) 266-6101
         Email:  sturman@turmanlegal.com

*Counsel for the Plaintiff, Bullion Exchange LLC*