**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**
-------------------------------------------------------------------X
**BULLION EXCHANGE LLC,**

                  **Plaintiff,**

           - against -

**BULLION SHARK, LLC and EKATERINA**
**OVODOVA,**

                  **Defendants.**
-------------------------------------------------------------------X

          **Case No.: 2:24-cv-467 (DG)(JMW)**


**DEFENDANT BULLION SHARK, LLC'S MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFF'S MOTION FOR AN ORDER TEMPORARILY RESTRAINING AND PRELIMINARILY ENJOING DEFENDANTS EKATERINA OVODOVA AND BULLION SHARK, LLC FROM USING, DISSEMINATING OR OTHERWISE BENEFITTING FORM PLAINTIFF'S TRADE SECRETS AND TURNING OVER AND <u>DESTROYING ALL COPIES OF PLAINTIFF'S TRADE SECRETS</u>**

## <u>TABLE OF CONTENTS</u>

**PRELIMINARY STATEMENT** ....................................................Error! Bookmark not defined.

**FACTS** ................................................................................Error! Bookmark not defined.

**LEGAL STANDARD** ..............................................................Error! Bookmark not defined.

**ARGUMENT** .........................................................................Error! Bookmark not defined.

   **POINT I** ............................................................................Error! Bookmark not defined.

   **PLAINTIFF CANNOT ESTABLISH IRREPRABLE HARM** Error! Bookmark not defined.

   **POINT II** ...........................................................................Error! Bookmark not defined.

   **PLAINTIFF CANNOT SHOW A LIKELIHOOD OF SUCCESS ON THE MERITS**
.............................................................................Error! Bookmark not defined.

**CONCLUSION** ....................................................................Error! Bookmark not defined.

i

## TABLE OF AUTHORITIES

**Cases**

*AG Capital Funding, LP v. State Street Bank and Trust*, 11 N.Y.3d 146, 158 (2008) ................ 24

*Benisek v. Lamone*, 138 S. Ct. 1942, 1943 (2018) .......................................................................... 8

*Biocon Ltd. v. Abraxis Bioscience, Inc.*, 2016 U.S. Dist. LEXIS 139211, *13
(S.D.N.Y. Sept. 26, 2016) .......................................................................................................... 14

*Cenveo Corp. v. Diversapack LLC*, 2009 Dist. LEXIS, *28 (S.D.N.Y. Oct. 1, 2009) ................. 9

*Coronel v. Decker*, 449 F. Supp. 3d 274, 280 (S.D.N.Y. 2020).......……………...…………...…..8

*Coscarelli v. ESquared Hosp. LLC*, 364 F.Supp.3d 207, 221 (S.D.N.Y. 2019) ........................... 11

*E.J. Brooks Co. v. Cambridge Sec. Seals*, 31 N.Y.3d 441, 80 N.Y.S.3d 162 (2018) ................. 23

*Eastview Mall, LLC v. Grace Holmes, Inc.*, 182 A.D.3d 1057, 1058 (4th Dept. 2020).............. 13

*eCommission Sols, Inc. v. CTS Holdings Inc.*, 860 Fed. Appx. 758, 760 (2d. Cir. 2019) ........... 22

*Elsevier Inc. v. Doctor Evidence, LLC*, 2018 U.S. Dist. LEXIS 10730, 2018 WL 557906,
at *6 (S.D.N.Y. Jan. 23, 2018) .................................................................................................. 16

*Faively Transport Malmo AB v. Wabtec Corp.*, 559 F.3d 110, 117, 118, 119 (2d Cir. 2009)  8, 11, 12, 20

*Freedom Holdings, Inc. v. Spitzer*, 408 F.3d 112, 114, 115 (2d Cir. 2005) .......................... 10, 11

*Frydman v. Verschleiser*, 172 F. Supp. 3d 653, 674-75 (S.D.N.Y. 2016)................................... 21

*Geritrex Corp. v. Dermarite Indus., LLC*, 910 F.Supp. 955, 966 (S.D.N.Y. 1996) ..................... 9

*GFRE, Inc. v U.S. Bank, N.A.*, 130 A.D.3d 569, 570 (2d Dept. 2015) ........................................ 28

*Hecht v. Nextel*, 2012 U.S. Dist. LEXIS 89351, at *19 (S.D.N.Y. June 27, 2012) ..................... 21

*In re Parmalat Sec. Litig.*, 258 F.R.D. 236, 255 (S.D.N.Y. 2009) .............................................. 17

*Indy 3000, Inc. v. Cirillo*, 2011 N.Y. Misc. LEXIS 3332, *14-15
(Sup. Ct. Suffolk Cnty. July 5, 2011) ....................................................................................... 26

*Intertek Testing Servs., N.A., Inc. v. Pennisi*, 443 F. Supp. 3d 303, 339, E.D.N.Y. 2020)..... 15, 20

*Joester Loria Group v. Licensing Company Ltd.*, 2011 U.S. Dist. LEXIS 46597, *1-3
2011 WL 1642736 (S.D.N.Y. 2011) ......................................................................................... 16

*Kaufman v. Cohen*, 307 A.D.2d 112, 126, 760 N.Y.S.2d 157 (2003) ......................................... 24

*Kolbeck*, 939 F.Supp at 247 ........................................................................................................ 24

*Marietta Corp. v. Fairhurst*, 301 A.D.2d 734, 754 N.Y.S.2d 62, 67 (N.Y. App. Div. 2003) ...... 17

*Medquest Ltd. v. Rosa*, 2023 U.S. Dist. LEXIS 46830, *16 (S.D.N.Y. 2023) ............................ 21

*Mobarak v. Mowad*, 117 A.D.3d 998, 1001, 986 N.Y.S.2d 539 (2014)..................................... 28

*N. Am. Soccer League, LLC v. U.S. Soccer Fed'n*, 883 F.3d 32, 37 (2d Cir. 2018)..................... 8

*N. Atl. Instruments, Inc. v. Haber*, 188 F.3d 38, 44 (2d Cir. 1999) .............................................. 16

*Omnistone Corp. v. Cuomo*, 485 F. Supp. 3d 365, 367 (E.D.N.Y. 2020); *Coronel v. Decker*, 449
F. Supp. 3d 274, 280 (S.D.N.Y. 2020) ........................................................................................ 8

*Palmetto Partners, L.P. v. AJW Qualified Partners, LLC*, 83 A.D.3d 804, 808-809 (2d Dept.
2011)........................................................................................................................................... 24

*Plaza Motors of Brooklyn, Inc. v. Bogdasarov*, No. 21-cv-6546 (KAM), 2021 WL 5630910
(E.D.N.Y. Dec. 1, 2021)............................................................................................................. 16

*Recovery Racing III LLC v. Brown*, 2021 U.S. Dist. LEXIS 262614, *813
(E.D.N.Y. 2021)…………………………………………………………………………….…..21

*Really Good Stuff, LLC v. BAP Investors, LLC*, 813 F. App'x 39, 44 (2d Cir. 2020) .................. 8

*Register.com, Inv. v. Verio, Inc.*, 356 F.3d 393, 404 (2d Cir. 2004) ............................................... 8

*Rensselaer Polytechnic Inst. v. Appl Inc.*, 2014 U.S. Dist. LEXIS 5186, *25 (N.D.N.Y. Jan 15, 2014) ....................................................................................................................................... 9

Rodriguez ex rel Rodriguez v. DeBuono, 175 F.3d 227, 234 (2d Cir. 1998) ............................. 10

*Rush v. Hillside Buffalo, LLC*, 314 F.Supp.3d 477 (W.D.N.Y. 2018) ........................................ 13

*Schroeder v. Pinterest Inc.*, 133 A.D.3d 12 (1st Dept 2015) ...................................................... 22

*Semiconductor Energy Lab. Co. v. Chimei Innolux Corp.*, 2012 U.S. Dist. LEXIS 186322, *10 (Cal. C.D.C. Dec. 19, 2012) ........................................................................................... 9

*Shepard Indus. v. 135 E. 57th St., LLC*, 1999 U.S. Dist. LEXIS 14431, *24-25 (S.D.N.Y. Sept. 15, 1999) ................................................................................................................................. 11

