UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------------------X
BULLION EXCHANGE LLC,

                    **Plaintiff,**

- against -

BULLION SHARK, LLC and EKATERINA OVODOVA,

                    **Defendants.**
-----------------------------------------------------------------X

Case No.: 2:24-cv-467 (DG)(JMW)

**DECLARATION OF ANDREW ADAMO IN OPPOSITION TO PLAINTIFF'S MOTION FOR A TEMPORARY RESTRAINING ORDER, PRELIMINARY INJUNCTION**

Andrew Adamo declares, pursuant to 28 U.S.C. § 1746, under penalty of perjury, that the following is true and correct:

1. I am an owner and President of Bullion Shark, LLC ("Defendant Shark"), a Defendant in this case.

2. As such, I am familiar with all the facts and circumstances heretofore had herein based upon my personal knowledge and a review of documents I maintain at the Defendant Shark office.

3. Defendant Shark was duly incorporated in May 2014.

4. Since its incorporation, Defendant Shark has operated in the field of collectible trading, including rare coins and precious metals, and provides its customers with the ability to purchase rare coins and precious metals, in addition to other collectibles.

5. Since its inception, Defendant Shark has invested in, developed, created, and fostered its customer list through its sales, marketing, and advertising efforts, which has cost Defendant Shark substantial time, effort, and money to do over the last near-decade.

6. My brother, Nicholas Adamo ("Nicholas") originally formed Defendant Shark in or around 2015 in order to turn his hobby of collecting rare coins and precious metals into a profitable business.

7. In or about May of 2015, I began working for and with Nicholas to help operate Defendant Shark.

8. For nearly a decade, Defendant Shark built and cultivated significant relationships in the rare coins and precious metals industry.

9. In the initial stages of what was our start-up, Nicholas and I would find and cultivate qualified leads and other potential customers that had displayed an interest in rare and vintage coins.

10. We would also make contact and connections with potential customers through various trade shows and acquired customers through the online business that Defendant Shark initially operated.

11. Eventually, based on our efforts in sourcing leads of potential customers and through Defendant Shark's paid advertisements, Defendant Shark had a master list of qualified leads and existing customers.

12. Defendant Shark was able to create and facilitate its list of qualified leads and existing customers through, among other things, the millions of dollars that we spent on advertisement and our attendance and participation at trade shows.

13. Further, in the last year alone, Defendant Shark has spent approximately one million dollars ($1,000,000) in advertising alone in order to help facilitate and grow our list of qualified leads and existing customers.

14. Defendant Shark also spends money to attend and/or have a table at various trade shows around the country, including in Maryland, Pennsylvania, California and Florida.

15. At these trade shows, Defendant Shark sells to other coin dealers and suppliers, and also networks with suppliers, vendors, and – of course – leads or prospective customers.

16. Moreover, Defendant Shark advertises in industry magazines, including but not limited to Coin World, a nationwide magazine, wherein it advertises its business to further facilitate its list of qualified leads which it converts to customers, whose identities are maintained in our customer list.

17. Defendant Shark also created its own website in order to advertise the various rare coins and precious metals that it has to offer, and spent (and continues to spend) substantial sums of money in creating and maintaining that website.

18. In addition, Defendant Shark spends significant amounts of money on its social media presence and other online advertising to help market itself and to grow its customer list.

19. Defendant Shark's customer list is kept confidential due to its inherent value in assisting it to make additional sales to customers.

20. The success of maintaining this information is evident because, when Defendant Shark contacts a qualified lead or existing customer, a vast majority of the time, that qualified lead or existing customer had already purchased products from Defendant Shark.

21. As such, this confidential information derives independent economic value.

22. Moreover, Bullion Shark's paid advertisement campaign drives people to visit its website, wherein customer information is saved and maintained in an encrypted system.

23. To date, Defendant Shark has over 1,200,000 followers on Facebook, 800,000 followers on TikTok, 600,000 followers on Instagram, and 310,000 followers on YouTube.

24. Part of Defendant Shark's marketing includes the retention of a third-party company, Semrush, which provides Defendant Shark with keywords, rankings, organic traffic and SEO information that is publicly available for competitors. This provides Defendant Shark with information on keywords to target to expand its own marketing.

25. Recognizing the inherent value in this information, and that it is shared with sales representatives that are hired by it, Defendant Shark requires its employees to sign restrictive covenant agreements prior to being provided its confidential and proprietary information.

26. These agreements provide, generally speaking, that all company information – including customer and lead information – is confidential and proprietary to Defendant Shark, and the agreements require that the sales representatives do not compete with Defendant Shark nor solicit its leads, customers, employees, and/or vendors.

27. In addition, Defendant Shark limits the employees that can view this encrypted customer information; when a sales representative is provided access to this encrypted customer information, they are not provided the entire qualified lead and customer list.