*Silipos, Inc. v. Bickel*, No. 06 Civ. 2205, 2006 U.S. Dist. LEXIS 54946, 2006 WL 2265055, at *4 (S.D.N.Y. Aug. 8, 2006) ....................................................................................................... 17

*Singh v. Thiyakaraajakkurukkal*, 2013 N.Y. Misc. LEXIS 7088, * 9 (Sup. Ct. Nassau Cnty. Aug. 1, 2013) ................................................................................................................................... 26

*Smith v. Pleasantville Cottage Sch.*, 2022 N.Y. Misc. LEXIS 6094, *3 (2022) .......................... 24

*Universal Instruments Corp. v. Micro Sys. Eng'g, Inc.*, 924 F.3d 32, 49 (2d Cir. 2019) ............ 20

*Uni-World Capital L.P. v. Preferred Fragrance, Inc.*, 73 F.Supp.3d 209, 236 (S.D.N.Y. 2014) 11

W. Page Keeton *et al.*, *Prosser & Keeton on the Law of Torts* § 46 at 323-24 (5th ed. 1984) .... 24

*Waste Distillation Tech., Inc. v. Blasland & Bouck Eng'rs, P.C.*, 136 A.D.2d 633, 523 N.Y.S.2d 875 (2d Dept. 1988) ................................................................................................................. 22

*Weil v. Stenzler*, 2019 N.Y. Misc. LEXIS 1751 (Sup. Ct. N.Y. Cnty. Apr. 5, 2019) .................. 22

**Statutes**

18 U.S.C. § 1839(3) ..................................................................................................................... 15

18 U.S.C. § 1839(5) ..................................................................................................................... 15

Defend Trade Secrets Act (DTSA), 18 U.S.C. § 1836 ................................................................ 15

## **PRELIMINARY STATEMENT**

Plaintiff, Bullion Exchange LLC ("Plaintiff" or "Exchange") seeks a temporary restraining order ("TRO") and preliminary injunction without facts or other information required to establish their entitlement to a TRO or preliminary injunction. Instead, Plaintiff seeks a TRO based on allegations "upon information and belief" that Bullion Shark LLC ("Defendant Shark") requested that Defendant Ekaterina Ovodova ("Defendant Ovodova") copy Plaintiff's marketing strategy and customer list while she was still employed by Plaintiff in order to provide it to Defendant. Plaintiff brings claims against Defendant Shark for (1) breach of the Defendant Trade Secrets Act; (2) New York trade secret law; (3) unfair competition; (4) aiding and abetting breach of fiduciary duty; and (5) unjust enrichment.[1] Plaintiff requests that this Court order Defendant Shark to provide its customer list to Plaintiff in order to conduct a comparison of Plaintiff's customer list and Defendant Shark's customer list, despite Defendant Shark having its owns proprietary interest in its customer list, which is Defendant Shark's trade secret.

Plaintiff is unable to show a likelihood of success of the merits on any of their claims. Plaintiff is further unable to establish that it will suffer irreparable harm without a TRO and preliminary injunction.

First, with respect to their claim of irreparable harm, Plaintiff's motion fails as it cannot establish that Defendant Shark is a direct competitor of Plaintiff. Instead, while Plaintiff's business model is focused on the sale of bullion (i.e. the sale of metals, with the value of the products determined based on the type of metal used and the current market value of the metal), Defendant Shark's business model is focused on the sale of collectible coins (i.e. the sale of coins where the value of the coin is determined on the rarity of coin based on extrinsic factors such as age or

---

[1] Defendant Shark notes that Plaintiff asserts a cause of action for breach of fiduciary duty as against Defendant Ovodova only. Defendant Shark need not address this cause of action as it is not alleged against Defendant Shark.

historical context rather than based on current trading price of the metal itself, essentially the value of the coin is dependent on the collectability of the coin).

While both businesses are do sell coins, the majority of Defendant Shark's business is the sale of collectible coins, where the value of the coin is derived from his, scarcity, beauty, and desirability of collectors to finish a collectible set. Meanwhile, the focus of Plaintiff's business is the sale of bullion, which is the sale of precious metals in the form of bars, rounds and coins to investors. The value of the products that Defendant Shark sells is well above the melt value of the coin (i.e. the value of the metal of the product if it were melted and sold for the price of the metal), while Plaintiff's products barely sell above the melt value of the product. Thus, how the value of the products sold by Defendant Shark and Plaintiff is determined is different and, therefore, is marketed towards buyers with different investment concerns. As such, Plaintiff and Defendant Shark are not direct competitors.

Notwithstanding that fatal defect, Plaintiff has had approximately five (5) months since it first contacted Defendant Shark regarding its allegations and are not able to point out a single customer of Plaintiff that ceased doing business with it due to any alleged misappropriation of trade secret by Defendant Shark or Defendant Ovodova – which Bullion Shark expressly denies – and instead, argues on purely speculative and theoretical harm. As such, Plaintiff is unable to establish that it will suffer irreparable harm if a TRO or preliminary injunction is not granted.

Second, Plaintiff cannot establish that its marketing strategy is a trade secret, sufficient to state a claim under the DTSA, the New York Trade Secret Law, and common law for unfair competition, aiding and abetting breach of fiduciary duty, and unjust enrichment. Nor can Plaintiff establish that Defendant Shark is in possession of Plaintiff's marketing strategy, as Defendant Ovodova merely provided a presentation to Defendant Shark and not a marketing strategy.

Third, Plaintiff is unable to show a likelihood of success that Defendant Shark is in possession of Plaintiff's customer list or that any of Defendant Shark's employees are using Plaintiff's customer list, including Defendant Ovodova to market the sale of bullion. To that end, it is an impossibility for Plaintiff to prevail on its claims based on the sworn declarations of Defendant Ovodova and Andrew Adamo, a principle of Defendant Shark. In Defendant Ovodova's sworn declaration, she states that while she did send herself Plaintiff's customer list for Plaintiff's benefit, she has since deleted the customer list and never provided the customer list to Defendant Shark. This is confirmed in Andrew Adamo's sworn declaration, which provides that Defendant Ovodova never provided Plaintiff's customer list to anyone at Defendant Shark and that Defendant Shark is not in possession of Plaintiff's customer list.

Fourth, Plaintiff is unable to establish beyond a theoretical claim that Defendant Shark asked Defendant Ovodova to take any of Plaintiff's trade secrets or that Defendant Shark has somehow benefits from any trade secret, since Defendant Shark is not in possession of any of Plaintiff's supposed trade secrets.

As such, Plaintiff is unable to establish irreparable harm and is also unable to establish a likelihood of success for any of its claims against Defendant Shark. Therefore, Plaintiff's request for a TRO and preliminary injunction must be denied in its entirety.

## FACTS

On or about early August 4, 2023, Defendant Shark contacted a neutral, third-party recruiting service, Candidate Labs Inc. ("Candidate Labs") to provide candidates for its Head of eCommerce position. Defendant Shark did so as the Head of eCommerce position was to be a highly compensated position and Defendant Shark wanted to ensure it performed its due diligence in interviewing and selecting a qualified candidate.

On or about August 8, 2023, Candidate Labs emailed Defendant Shark's principles to provide a synopsis of the candidate that Defendant Shark was looking to interview, and provided Defendant Shark with an interview process form. The interview process form contained suggested questions and strategies for interviewing candidates for employment.

On or about August 15, 2023, Candidate Labs provided Defendant Shark with the name of the first candidate that it located for Defendant Shark to interview, Defendant Ovodova. Candidate Labs provided Defendant Ovodova's resume and notes from Candidate Labs' initial phone call with Defendant Ovodova. Defendant Shark requested that Candidate Labs schedule a time for its principles to interview Defendant Ovodova, and Candidate Labs reached out to Defendant Ovodova and scheduled the interview with her.