28. This is another method by which Defendant Shark safeguards its confidential information and proprietary trade secrets.

29. Further, Defendant Shark's customer information encrypted in a customer relationship management ("CRM") system and is password protected.

30. Bullion Shark goes through such great lengths to protect this information; its passwords are changed *daily* at the end of every day by Nicholas and I. Moreover, there is a multifactor authentication that is required for any salesperson to access the qualified leads and customer information, including myself and Andrew.

31. Only administrative Defendant Shark employees have access to the entire qualified lead and potential customer list in order to fulfill their job duties.

32. It is worthy to note that Bullion Shark has spent thousands of dollars to install, maintain, tailor, and customize the CRM system to Bullion Shark's needs.

33. All of this information is confidential and proprietary to Bullion Shark.

34. On or about early August 4, 2023, Defendant Shark contacted a neutral, third-party recruiting service, Candidate Labs Inc. ("Candidate Labs") to provide candidates for its Head of eCommerce position.

35. Defendant Shark did so as the Head of eCommerce position was to be a highly compensated position and Defendant Shark wanted to ensure it performed its due diligence in interviewing and selecting a qualified candidate.

36. On or about August 8, 2023, Candidate Labs emailed Defendant Shark's principles to provide a synopsis of the candidate that Defendant Shark was looking to interview, and provided Defendant Shark with an interview process form.

37. The interview process form contained suggested questions and strategies for interviewing candidates for employment.

38. On or about August 15, 2023, Candidate Labs provided Defendant Shark with the name of the first candidate that it located for Defendant Shark to interview, Defendant Ekaterina Ovodova ("Defendant Ovodova"). Candidate Labs provided Defendant Ovodova's resume and notes from Candidate Labs' initial phone call with Defendant Ovodova.

39. Defendant Shark requested that Candidate Labs schedule a time for Nicholas and I to interview Defendant Ovodova, and Candidate Labs reached out to Defendant Ovodova and scheduled the interview with her.

40. On or about August 23, 2024, Nicholas and I conducted a virtual interview with Defendant Ovodova. During this interview, Defendant Ovodova impressed us, and based upon the instruction by Candidate Labs, we requested that she provide an action plan presentation on how she would help Defendant Shark if she were to be hired.

41. Following our interview with Defendant Ovodova, Nicholas and I again contacted Candidate Labs to help coordinate the second interview for Defendant Ovodova and we further asked Candidate Labs to provide Defendant Ovodova with guidelines with what should be contained in the action plan presentation pursuant to the initial interview strategy procedures that Candidate Labs had provided to us to use in our candidate search.

42. The guidelines that Candidate Labs provided to Defendant Ovodova for the action plan was to provide a strategy plan for achieving Defendant Shark's goals, including obtaining more leads from its website, optimizing advertisements and search engine optimization ("SEO"), optimizing other existing channels, including but not limited to social media, increasing conversion rates for prospective customers, creating new channels for advertisements, and any other additional website optimization that Defendant Ovodova felt would benefit Defendant Shark.

43. At no point did Nicholas or I ask that Defendant Ovodova take any information from Plaintiff. Further, upon information and belief, Candidate Labs did not ask Defendant Ovodova to take any information from Plaintiff. Instead, we were simply doing our due diligence on a prospective hire and were investigating her knowledge of advertisements and eCommerce.

44. On or about August 24, 2023, Candidate Labs provided Nicholas and I with additional candidates to consider.

45. On or about August 28, 2023, Nicholas and I conducted a second-round interview

6

with Defendant Ovodova, wherein she provided what she titled "Marketing Plan Presentation" (hereinafter the "Presentation"). Annexed hereto as Exhibit "A" is a copy of the Presentation.

46. The Presentation contained information relating to brand overview and goals, key performance indicators, an action plan on how to achieve 25% increase in online business, a list of marketing channels, all of which Defendant Shark was already advertising on, and optimization opportunities examples. Part of the optimization opportunities included a breakdown of Defendant Shark's ranking for hits per keyword searched.

47. Again, it must be reiterated that Defendant Ovodova created the Presentation based upon Candidate Labs' instruction and in order to evaluate whether Defendant Ovodova had the knowledge that she was stating she had during her interview.

48. None of the information contained in the Presentation contained any proprietary information from Plaintiff and there was no information contained in the Presentation that would have caused Nicholas or I to believe Plaintiff took the information from any other entity.

49. Moreover, the only purpose of the Presentation was for Nicholas and I to interview Defendant Ovodova regarding her knowledge of ecommerce. None of Defendant Shark's employees, nor Nicholas and I, have not used the Presentation since Defendant Ovodova provided it to us.