On or about August 23, 2024, Defendant Shark's principles conducted a virtual interview with Defendant Ovodova. During this interview, Defendant Ovodova impressed Defendant Shark's principles, and based upon the instruction by Candidate Labs, they requested that she provide an action plan on how she would help Defendant Shark if she were to be hired. Following their interview with Defendant Ovodova, Defendant Shark's principles again contacted Candidate Labs to help coordinate the second interview for Defendant Ovodova and further asked Candidate Labs to provide Defendant Ovodova with guidelines with what should be contained in the action plan presentation. The guidelines that Candidate Labs provided to Defendant Ovodova for the action plan presentation was to provide a strategy plan for achieving Defendant Shark's goals, including obtaining more leads from its website, optimizing advertisements and search engine optimization ("SEO"), optimizing other existing channels, including but not limited to social media, increasing conversion rates for prospective customers, creating new channels for advertisements, and any other additional website optimization that Defendant Ovodova felt would

benefit Defendant Shark. At no point did Defendant Shark ask that Defendant Ovodova take any information from Plaintiff. Instead, Defendant Shark was simply doing its due diligence on its prospective hire and was investigating her knowledge of advertisements and eCommerce.

On or about August 24, 2023, Candidate Labs provided Defendant Shark with additional candidates to interview.

On or about August 28, 2023, Defendant Shark's principles conducted a second-round interview with Defendant Ovodova, wherein she provided what she titled "Marketing Plan Presentation" (hereinafter the "Presentation"). The Presentation contained information relating to brand overview and goals, key performance indicators, an action plan on how to achieve 25% increase in online business, a list of marketing channels, all of which Defendant Shark was already advertising on, and optimization opportunities examples. Part of the optimization opportunities included a breakdown of Defendant Shark's ranking for hits per keyword searched. None of the information contained in the Presentation contained any proprietary information from Plaintiff and there was no information contained in the Presentation that would have caused Defendant Shark to believe Plaintiff took the information from any other entity. Moreover, the only purpose of the Presentation was for Defendant Shark to interview Defendant Ovodova regarding her knowledge of ecommerce. Defendant Shark has not used the Presentation since Defendant Ovodova provided it to Defendant Shark.

Furthermore, there was no information or strategy in the Presentation that Defendant Shark was not already using. In fact, Defendant Shark has spent over $1,000,000 to market its business over the last several years. Part of that marketing included Defendant Shark's retention of a third-party company, Semrush, which provides Defendant Shark with keywords, rankings, organic traffic and SEO information that is publicly available for competitors. This provides Defendant

Shark with information on keywords to target to expand its own marketing. Thus, nothing contained in the Presentation was a novel idea and Defendant Shark already knew the information contained in the Presentation. Defendant Ovodova created the Presentation based upon Candidate Labs' instruction and in order to evaluate whether Defendant Ovodova had the knowledge that she was stating she had during her interview.

During the August 28, 2023, second round interview, Defendant Shark informed Defendant Ovodova that it was still interviewing other candidates and that it would reach out to her. On August 29, 2023, Candidate Labs provided additional candidates for Defendant Shark to interview for the position. Ultimately, Defendant Shark determined that it wanted to make Defendant Ovodova an offer, but first requested that Candidate Labs make sure that there were no clauses or non-competes in contract with her then-employer, Plaintiff, that would cause an issue for Defendant Shark if they were to employ Defendant Ovodova. Candidate Labs confirmed that there were no clauses or non-competes in her contract with Plaintiff. Defendant Shark discussed what it should offer Defendant Ovodova for initial compensation.

Following the confirmation by Candidate Labs that there were no clauses that would have prevented Defendant Ovodova from working with Defendant Shark, it extended an offer of employment to Defendant Ovodova on or about September 1, 2023, pending clearance from Defendant Ovodova's background screening. Defendant Ovodova accepted the employment offer from Defendant Shark on the same day. Following clearance of Defendant Ovodova's background screening, Defendant Shark and Defendant Ovodova agreed on a start date of September 18, 2023 as Defendant Shark wanted to ensure that Defendant Ovodova was able to provide Plaintiff with two (2) weeks-notice of resignation.

Thereafter, Defendant Ovodova began her employment with Defendant Shark on or about September 18, 2023. At no point prior to her employment and at no point through the present did any employee or principle of Defendant Shark ask or require Defendant Ovodova to take any information from Plaintiff, including its customer lists or other potentially proprietary information.

Defendant Shark takes seriously the safeguards that are in place to protect its customer list and other trade secrets of Defendant Shark. In fact, Defendant Shark required that there be language included in Defendant Ovodova's employment agreement that provided that Defendant Ovodova acknowledged and agreed that Defendant Shark's suppliers and customers, customer sales histories and Defendant Shark's pricing and cost data, analytical business data and business strategies and operations were considered confidential information and constituted a trade secret of Defendant Shark. The employment agreement further provided that Defendant Ovodova would not directly or indirectly use, divulge, furnish or otherwise make available to anyone Defendant Shark's confidential information and trade secrets. Thus, Defendant Shark  has its own measures to safeguard its confidential information and trade secrets and does not infringe on any other company's trade secrets or confidential information, including Plaintiff.

To this date, Defendant Shark has not received any trade secret of Plaintiff, including its customer list (and marketing plan, to the extent it is a trade secret of Plaintiff). Nor has any employee of Defendant Shark received and/or is using Plaintiff's customer list or marketing plan. Defendant Shark has not improperly solicited any of Plaintiff's customers and would not have any ability to determine if it had contacted any of Plaintiff's customers as Defendant Shark does not know who Defendant Shark's customers are.

Further, Defendant Shark and Plaintiff are not direct competitors. While Defendant Shark and Plaintiff both sell various coins and there may be overlap in their customer base, the value of

6

the products that Defendant Shark sells is derived from the rarity of the coin itself compared to Plaintiff's products, that value of which is determined based on the type of metal contained in the coin. For example, Defendant Shark sells categories of coins that are from various shipwrecks. The value of these coins is dependent on the shipwreck that the coins were discovered at (i.e. coins discovered from the Atocha ship from 1622, compared to coins discovered from the S.S. New York during the Civil War). Thus, the types of customers that Defendant Shark typically encounters are collectors of coins.

Conversely, Plaintiff's products derive their value based on the type of metal that is in the coin itself (i.e. gold, silver, platinum). The value of these coins fluctuates with the current market price of the metal, and is not dependent on the rarity of the coin. Thus, Plaintiff's customers are fundamentally different from Defendant Shark's customers because Plaintiff's customers are looking to buy and trade the coins for the value of the metal and to make a profit, similar to stocks. In fact, Plaintiff's website contains a chart that shows the current price chart for the various types of metals, again, similar to a stock. Thus, Plaintiff and Defendant Shark are not direct competitors of each other, as each sells products whose value is dependent on different factors.

## **LEGAL STANDARD**

The Second Circuit has long established that a party seeking a preliminary injunction must show three things: (1) irreparable harm in the absence of an injunction pending resolution of the action, (2) either a likelihood of success on the merits or both serious questions on the merits and a balance of hardships decidedly favoring the moving party, and (3) that a preliminary injunction is in the public interest. *See N. Am. Soccer League, LLC v. U.S. Soccer Fed'n*, 883 F.3d 32, 37 (2d Cir. 2018). Courts apply the same standard when considering an application for a TRO. *See e.g., Omnistone Corp. v. Cuomo*, 485 F. Supp. 3d 365, 367 (E.D.N.Y. 2020); *Coronel v. Decker*, 449

F. Supp. 3d 274, 280 (S.D.N.Y. 2020). Moreover, "a preliminary injunction is an extraordinary remedy never awarded as of right." *Benisek v. Lamone*, 138 S. Ct. 1942, 1943 (2018) (per curiam).

## ARGUMENT

### POINT I
### PLAINTIFF CANNOT ESTABLISH IRREPRABLE HARM

Demonstrating irreparable harm is "the single most important prerequisite for the issue of" a temporary restraining order. *Faively Transport Malmo AB v. Wabtec Corp.*, 559 F.3d 110, 118 (2d Cir. 2009) (internal citation omitted). While a businesses' "loss of reputation and goodwill constitutes irreparable harm" (*Really Good Stuff, LLC v. BAP Investors, LLC*, 813 F. App'x 39, 44 (2d Cir. 2020) (*citing Register.com, Inv. v. Verio, Inc.*, 356 F.3d 393, 404 (2d Cir. 2004))), the "loss of trade secrets and client relationships does not establish irreparable harm absent a showing that there is an imminent risk of dissemination of trade secrets and that plaintiff's injuries are not compensable through an award of damages." *See Faiveley*, 559 F.3d at 119 ([W]here there is no danger that a misappropriator will disseminate proprietary information, 'the only possible injury that [the] plaintiff may suffer is loss of sales to a competing product . . . [which] should be fully compensable by money damages.'" (*quoting Geritrex Corp. v. Dermarite Indus., LLC*, 910 F.Supp. 955, 966 (S.D.N.Y. 1996))).