50. Furthermore, there was no information or strategy in the Presentation that Defendant Shark was not already using.

51. Thus, nothing contained in the Presentation was a novel idea and Nicholas and I already knew the information contained in the Presentation.

52. During the August 28, 2023, second round interview, Nicholas and I informed Defendant Ovodova that we were still considering other candidates and that we would reach out

7

to her.

53. On August 29, 2023, Candidate Labs provided additional candidates for Defendant Shark to interview for the position.

54. Ultimately, Defendant Shark determined that it wanted to make Defendant Ovodova an offer, but first requested that Candidate Labs make sure that there were no clauses or non-competes in contract with her then-employer, Plaintiff, that would cause an issue for Defendant Shark if they were to employ Defendant Ovodova.

55. Candidate Labs confirmed that there were no restrictive covenants or non-competes in her contract with Plaintiff. Defendant Shark discussed what it should offer Defendant Ovodova for initial compensation.

56. Following the confirmation by Candidate Labs that there were no clauses that would have prevented Defendant Ovodova from working with Defendant Shark, Nicholas and I extended an offer of employment to Defendant Ovodova on or about September 1, 2023, pending clearance from Defendant Ovodova's background screening.

57. Defendant Ovodova accepted the employment offer from Defendant Shark on the same day.

58. Following clearance of Defendant Ovodova's background screening, Defendant Shark and Defendant Ovodova agreed on a start date of September 18, 2023 as Defendant Shark wanted to ensure that Defendant Ovodova was able to provide Plaintiff with two (2) weeks-notice of resignation.

59. Thereafter, Defendant Ovodova began her employment with Defendant Shark on or about September 18, 2023. At no point prior to her employment and at no point through the present did I, Nicholas or any employee of Defendant Shark ask or require Defendant Ovodova

to take any information from Plaintiff, including its customer lists or other potentially proprietary information.

60. Defendant Shark takes seriously the safeguards that are in place to protect its customer list and other trade secrets of Defendant Shark.

61. In fact, just as it does with any other employee, Defendant Shark required that there be language included in Defendant Ovodova's employment agreement that provided that she acknowledged and agreed that Defendant Shark's suppliers and customers, customer sales histories and Defendant Shark's pricing and cost data, analytical business data and business strategies and operations were considered confidential information and constituted a trade secret of Defendant Shark.

62. The employment agreement further provided that Defendant Ovodova would not directly or indirectly use, divulge, furnish or otherwise make available to anyone Defendant Shark's confidential information and trade secrets.

63. Thus, Defendant Shark maintains its own measures to safeguard its confidential information and trade secrets and does not infringe on any other company's trade secrets or confidential information, including Plaintiff.

64. To this date, Defendant Shark has not received any trade secret of Plaintiff, including its customer list (and marketing plan, to the extent it is a trade secret of Plaintiff). Nor has any employee of Defendant Shark received and/or is using Plaintiff's customer list or marketing plan.

65. Defendant Shark has not improperly solicited any of Plaintiff's customers and would not have any ability to determine if it had contacted any of Plaintiff's customers as Defendant Shark does not know who Defendant Shark's customers are.

66. Further, Defendant Shark and Plaintiff are not direct competitors.

67. While Defendant Shark and Plaintiff both sell various coins and there may be overlap in their customer base, the value of the products that Defendant Shark sells is derived from the rarity of the coin itself compared to Plaintiff's products, that value of which is determined based on the type of metal contained in the coin. For example, Defendant Shark sells categories of coins that are from various shipwrecks. The value of these coins is dependent on the shipwreck that the coins were discovered at (i.e. coins discovered from the Atocha ship from 1622, compared to coins discovered from the S.S. New York during the Civil War). Thus, the types of customers that Defendant Shark typically encounters are collectors of coins.

68. Conversely, Plaintiff's products derive their value based on the type of metal that is in the coin itself (i.e. gold, silver, platinum). The value of these coins fluctuates with the current market price of the metal, and is not dependent on the rarity of the coin. Thus, Plaintiff's customers are fundamentally different from Defendant Shark's customers because Plaintiff's customers are looking to buy and trade the coins for the value of the metal and to make a profit, similar to stocks. In fact, Plaintiff's website contains a chart that shows the current price chart for the various types of metals, again, similar to a stock. Thus, Plaintiff and Defendant Shark are not direct competitors of each other, as each sells products whose value is dependent on different factors.

69. Based on Plaintiff's request for Defendant Shark's confidential and proprietary and information and because Defendant Shark has not received any of Plaintiff's confidential or proprietary information, Plaintiff's motion should be denied in its entirety and Defendant Shark should be dismissed from this case.

70. I respectfully request that this Court deny Plaintiff any relief requested and further dismiss Defendant Shark from this lawsuit.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on April 5, 2024.

Andrew Adamo