   *A. Plaintiff is unable to establish that Defendant Shark and Plaintiff are direct competitors.*
Relevant here, to establish irreparable harm, Plaintiff must show that Defendants are direct competitors of Plaintiff, which it cannot show. *See Cenveo Corp. v. Diversapack LLC*, 2009 Dist. LEXIS, *28 (S.D.N.Y. Oct. 1, 2009) ("Here, [plaintiff] concedes that [defendant] is not a direct competitor and has not alleged misappropriation of trade secrets, clients, or confidential information. Without such claims, [plaintiff] has not made a clear showing of irreparable harm"); *Rensselaer Polytechnic Inst. v. Appl Inc.*, 2014 U.S. Dist. LEXIS 5186, *25 (N.D.N.Y. Jan 15,

2014) ("the parties are not direct competitors, as neither RPI nor Dynamic practices the '1793 Patent, there is little risk that the plaintiff will suffer irreparable harm through the continued use of accused technology that cannot be compensated through monetary relief"); *see also Semiconductor Energy Lab. Co. v. Chimei Innolux Corp.*, 2012 U.S. Dist. LEXIS 186322, *10 (Cal. C.D.C. Dec. 19, 2012) (finding that the plaintiff would not suffer damage to its revenues because it is not a direct competitor of the defendants).

The Declaration of Andrew Adamo sufficiently establish that Plaintiff and Bullion Shark are not direct competitors. There is a fundamental difference between the types of products that Plaintiff sells and the types of products that Bullion Shark sells. Specifically, Plaintiff is in the business of selling bullion, while Defendant Shark derives the majority of its business through the sale of rare coins. Plaintiff's products derive their value based on the type of metal that the products, including coins, are comprised of. Meaning, the value of the product that Plaintiff sells is determined based upon whether the coin is gold, silver, platinum, etc., which is based on overall financial market conditions (are rare metals a safer bet than, for example, crypto or other equities). For example, Plaintiff's website specifically lists the current pricing of gold, silver, platinum, and palladium in order to inform its customers as to the value of the metal for the coins it offers for sale. Moreover, Plaintiff's website advertises that "metals are down" and to "buy metal on the dip", meaning to buy its products now while the value of metal is down in order to sell the metal later; there is no difference in the type of coin, but only the type of metal. Historical value of the coins sold are irrelevant to Plaintiff's business and customer base.

Conversely, the types of products that Defendant Shark sells derives the value based on the rarity of the coin itself. For example, Defendant Shark specifically offers one subset of rare coins that are "ancient and shipwreck coins." The value of those coins is determined based upon the

shipwreck that the coins were found at, and the rarity and number of coins that are in existence. Simply put, Bullion Shark's customers are collectors of coins, while Plaintiff's customers are persons seeking to make a profit by buying the metal at a low price point and reselling when the value of that metal is higher. As such, Plaintiff cannot establish that Plaintiff and Bullion Shark are direct competitors, sufficient to warrant a finding that it will suffer irreparable harm.

Plaintiff's inability to establish this necessary element of a request for injunctive relief requires denial of the application.

B. *Plaintiff's alleged harm is theoretical and could be compensated through a monetary award.*

Irreparable harm is the "single most important prerequisite for the issuance of a preliminary injunction." Freedom Holdings, Inc. v. Spitzer, 408 F.3d 112, 114 (2d Cir. 2005). To fulfill the irreparable harm requirement, the moving party "must demonstrate an injury that is neither remote nor speculative, but actual and imminent, and one that cannot be remedied by an award of monetary damages." *Rodriguez ex rel Rodriguez v. DeBuono*, 175 F.3d 227, 234 (2d Cir. 1998); "This is because a preliminary injunction is an 'extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief.'" *Id.* "[I]f a party fails to show irreparable harm, a court need not even address the remaining elements" of the preliminary injunction standard. *Coscarelli v. ESquared Hosp. LLC*, 364 F.Supp.3d 207, 221 (S.D.N.Y. 2019). "[C]onclusory statements of loss of reputation and goodwill constitute an insufficient basis for a finding of irreparable harm." *Uni-World Capital L.P. v. Preferred Fragrance, Inc.*, 73 F.Supp.3d 209, 236 (S.D.N.Y. 2014); *see also Shepard Indus. v. 135 E. 57th St., LLC*, 1999 U.S. Dist. LEXIS 14431, *24-25 (S.D.N.Y. Sept. 15, 1999) (vacating preliminary injunction because plaintiff only asserted conclusory allegations of irreparable harm).

Here, Plaintiff merely alleges speculative harm by incorrectly alleging that Defendant Shark misappropriated Plaintiff's customer list and marketing practices through the help of Defendant Ovodova and that there is a risk that Defendant Ovodova or Defendant Shark will sell this information to competitors of Plaintiff. However, this purely speculative claim fails as there has been no affidavit of declaration submitting in support of this claim that actually states that Plaintiff has lost any customers due to Defendant Ovodova or Defendant Shark since Defendant Ovodova left her employment with Plaintiff in August 2023- seven months ago. Instead, Plaintiff attempts to allege that Plaintiff stands to lose market share and valuable business without any support. However, absent evidentiary support that Defendant Shark or Defendant Ovodova is or will disseminate Plaintiff's customer list, there is no basis for this Court to enter a preliminary injunction against Defendant Shark. *See Faiveley*, 559 F.3d 110 (2d Cir. 2009). Even if there was such evidence loss of market share is not 'imminent harm' sufficient to warrant injunctive relief. Freedom Holdings, 408 F.3d at 115.

Plaintiff has had seven months to provide the name(s) of customers that it believed that Defendants improperly solicited due to the alleged theft of Plaintiff's customers, which it has not done. Nor has Plaintiff provided any evidentiary support to show that it lost business or market share or even less traffic to their website in the last seven months since Defendant Ovodova left employment with Plaintiff, let alone due to any alleged actions by Defendants Even more telling, Plaintiff has failed to prove any evidentiary support that there is an imminent risk that Defendants would disseminate its trade secrets. *Id.*

In *Faiveley Transp. Malmo AB v. Wabtec Corp.*, the Second Circuit found that the plaintiff had failed to provide any evidentiary support of irreparable harm, because the plaintiff was unable to show that despite using plaintiff's proprietary information for twelve years to manufacture

products, the plaintiff was unable to provide any evidentiary support that the defendant was disseminating plaintiff's trade secrets. 559 F.3d 110 (2d Cir. 2009). Accordingly, the Second Circuit reversed the District Court's granting of a preliminary injunction due to the absence of any evidentiary support that the proprietary information as to be disseminated. *Id.*

Similarly here, Plaintiff has failed to provide any evidentiary support that Defendant Shark, Defendant Ovodova, or any other employee of Defendant Shark is disseminating Plaintiff's trade secrets – which they cannot show, as Defendant Shark is not in possession of any of Plaintiff's trade secrets.

Similarly, in *Shepard Indus.*, the temporary injunctive relief ordered by the Court and agreed to and extended by the parties was vacated because the plaintiff's "pleadings, affidavits, and exhibits consist[ed] only of conclusory allegations of harm to its goodwill or reputation in the absence of a preliminary injunction." 1999 U.S. Dist. LEXIS 14431, at *24. The Court further found that the plaintiff failed to allege it faced imminent financial ruin and that its damages would be easily calculable at trial, sufficient to find that the plaintiff failed to show a sufficient threat of irreparable harm. *Id.*

The same is true here. Plaintiff's pleadings, declarations and exhibits contain only conclusory allegations that it will suffer irreparable harm to its goodwill or reputation. Plaintiff is unable to show through any documentary evidence or otherwise that Defendants are disseminating its supposed trade secrets, nor has Plaintiff submitted any evidentiary support to show that its sales have gone down in the seven months since Defendant Ovodova left employment with Plaintiff. Further, even if Plaintiff could show a drop in financials since Defendant Ovodova left employment, it cannot connect any drop in finances to any supposed misappropriation of its trade secrets. As such, Plaintiff cannot establish irreparable harm.

Plaintiff submits contradictory positions in its Complaint and in its Memorandum of Law in Support. In paragraph 78 of the Complaint, Plaintiff alleges that as Head of eCommerce for Defendant Shark, Defendant Ovodova is using Plaintiff's customer list and marketing strategy to divert Plaintiff's customers to Defendant Shark and to deprive Plaintiff of those business opportunities. *See* ECF Doc. No. 1, at ¶ 78. Such an allegation would require knowledge by Plaintiff of customers that have been diverted to Defendant Shark. However, Plaintiff states in its Memorandum of Law in Support that Plaintiff "could not possibly track what business opportunities have been, and will be, lost and money damages thus would prove an inadequate remedy." See ECF Doc. No. 11, P. 13. Plaintiff cannot assert both that it knows that business has been diverted to Defendant Shark and that Plaintiff has no way of tracking what opportunity has been lost. Defendant Shark submits that Plaintiff asserts these conflicting statements in an effort to overcome its failure to establish irreparable harm. As such, Plaintiff only asserts speculative irreparable harm and must be not be granted a TRO or preliminary injunction.

Moreover, any harm to Plaintiff would be made whole by an award of monetary damages should this Court find that Defendant Shark or Defendant Ovodova misappropriated its trade secret(s). *See Rush v. Hillside Buffalo, LLC*, 314 F.Supp.3d 477 (W.D.N.Y. 2018) (denying request for injunctive relief after finding that monetary damages were sufficient); *see also Eastview Mall, LLC v. Grace Holmes, Inc.*, 182 A.D.3d 1057, 1058 (4th Dept. 2020) ("[W]here 'any loss of sales [caused] by the allegedly improper conduct of [the] defendant can be calculated,' a plaintiff has an adequate remedy in the form of money damages and is not entitled to injunctive relief.") (internal citations omitted).

In *Rush*, the Court found that monetary damages would have been sufficient to compensate the plaintiff who alleged that defendant misused plaintiff's trademark for an event. *Rush*, 314

F.Supp.3d 477. Moreover, in *Biocon Ltd. v. Abraxis Bioscience, Inc.*, the Southern District Court found that a loss of customers could be compensated through monetary damages. *Biocon Ltd. v. Abraxis Bioscience, Inc.*, 2016 U.S. Dist. LEXIS 139211, *13 (S.D.N.Y. Sept. 26, 2016). Similarly here, Plaintiff could determine which customers it lost after Defendant Ovodova's cessation of employment with Plaintiff and any damages would be compensable through monetary damages. Accordingly, Plaintiff is unable to establish that it will suffer irreparable harm absent a TRO or preliminary injunction.

### C. Plaintiff has failed to address that it would be required to post a bond due to its request to be provided Defendant Shark's confidential and proprietary customer list

Rule 65 of the Federal Rules of Civil Procedure provides that "[t]he Court may issue a preliminary injunction or a temporary restraining order only if the movant gives security in the amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." The allegations contained in the Complaint, as demonstrated herein, are frivolous and therefore a large bond must be posted. This is especially true as Plaintiff is requesting that this Court order Defendant Shark to provide its customer list to Plaintiff, which is a trade secret of Defendant Shark.

## POINT II

## PLAINTIFF CANNOT SHOW A LIKELIHOOD OF SUCCESS ON THE MERITS

*Assuming arguendo* that this Court does find that Plaintiff has established that it will suffer irreparable harm, which it should not, Plaintiff cannot establish a likelihood of success on the merits of any of their claims. In fact, pursuant to Judge Gujarati's Individual Rules of Practice, Defendant Shark will be filing a pre-motion conference request to move to dismiss Plaintiff's claims.

14

A.  *Plaintiff cannot establish the likelihood that it will prevail of its cause of action pursuant to the Defend Trade Secrets Act*

To prevail under the Defend Trade Secrets Act (DTSA), 18 U.S.C. § 1836, Plaintiff is required to show that Defendants disclosed a trade secret without consent where either: (1) that secret was acquired by improper means; or (2) at the time of disclosure, Defendants knew or had reason to know that the secret was acquired by improper means, under circumstances creating a duty to maintain secrecy, or derived from a person who owed such a duty. 18 U.S.C. § 1839(5). Under this test, "improper means" includes misrepresentation and breach or inducement of the breach of the duty to maintain secrecy; it does not include where the information in question is "reverse engineer[ed]" or "independent[ly d]eriv[ed]". *Intertek Testing Servs., N.A., Inc. v. Pennisi*, 443 F. Supp. 3d 303, 340 (E.D.N.Y. 2020).

A trade secret is defined as "all forms and types of financial business, scientific, technical, economic, or engineering information . . . if (A) the owner thereof has taken reasonable measures to keep such information secret; and (B) the information derives independent economic value . . . from not being generally known to and not being readily ascertainable through proper means by another person who can obtain eco value from the disclosure or use of the information . . ." 18 U.S.C. § 1839(3). The Second Circuit has previously found that "[a] customer list developed by a business through substantial effort and kept in confidence may be treated as a trade secret and protected . . . **against disclosure to a competitor**, provided the information it contains is not otherwise readily ascertainable." *Plaza Motors of Brooklyn, Inc. v. Bogdasarov*, No. 21-cv-6546 (KAM), 2021 WL 5630910 (E.D.N.Y. Dec. 1, 2021) (emphasis added) (quoting N. Atl. Instruments, Inc. v. Haber, 188 F.3d 38, 44 (2d Cir. 1999). In addition, general and vague references to methods, processes, interpretation, programs, and data configuration protocols do not plausibly support the existence of a trade secret without supportive facts explaining, for example,

15

how such strategies, techniques or models function, how Intrepid derives value from them, or what Intrepid specifically does to ensure their secrecy. *See Elsevier Inc. v. Doctor Evidence, LLC*, 2018 U.S. Dist. LEXIS 10730, 2018 WL 557906, at \*6 (S.D.N.Y. Jan. 23, 2018) (Holding that "[a]lleging the existence of general categories of confidential information, without providing any details to generally define the trade secrets at issue . . . does not give rise to a plausible allegation of a trade secret's existence.") (internal quotation marks and citation omitted) (emphasis in original).

As detailed in Point I.A above, Plaintiff cannot establish that it is a direct competitor with Bullion Shark as they both sell products that have different values based upon different characteristics. Plaintiff's products derive their value based upon the type of metal and the current market price of that metal. Defendant Shark's products primarily derive their value based on the number of coins in existence and the rarity of the coin is independent from the type of metal in the coin itself. Thus, Plaintiff's claim pursuant to the DTSA must fail for that reason alone.

Moreover, Plaintiff is unable to show that it took adequate safeguards to maintain its allegedly proprietary information. First, Plaintiff uploaded its alleged marketing strategies in unredacted form on the public docket and further provided to Defendant Shark when it first contacted Defendant Shark prior to filing the instant claim. Second, Plaintiff only began to investigate whether Defendant Ovodova took Plaintiff's marketing plan and customer list after Defendant Ovodova updated her LinkedIn account, more than a month after her employment with Plaintiff ended. If Plaintiff had adequate safeguards in place to monitor its allegedly proprietary information, it would have been alerted immediately when Defendant Ovodova supposedly took the information.

Further, a party must provide more than "mere speculation" or "guesswork" that the confidential and proprietary information was improperly taken and more likely than "an alternative, lawful explanation of events." *See Joester Loria Group v. Licensing Company Ltd.*, 2011 U.S. Dist. LEXIS 46597, *1-3 2011 WL 1642736 (S.D.N.Y. 2011) (dismissing misappropriation claim wherein plaintiff alleged that defendant was given confidential and proprietary information regarding plaintiff's marketing strategies and that defendant used that information to bid against plaintiff for a contract, which was supported only by the contention that defendant necessarily "had to use [plaintiff's] proprietary and confidential information.").

First, Plaintiff cannot establish that their marketing strategy is a trade secret. The information that Defendant Ovodova provided to Defendant Shark at the direction of Candidate Labs at best contained certain key word searches for certain phrases relating to bullion and other rare coins and metals. In fact, the keywords in the Presentation shows Defendant Shark's links and keywords, not Plaintiff's. Thus, the keywords contained in the Presentation are not Plaintiff's. Moreover, Defendant Shark already had the keyword information that Defendant Ovodova provided to Defendant Shark in the Presentation through Defendant Shark's retention of Semrush. This information certainly does not rise to a level of a trade secret as it merely provides marketing strategies for key words that potential customers use when searching for bullion and rare coins. *See In re Parmalat Sec. Litig.*, 258 F.R.D. 236, 255 (S.D.N.Y. 2009) (holding that marketing strategies are not trade secrets where the plaintiff "failed to explain what particular information about the particular . . . marketing techniques are not already public [and] are not already commonly known in the industry"); *Marietta Corp. v. Fairhurst*, 301 A.D.2d 734, 754 N.Y.S.2d 62, 67 (N.Y. App. Div. 2003) (concluding that "pricing data and market strategies . . . would not constitute trade secrets"); *see also Silipos, Inc. v. Bickel*, No. 06 Civ. 2205, 2006 U.S. Dist. LEXIS

54946, 2006 WL 2265055, at *4 (S.D.N.Y. Aug. 8, 2006) ("[T]rade-secret protection does not extend to information regarding market strategies." (internal quotation marks omitted)). The information that Defendant Shark has obtained through publicly available keyword information must not be considered a trade secret.

Moreover, Defendant Shark has no desire or need for Plaintiff's marketing strategies, as Defendant Shark has a larger following on social media than Plaintiff. Specifically, Defendant Shark has over 1,200,000 followers on Facebook, 800,000 followers on TikTok, 600,000 followers on Instagram, and 310,000 followers on YouTube. Meanwhile, Plaintiff has less than 100,000 followers across all of their social media accounts. Additionally, to the extent that Plaintiff alleges that Defendant Shark does less business on eBay compared to Plaintiff and sought to copy Plaintiff's eBay marketing strategy, Defendant Shark has not increased its sales on eBay and has no desire to do so. Thus, if any party had a desire to copy the other's marketing strategy, it would be Plaintiff that would desire to copy Defendant Shark's marketing strategy, not that Defendant Shark would desire to copy Plaintiff's marketing strategy since they are not direct competitors.

Further, similar to *In re Parmalat Sec. Litig.*, the key word searches for phrases relating to bullion and other rare coins and metals is public and commonly known in the industry. Defendant Shark works with Semrush, which provides keyword search terms (or similar keyword search terms) that are contained in the Presentation. Thus, with regards to the marketing plan, Plaintiff cannot establish that the information contained in its marketing plan is not already public and commonly known in the industry. Therefore, Plaintiff cannot show that it likely to prevail on its DTSA claim regarding its marketing plan.

Second, Plaintiff cannot establish that Defendant Shark ever received a copy of Plaintiff's customer list and cannot establish that Defendant Ovodova, as an employee of Defendant Shark,

is utilizing Plaintiff's customer list. Instead, Plaintiff makes untrue and speculative statements in an attempt to overcome its failure to establish a claim pursuant to the DTSA. Plaintiff's claim that Defendant Shark either hired or commissioned Defendant Ovodova to provide services to Defendant Shark while she was still employed by Plaintiff is demonstrably false. To that end, Defendant Shark did not make any payments to Defendant Ovodova nor is there any payroll records that evidence that Defendant Shark was paying Defendant Ovodova prior to her employment began.

Both of Defendant Shark's principles attest that they engaged a recruiting company to provide potential applicants to interview for the position of Head of eCommerce. Due to the cost and responsibility of that position, Defendant Shark asked the recruiting company what type of due diligence it should take to ensure that it hired a candidate that had the requisite knowledge and ability to handle the position. Part of the due diligence recommended by the recruiting company was to have Defendant Ovodova prepare a marketing strategy with her goals and strategy on how to improve Defendant Shark's business. Defendant Shark never asked or required Defendant Ovodova to take any information from Plaintiff, including its marketing plan or its customer list. Further, Plaintiff claims that Defendant Shark acted as Defendant Ovodova's "secret second employer" without any proof to support this claim, while Defendant Shark has provided sworn declarations that it was merely interviewing Defendant Ovodova at the time that Plaintiff alleges there was an improper business relationship with Defendant Shark. Nothing could be further from the truth here. As further proof of Plaintiff's purely speculative claims, in the five (5) months that Plaintiff has been in contact with Defendant Shark about its potential claims and since it filed the instant lawsuit, Plaintiff has failed to establish a single customer that Defendant Shark has misappropriated. This is because Defendant Shark does not have Plaintiff's customer list and no

employee of Defendant Shark is utilizing any customer list to the extent that it was taken, which Defendant Shark has no knowledge of. Furthermore, Defendant Shark has provided the most relevant relief that was requested by Plaintiff in its proposed order to show cause; Defendant Shark has attested that it does not have any copies of Plaintiff's customer list and it cannot destroy any customer list that it does not have.

Accordingly, Plaintiff is unable to establish a likelihood of success on the merits of its DTSA claim and Plaintiff's request for an order to show cause must be denied in its entirety.

**B.   *Plaintiff cannot establish the likelihood that it will prevail on its second cause of action for violation of New York Trade Secret Law***

"Under New York law, '[a] plaintiff claiming misappropriation of a trade secret must prove that (1) it possessed a trade secret, and (2) the trade secret was used by defendant in breach of an agreement, confidence, or duty, or as a result of discovery by improper means.'" *Intertek Testing Servs.*, 443 F. Supp. 3d at 339 (*citing Universal Instruments Corp. v. Micro Sys. Eng'g, Inc.*, 924 F.3d 32, 49 (2d Cir. 2019)). "A trade secret is any formula, pattern, device or compilation of information which is used in one's business, and which gives one an opportunity to obtain an advantage over competitors who do not know or use it." *Id.*; *accord Faiveley Transp. Malmo AB*, 559 F.3d at 117.

First, regarding the marketing strategy that Plaintiff claims constitutes a trade secret, as detailed in Point II.A., the information contained in the in Presentation that Candidate Labs had Defendant Ovodova provide to Defendant Shark as part of her interview process does not give Plaintiff an advantage over competitors who do not know or use it. The key word search terms that were contained in the marketing strategy are commonly known, and Defendant Shark pays a third-party software company, Semrush, to provide they key word search terms to Defendant Shark. Semrush searches publicly available information to provide the keyword search terms and other

20

SEO information to Defendant Shark. Thus, the information contained in the marketing strategy is not a trade secret because it does not give Plaintiff an advantage over competitors – to the extent Defendant Shark is a competitor – due to the ability to obtain the information through an independent source.

Second, Plaintiff is unable to establish that its customer information was used by Defendant Shark. While Plaintiff relies on allegations "upon information and belief" that Defendant Shark is utilizing Plaintiff's customer list, Defendant Shark's principles deny that they have received Plaintiff's customer list from Defendant Ovodova and are therefore not utilizing any customer list of Plaintiff. A fact underscored considering that Plaintiff has failed to allege or show a single customer that ceased doing business with Plaintiff due to any alleged misappropriation of Plaintiff's customer list since Defendant Ovodova left her employ with Plaintiff seven months ago. Such a speculative claim is insufficient to warrant a TRO. *See Medquest Ltd. v. Rosa*, 2023 U.S. Dist. LEXIS 46830, *16 (S.D.N.Y. 2023) ("speculative allegations are not sufficient to allege misappropriation of a trade secret."); *Frydman v. Verschleiser*, 172 F. Supp. 3d 653, 674-75 (S.D.N.Y. 2016) (dismissing claim that a defendant "conspired to steal the Stolen Trade Secrets" and "effected the scheme through [another individual]" as conclusory). Thus, Plaintiff is unable to establish a likelihood of success that Defendant Shark or Defendant Ovodova is utilizing Plaintiff's customer list through improper means.

Moreover, Plaintiff is unable to establish that there was any misappropriation by Defendant Ovodova due to any alleged breach of an agreement. Instead, Plaintiff attempts to allege that Defendant Ovodova was bound based upon Plaintiff's employee handbook. However, an employee handbook is not automatically deemed a contract pursuant to New York Law. *See Recovery Racing III LLC v. Brown*, 2021 U.S. Dist. LEXIS 262614, *813 (E.D.N.Y. 2021); *Hecht*

*v. Nextel*, 2012 U.S. Dist. LEXIS 89351, at *19 (S.D.N.Y. June 27, 2012) ("It is well settled under New York law that a disclaimer in an employment handbook indicating that it is not a contract precludes a breach of contract claim."). Plaintiff has failed to include a copy of its employee handbook to determine whether any such disclaimer is present. Notably, despite Plaintiff's averments about how top secret their marketing strategy and customer list are, conspicuously absent from Plaintiff's purported stringent security controls is any restrictive covenant prohibiting such disclosure and use.

Thus, Plaintiff is unable to show a likelihood of success on its claim for a violation of New York Trade Secret Laws.

C. *Plaintiff cannot establish the likelihood that it will prevail of its cause of action for Unfair Competition*

Plaintiff fails to address the requisite elements of its unfair competition claim, warranting a finding that Plaintiff has failed to establish a likelihood of success on the merits of that claim.

Pursuant to New York law, a claim for unfair competition is predicated upon "the alleged bad faith misappropriation of a commercial advantage belonging to another by exploitation of proprietary information or trade secrets." *Weil v. Stenzler*, 2019 N.Y. Misc. LEXIS 1751 (Sup. Ct. N.Y. Cnty. Apr. 5, 2019) (internal citations omitted). Thus, in order to establish a claim for unfair competition, Plaintiff is required to establish that (1) it possessed a trade secret; (2) Defendant(s) used that trade secret in breach of an agreement, confidential relationship, or duty, or as a result of discovery by improper means; and (3) Defendant(s) engaged in bad faith misappropriation of a commercial advantage belonging exclusively to Plaintiff. *See Schroeder v. Pinterest Inc.*, 133 A.D.3d 12 (1st Dept 2015); *Weil*, 2019 N.Y. Misc. LEXIS 1751. Moreover, "[u]nder New York law, damages is an essential element of unfair competition claims." *eCommission Sols, Inc. v. CTS Holdings Inc.*, 860 Fed. Appx. 758, 760 (2d. Cir. 2019) (granting summary judgment to defendant

because plaintiff failed to provide any admissible evidence to support its claim that defendant's use of plaintiff's pricing and customer list caused a loss of business to plaintiff); *see also Waste Distillation Tech., Inc. v. Blasland & Bouck Eng'rs, P.C.*, 136 A.D.2d 633, 523 N.Y.S.2d 875 (2d Dept. 1988) ("[T]he absence of sufficient allegation of special damages mandates the dismissal of the plaintiff's unfair competition and prima facie tort causes of action."). The damages alleged pursuant to an unfair competition claim must be directly traceable to the acts of unfair competition, and the "damages cannot be remote, contingent or speculative . . . . The standard is not one of mathematical certainty but only reasonable certainty." *Id.* (*quoting E.J. Brooks Co. v. Cambridge Sec. Seals*, 31 N.Y.3d 441, 80 N.Y.S.3d 162 (2018).

Here, as previously detailed *supra*, Plaintiff cannot establish that the alleged marketing strategy is a trade secret. Thus, the only alleged trade secret that Plaintiff can attempt to claim it possessed was its customer list. However, Plaintiff is unable to establish the remaining elements of the unfair competition claim. Recognizing its failure to establish this claim, Plaintiff's Memorandum of Law provides little to no argument relating to the remaining elements of an unfair competition claim. To that end, Plaintiff is unable to produce any facts to establish that it is likely to show that Defendant Shark or Defendant Ovodova is using Plaintiff's customer list. Defendant Shark has not received any copy of Plaintiff's customer list and none of Defendant Shark's employees are using Plaintiff's trade secret. Similarly, as Defendant Shark is not in possession of Plaintiff's customer list, it could not have misappropriated a commercial advantage belonging exclusively to Plaintiff.

Furthermore, Plaintiff only alleges hypothetical harm by claiming that it is "highly likely" that Defendant Ovodova misappropriated Plaintiff's alleged trade secrets to give Defenant Shark a competitive advantage and to impress Defendant Shark. Plaintiff cannot establish, let alone does

not allege, any damages attributable to any alleged theft of trade secrets. Moreover, as Defendant Shark has not received and are not using any of Plaintiff's trade secrets, Plaintiff will be unable to prove damages, and Plaintiff is unable to establish a likelihood of success on the merits of their unfair competition claim. Accordingly, Plaintiff's request for a TRO and preliminary injunction must be denied.

### D. Plaintiff cannot establish the likelihood that it will prevail of its cause of action for aiding and abetting breach of fiduciary duty

Pursuant to New York law, a claim for aiding and abetting a breach of fiduciary duty requires: (1) a breach by a fiduciary of obligations to another; (2) that the defendant knowingly induced or participated in the breach; and (3) that plaintiff suffered damage as a result of the breach. *Palmetto Partners, L.P. v. AJW Qualified Partners, LLC*, 83 A.D.3d 804, 808-809 (2d Dept. 2011) (internal citations omitted). Moreover, "[a] person knowingly participates in a breach of fiduciary duty only when he or she provides substantial assistance to the primary violator." *Kaufman v. Cohen*, 307 A.D.2d 112, 126, 760 N.Y.S.2d 157 (2003) (internal citations omitted). Substantial assistance occurs when a defendant affirmative assists, helps conceal or fails to act when required to do so, thereby enabling the breach to occur. *Id.*, (internal citations omitted*)*. However, inaction constitutes substantial assistance only when an "independent duty to act was a duty owed to the defrauded investor." *Kolbeck*, 939 F.Supp at 247 (internal citations omitted). "[I]naction, or a failure to investigate, constitutes actionably participation only when a defendant owes a fiduciary duty direct to the plaintiff; that the primary violator owes a fiduciary duty to the plaintiff is not enough. *Id.*, (*citing* W. Page Keeton *et al.*, *Prosser & Keeton on the Law of Torts* § 46 at 323-24 (5th ed. 1984) ("Since there is ordinarily no duty to take affirmative steps to interfere, mere presence at the commission of the wrong . . . is not enough to charge one with responsibility)).

Here, Plaintiff is unable to establish a likelihood of success on its claim for aiding and abetting breach of fiduciary duty.

Here, Plaintiff has failed to show a likelihood of success on the merits for any of the elements to establish a claim for aiding and abetting a breach of fiduciary duty. "A fiduciary relationship exists between two persons when one of them is under a duty to act for or to give advice for the benefit of another upon matters within the scope of the relation. Mere allegations that a fiduciary relationship exists, with nothing more, are insufficient." *Smith v. Pleasantville Cottage Sch.*, 2022 N.Y. Misc. LEXIS 6094, *3 (2022) (*quoting AG Capital Funding, LP v. State Street Bank and Trust*, 11 N.Y.3d 146, 158 (2008)). Plaintiff has failed to establish, beyond mere allegations, that a fiduciary relationship existed between Plaintiff and Defendant Ovodova.

*Assuming arguendo* that Plaintiff has alleged sufficient facts to establish that Defendant Ovodova owed Plaintiff a fiduciary duty, Plaintiff is unable to satisfy the other remaining elements to show a likelihood of success of its claim for aiding and abetting a breach of fiduciary duty as against Defendant Shark. As further detailed in the and Declaration of Andrew Adamo, Plaintiff cannot show that Defendant Shark knowingly or induced Defendant Ovodova to breach her fiduciary duty to Plaintiff. Defendant Shark utilized a neutral, third-party recruiting service, Candidate Labs to perform a search for candidates for the Head of eCommerce position. Candidate Labs provided Defendant Shark with an interview process form, and helped to guide Defendant Shark through the process. Part of the interview process form provided that Defendant Shark should request the candidates to provide a 30/60/90 day plan for onboarding as the Head of eCommerce position. Thus, Defendant Shark requested Defendant Ovodova to create a marketing plan presentation as part of Defendant Shark's due diligence to effectively and efficiently interview candidates for employment. At no point in the interview process did Defendant Shark request that

Defendant Ovodova provide it with a copy of Plaintiff's marketing plan. Moreover, a review of the allegedly proprietary marketing plan that Plaintiff submitted as Exhibit 3 to the Declaration of Ernest Gozenput with the Presentation that Defendant Ovodova provided to Defendant Shark has little to no overlap. The only overlap between the two documents is the marketing channels distribution, which contains Bullion Shark's information, and the list of keyword search terms. However, Bullion Shark has used a software program Semrush, for years prior, which provides the keyword search terms. Thus, the search term information is not proprietary to Plaintiff as it exists in the public domain.

Additionally, Defendant Shark is not in possession of any customer list of Plaintiff and did not ask or encourage Defendant Ovodova to make a copy of Plaintiff's customer list, to the extent that she did so. Plaintiff has no ability to allege, beyond upon information and belief, that Defendant Shark is in possession of Plaintiff's customer list. There are no records that show that Defendant Ovodova ever sent Defendant Shark Plaintiff's customer list.

Plaintiff argues that Defendant Shark had created an improper business relationship with Defendant Ovodova three weeks before she resigned from Plaintiff and was acting as her "secret second employer" to encourage and induce her to steal Plaintiff's trade secrets. Despite attempting to pull the wool over this Court's eyes in its Memorandum of Law, Plaintiff admits in its Complaint that it has no first-hand knowledge that Defendant Shark encouraged Defendant Ovodova to misappropriate Plaintiff's customer list before she gave her notice of resignation. *See* ECF Doc. No. 1, ¶ 58 (alleging "upon information and belief, Bullion Shark encouraged Ovodova to misappropriate Bullion Exchange's customer lists before she gave Bullion Exchange notice of her resignation.). *See Singh v. Thiyakaraajakkurukkal*, 2013 N.Y. Misc. LEXIS 7088, * 9 (Sup. Ct. Nassau Cnty. Aug. 1, 2013) (denying request for temporary restraining order based on allegations

"upon information and belief"); *Indy 3000, Inc. v. Cirillo*, 2011 N.Y. Misc. LEXIS 3332, *14-15 (Sup. Ct. Suffolk Cnty. July 5, 2011) (vacating preliminary injunction granted based upon allegations "upon information and belief" and granting cross-motion for a hearing on damages sustained by reason of the temporary restraining order). Thus, Plaintiff is unable to show that Defendant Shark did not participate in any breach, and did not assist or encourage Defendant Ovodova to breach her fiduciary duty to Plaintiff.

Moreover, Plaintiff has admitted that it does not have any damages. Instead, it submits that it may face damages in the future based on the alleged actions of Defendant Ovodova. Plaintiff states that "upon information and belief", Defendant Ovodova is using Plaintiff's marketing strategy and customer list to drive business to Defendant Shark. However, this speculative allegation, without more, is insufficient to establish a likelihood of success on the merits. In its Complaint, Plaintiff states that "Bullion Shark and/or Ovodova could easily sell Bullion Exchange's customer lists to other competitors of Bullion Exchange – if they have not done so already." *See* ECF Doc. No. 1, ¶ 80. Plaintiff again repeats this same hypothetical damage in the Declaration of Ernest Gozenput when it alleges that "Bullion Shark and/or Ovodova could easily sell [Plaintiff's] customer lists to other competitors. Should this occur, it would be extremely difficult for Bullion Exchange to discover this misconduct and prevent further irreparable harm and economic loss." *See* ECF Doc. No. 8, ¶ 37.

Defendant Shark again repeats that it never received Plaintiff's customer list so it's an impossibility that its employees are using Plaintiff's customer list. As a consequence, Plaintiff will never be able to show any damages. Again, seven months have passed since Defendant Ovodova left her employ with Plaintiff and Plaintiff has not yet identified a single lost customer or lost

penny attributable to any of the fanciful allegations Plaintiff concocts. Nor has Plaintiff produced

a single record that shows that Defendant Shark is in possession of Plaintiff's customer list.

Additionally, Defendant Shark would have no use of Plaintiff's customer list based upon

the difference between its customers and Plaintiff's customers, as detailed herein. Even if

Defendant Shark had Plaintiff's customer list, Defendant Shark would not be able to market

anything to them based on the difference in customers and the difference in the products sold.

Nearly none of Defendant Shark's business comes from the products that Plaintiff sells. For

example, Defendant Shark may have a coin that is worth $30.00 in silver, but it is sold for $20,000

because of the rarity of the coin. One example of this is the Morgan Silver Dollars that Defendant

Shark sells. The Morgan Silver Dollar may only have $25.00 worth of silver if it were melted, but

these coins sell for anywhere from $1,000.00 to $50,000.00 based on the rarity of the coin. Thus,

the melt value of the coin is insignificant. Conversely, the value of Plaintiff's products is dictated

solely based on the melt value, and their products typically sell at or around the melt value of the

coin. Out of the approximately 4,000 products currently on Defendant Shark's website, only

between 10 to 20 of those products are bullion related (meaning selling around the melt value of

the coin).

Accordingly, Plaintiff is unable to show a likelihood of success on the merits of its claim

for aiding and abetting breach of fiduciary duty against Defendant Shark.

E. *Plaintiff cannot establish the likelihood that it will prevail of its cause of action for unjust enrichment*

"The elements of a cause of action to recover for unjust enrichment are '(1) the defendant

was enriched, (2) at the plaintiff's expense, and (3) that it is against equity and good conscience to

permit the defendant to retain what is sought to be recovered.'" *GFRE, Inc. v U.S. Bank, N.A.*, 130

A.D.3d 569, 570 (2d Dept. 2015) (*quoting Mobarak v. Mowad*, 117 A.D.3d 998, 1001, 986

N.Y.S.2d 539 (2014)). "The essential inquiry in any action for unjust enrichment or restitution is whether it is against equity and good conscience to permit the defendant to retain what is sought to be recovered" *Id.* (*internal citations omitted*)

Again, Plaintiff again submits argument in contradiction to its Complaint by stating that Defendants have used and continue to use Plaintiff's trade secrets. Plaintiff has failed to produce any proof that Defendant Shark is utilizing Plaintiff's information. Instead, Plaintiff submits conclusory statements that Defendant Shark has generated revenues through sales to Plaintiff's customers. Such a conclusory allegation, without proof of a single customer that has supposedly purchased products from Defendant Shark based on the use of any of Plaintiff's trade secret(s) warrants a finding that Plaintiff does not have a likelihood of success on the merits. This is especially true considering the sworn statements of Defendant Shark's principles that it is not in possession or using any of Plaintiff's trade secrets.

Further, Plaintiff submits a conclusory statement, without proof, that Plaintiff has been harmed due to the alleged misappropriation. Plaintiff does not provide a single customer name that no longer does business with, or does substantially less business with, Plaintiff due to Defendant Shark or Defendant Ovodova's alleged actions. Thus, Plaintiff cannot show how Defendant Shark was enriched at Plaintiff's expense. As such, Plaintiff is unable to show a likelihood of success on the merits of its unjust enrichment claim.

## **CONCLUSION**

Based on the above, Plaintiff is unable to establish its entitlement to the extreme remedy of a TRO and preliminary injunction. Accordingly, Defendant Shark respectfully requests that this Court deny Plaintiff's request for a TRO and preliminary injunction in its entirety and to grant such other and further relief as this Court deems just and proper.

Dated:   Lake Success, New York
         April 5, 2024

**MILMAN LABUDA LAW GROUP PLLC**

By:____*/s/ Kyle F. Monaghan, Esq.*_____
Kyle F. Monaghan, Esq.
3000 Marcus Avenue, Suite 3W8
Lake Success, NY 11042-1073
(516) 328-8899 (office)
(516) 303-1361 (direct dial)
(516) 328-0082 (facsimile)
kyle@mllaborlaw.com
*Attorneys for Defendant Bullion Shark, LLC*