UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| BULLION EXCHANGE LLC,<br><br>                           Plaintiff,<br><br>                 v.<br><br>BULLION SHARK, LLC, and EKATERINA OVODOVA,<br><br>                          Defendants. | Case No. 24-CV-00467 (DG)<br><br>**REPLY DECLARATION OF ERNEST GOZENPUT IN RESPONSE TO ALLEGATIONS MADE DEFENDANTS AND IN FURTHER SUPPORT OF PLAINTIFF'S MOTION FOR A PRELIMINARY INJUNCTION** |

ERNEST GOZENPUT[1] declares, pursuant to 28 U.S.C. § 1746, that the following is true and correct:

1.    I am the Chief Executive Officer and a member of Bullion Exchange LLC ("Bullion Exchange" or "Plaintiff"), roles that grant me comprehensive oversight over our operations and strategic decision-making. The facts described herein are based on my personal knowledge or acquired from my review of Bullion Exchange's books and records, which are maintained in the ordinary course of its business. I respectfully submit this Declaration in reply to the Declarations of Andrew Adamo ("Adamo"), dated April 5, 2024 (ECF No. 33)(the "Adamo Declaration" or "Adamo Decl."), and the Declaration of Ekaterina Ovodova ("Ovodova Declaration" or "Ovodova Decl.), dated April 5, 2024 (ECF No. 30)(the "Ovodova Declaration" or "Ovodova Decl."). This Reply Declaration also provides further support for Bullion Exchange's motion (the "Motion"), brought by order to show cause (ECF No.7), seeking a temporary restraining order and preliminary injunction against Defendants Bullion Shark LLC ("Bullion Shark") and Ekaterina Ovodova ("Ovodova") (collectively referred to as the "Defendants").

---

[1] Although my legal name is Ernest Gozenput, I am referred to professionally and by friends and family as Eric.

## A. BULLION EXCHANGE AND BULLION SHARK ARE DIRECT COMPETITORS

2. In opposing the Motion, the Defendants suggest Bullion Exchange is not entitled to injunctive relief because it cannot demonstrate irreparable harm. In particular, Bullion Shark and Ovodova falsely claim that, because Bullion Shark and Bullion Exchange are not direct competitors, Bullion Exchange cannot prove that it has been irreparably harmed by the misappropriation of its trade secrets, including its marketing strategy and customer lists. (Adamo Decl. (ECF Doc. 33) at ¶¶ 66-69; Ovodova Decl. (ECF Doc. 30) at ¶¶ 62-70; Bullion Shark Memo of Law (ECF Doc.32) at pp. 0-1, 6-7, 8-10; Ovodova Memo of Law (ECF Doc. 36) at pp. 4-5). Although proving direct competition is not a prerequisite for granting injunctive relief, the evidence clearly establishes that Bullion Shark and Bullion Exchange are direct competitors.

3. In particular, Bullion Exchange and Bullion Shark both sell a wide variety of gold, silver and platinum coins, bars, rounds, and bullion, which vary in price based on the metal content, the age of the coin, the coin's provenance, and its grade/condition. This competitive overlap is evident from a comparison of the top-selling products on both Bullion Exchange and Bullion Shark's websites (www.bullionexchanges.com and www.bullionshark.com respectively).

4. For example, the following screenshots from Bullion Exchange's website (annexed hereto as **Exhibit A**) should be compared to pages from Bullion Shark's website that list substantially similar, if not identical, products (annexed as **Exhibit B**). These exhibits clearly show that both companies sell the same types and varieties of rare, collectible, investment-grade coins, and comparable products. In fact, the most popular products sold on both websites include: Double Eagles; Gold Eagles; Maple Leaf coins; Morgan Dollars; Peace Dollars; Platinum Eagles;

and Silver Eagles, all available in both proof and uncirculated condition from various years. (Compare Exhibit A with Exhibit B).

5. The Defendants' claim that Bullion Exchange's products are sold based purely on the spot value of the precious metal is demonstrably false while the Defendants' products are based on their numismatic value is demonstrably false. (Adamo Decl. (ECF 33) at ¶¶ 67-68). For example, the pricing of Morgan dollars sold by both companies varies significantly based on the year issued, third-party certification and appraisals, the condition of the coin, along with other factors unrelated to the metallurgic content of the coins. (Compare Exhibit A with Exhibit B).

6. Bullion Exchange and Bullion Shark also offer rare coins with unusual provenance favored by numismatic collectors, including shipwreck coins, ancient Byzantine coins, and ancient Roman coins. (Annexed as **Exhibit C** are screenshots from Bullion Exchange's website showing listings for shipwreck coins, Byzantine and Roman coins currently listed for sale). Contrary to Bullion Shark's assertions, which aim to differentiate their offerings, Bullion Exchange sells the same or substantially similar ancient and rare coins that compete directly with the rare coins purportedly sold by Bullion Shark. For example, annexed as **Exhibit D** are screenshots from Bullion Shark's website showing listings for shipwreck coins, Byzantine coins, and Roman coins currently listed for sale that shows Bullion Shark offering similar ancient coins to those offered by Bullion Exchange. (Compare Exhibit C with Exhibit D).

7. To further illustrate the overlap in products sold by Bullion Exchange and Bullion Shark, please consider **Exhibit E**, which is a screen shot from Bullion Exchange's website showing a listing for a 2011-W $100 Platinum Eagle NGC PF70 UCAM coin. A corresponding screenshot from Bullion Shark's website (annexed as **Exhibit F**) lists the same exact coin. Both screenshots were taken on April 11, 2024, and show that Bullion Shark and Bullion Exchange are

selling two virtually identical proofs, both with NGC certification, a face value of $100, and even identical packaging. The only difference between these two products is that Bullion Exchange is selling this coin for $1,557.75, while Bullion Shark is selling it for $2,040.00.

8. While Bullion Shark purports to offer an extensive selection of historic U.S. coins and other coins dating back to antiquity, Bullion Exchange also sells historic coins that derive their value for their provenance and historical meaning rather than the spot price of their metal value. (Compare Exhibit C with Exhibit D). The price of the coins sold by Bullion Exchange is based on numismatic factors that extend beyond the spot value of the metal used to stamp those coins.

9. While Bullion Shark may claim to offer a larger inventory of ancient coins and shipwreck coins than Bullion Exchange and may promote the sales of these coins more aggressively than Bullion Exchange, this does not change the fact these companies are direct competitors. Even if Bullion Shark's claims are true (which they are not), the fact that it purports to sell a few items not offered by Bullion Exchange does not change the fact these companies are both direct competitors for ninety-nine (99%) percent of the products they sell. By analogy, Burger King and McDonalds both compete in the fast-food market nationally and are known for selling hamburgers and French fries. Although McDonalds also sells premium coffee drinks and McRib sandwiches, two products that are not sold by Burger King, minor differences in product offerings do not change the fact that Burger King and McDonalds are direct competitors with respect to most of the products they sell (burgers and fries in particular).

10. The evidence here clearly shows that Bullion Exchange and Bullion Shark sell substantially similar, if not the same, products. Both companies' products overlap across bullion, modern numismatic issues, ancient coins, shipwreck coins, and classic U.S. and foreign coin

categories, targeting both precious metals investors and coin collectors/numismatists alike (which often the same customers).

11. Bullion Exchange and Bullion Shark are not direct competitors merely because we sell substantially the same products. We are also direct competitors because we advertise, market, and sell those products using our respective websites, online auction sites (eBay in particular), and other online sales portals to chase the same customers in the same geographic region (i.e., the entire United States). Even the names of the companies, "Bullion Shark" and "Bullion Exchange," strongly suggest to consumers that both companies offer similar, if not identical, products.

12. Both Bullion Exchange and Bullion Shark sell bullion, precious metals in various forms, and in collectible coins and numismatics. Even if some products we sell are not identical, these products are all in the class of physical investment assets which tend to interest the same customers including collectors and investors looking for non-traditional, tangible assets, rather than non-tangible stocks and bonds. Since any given customer has a finite amount of money for such investments and acquisitions, if a Bullion Exchange customer is improperly enticed to make a purchase from Bullion Shark, the funds used for that purchase are no longer available to invest in assets sold by Bullion Exchange, resulting in lost sales opportunities for Bullion Exchange.

**B. AT ALL RELEVANT TIMES, OVODOVA KNEW THAT BULLION SHARK WAS A DIRECT COMPETITOR OF BULLON EXCHANGE**

13. Ovodova states in her declaration, "[i]t was and still is my understanding that Bullion Shark is not a direct competitor of Bullion Exchange." (Ovodova Decl. (ECF No. 30) at ¶ 62; *see also* ¶¶ 18, 59, 62-70) )(reflecting Ovodova's purported belief that Bullion Shark and Bullion Exchange are not competitors). Nevertheless, Ovodova's self-serving statements are demonstrably false.

14. As Director of Marketing for Bullion Exchange, Ovodova was well aware of our primary competitors. It was her duty to manage media and advertising buys that targeted potential customers performing online searches for Bullion Exchange's competitors, redirecting them instead to our website. These "pay-per-click" advertising campaigns are costly, often exceeding $10 per click, which underscores their strategic use solely against direct competitors due to the expenses involved.

15. Ovodova knew that Bullion Shark was a direct competitor to Bullion Exchange because she routinely monitored Bullion Shark's marketing and advertising campaigns and made advertising purchases that mirrored those efforts—which Bullion Shark also routinely does concerning our advertising campaigns. In particular, Ovodova actively targeted customers searching for Bullion Shark by purchasing ads to appear on Google searches and alongside Bullion Shark's YouTube videos. For instance, attached as **Exhibit G** is a Slack conversation dated March 2, 2021, where Ovodova and I discuss a successful Google Ads campaign targeting Bullion Shark customers, costing $495.00 and yielding significant sales. This led to further advertising targeted directly against Bullion Shark's online content on Google and elsewhere, which I approved. Such media buys would only be justified against a direct competitor due to their high cost.

16. At all relevant times, Ovodova knew that Bullion Shark was a direct competitor of Bullion Exchange.

### C. OVODOVA'S CLAIM THAT SHE DOWNLOADED THE CUSTOMER LISTS TO TRAIN A PURPORTED AI CHATBOT IS FALSE

17. Ovodova claims she downloaded the customer lists for the purpose of training an AI Chatbot for Bullion Exchange. Specifically, Ovodova states, "I do not recall if I e-mailed myself the customer lists on September 6, 2023, but I know at some point I did download the customer lists because I was working with a co-worker, Dima Skuratov, on programming an AI

6

Chat Bot for the benefit of Bullion Exchange." (Ovodova Decl. at ¶ 54). This is patently untrue, as Bullion Exchange does not have an AI Chatbot and no such project was ever approved.

18. In fact, on August 22, 2022, Ovodova sent me a message on Slack asking me to approve a project to collaborate with a company that would deploy an AI Chatbot for Bullion Exchange's website, which would need to be trained using Bullion Exchange's data. I declined this proposal, preferring that Bullion Exchange customers interact with live sales staff and not receive generic responses from an AI Chatbot. (A true copy of the conversation I had with Ovodova on August 22, 2022, where I rejected this proposed AI Chatbot is annexed as **Exhibit H**). Use of an AI Chatbot was never again considered by Bullion Exchange.

19. Ovodova's claim that she needed to send copies of Bullion Exchange's customer lists to her personal email account to train an AI Chatbot is false and the assertion that she needed to email copies of our customer lists to her personal email account to train a purported AI Chatbot the day before she gave notice of her resignation defies all logic.

### D. OVODOVA'S CLAIM THAT SHE INFORMED ME THAT SHE WAS LEAVING TO JOIN A COMPANY IN THE INDUSTRY IS FALSE

20. In her Declaration, Ovodova alleges: "on September 7, 2023, I informed Eric that I was resigning from Bullion Exchange effective September 15, 2023. Mr. Gozenput asked me where I was going to work. I declined to inform him that I was going to work at Bullion Shark. I did divulge to Eric that the new company that I was going to work for was in the same industry, but that they were not a direct competitor." (Ovodova Decl. (ECF No. 30) at ¶ 59). This statement is false.

21. Had Ovodova actually told me she was leaving Bullion Exchange to accept a job with another company in the industry, I would not accept her (or any other employee's word) that the new company was not a direct competitor. I would have insisted that they tell me the name of

their new employer. If Ovodova or any other employee refused to provide this information, I would have assumed they were leaving to join a competitor and I would have asked that employee to pack their personal belongings and leave immediately. The employee would still be paid all amounts required under applicable law, but Bullion Exchange cannot risk having an employee on site with access to Bullion Exchange's trade secrets and other confidential information that could be used against us by one of our competitors.

22. In this case, Ovodova was well aware that Bullion Shark was a direct competitor of Bullion Exchange. At a minimum, Ovodova certainly knew I would consider Bullion Shark to be a direct competitor. For this reason, Ovodova deliberately misled me about the identity of her new employer. She falsely claimed that she was leaving to accept a job *outside of the industry* and, based on Ovodova long history with Bullion Exchange and the trust I had in her, I made the mistake of believing her.

23. Had Ovodova been honest with me about joining Bullion Shark, she is correct in believing that she would have been asked to leave the company that day and we would have initiated an immediate investigation of her online activities, email activities, and would have reviewed the contents of her physical data storage devices, server accounts, and the Google Drive account provided by Bullion Exchange for Ovodova's use as a company employee. This is standard procedure anytime an employee is suspected of leaving to join one of our competitors. Had we done this when I was first informed of Ovodova's resignation, we would have uncovered Ovodova's actions much sooner and possibly discovered other breaches of her duties to Bullion Exchange. By lying to me, Ovodova gained a significant head start for herself and for Bullion Shark in the misappropriation of Bullion Exchange's trade secrets.

### E. THE PRECIOUS METALS, BULLION, AND RARE COIN INDUSTRY IS HIGHLY COMPETITIVE

24. The rare coin and precious metals industry, while potentially lucrative, is known for its highly competitive and cutthroat market dynamics. Metals like gold and silver create an inherently limited supply, but there is high demand from collectors and investors. This supply-demand imbalance often leads to fierce competition between dealers and collectors vying to acquire specific rare items. The industry's allure, driven by the high value and appreciative potential of these commodities, draws a diverse array of participants, ranging from individual hobbyists to large-scale investment firms. This wide range of market entrants further intensifies competition as different players vie for the best possible assets to enhance their collections or investment portfolios, utilizing varied strategies and resources.

25. In short, Bullion Shark and Bullion Exchange are in a highly competitive, cutthroat industry. If Bullion Shark has access to Bullion Exchange's customer lists directly or indirectly through Ovodova, Bullion Shark would have an unfair competitive advantage over Bullion Exchange. Bullion Shark could and likely is benefiting greatly from Ovodova's misappropriation of Bullion Exchange's trade secrets to the detriment of Bullion Exchange.

### F. BULLION EXCHANGE'S CUSTOMER LISTS AND MARKETING STRATEGIES ARE PROTECTABLE TRADE SECRETS

26. For the reasons set forth in my declaration in support of the Motion, dated January 18, 2024 (ECF 8), Bullion Exchange's customer lists are protectable trade secrets. (Gozenput Decl. (ECF 8) at ¶¶ 8-10, 35).

27. Bullion Exchange's proprietary marketing strategies, including the marketing strategy misappropriated from Bullion Exchange is also a protectable trade secret. Even if Bullion Exchange and Bullion Shark both use SEO tools like Ahrefs and SEMrush (both of which industry

agnostic tools that are commonly available for a licensing fee) as part of our respective marketing strategies, which does not change the fact that the marketing strategies themselves are proprietary trade secrets. In fact, Bullion Exchange's marketing strategy is a compilation of publicly available data, combined with our own proprietary sales data and analytics, which is then compiled using unique methodologies that we have developed over time to optimize our sales outcomes.

28. The protectable proprietary nature of our marketing strategy lies in "how" the specific analysis, application, and decision-making framework is used to convert public and proprietary sales data and research into actionable business intelligence. Our marketing strategy is the product of trial and error, which is continuously being updated and refined as search engine algorithms, customer tastes, and the availability of new sales portals develop and change. This unique integration of disparate data points into a coherent and strategic marketing plan is a proprietary process that gives Bullion Exchange a competitive advantage. A competitor would gain an unfair advantage from the head start our marketing strategy would provide since our competitor would not have to make the same mistakes we made over the past twelve (12) years to achieve the sales results we now benefit from.

29. In addition, the marketing strategy Bullion Exchange uses is not a product or strategy that can be purchased off the shelf, nor is a static system. Instead, the development of Bullion Exchange's marketing strategy represents a significant investment of resources and intellectual capital. Over the course of more than ten (10) years, our marketing team, consisting of several marketing professionals (including Ovodova), dedicated thousands of hours refining Bullion Exchange's approach to and use of data points we collect from publicly available sources as well as own internal analytics and sales data that is not publicly available. The cost of developing our marketing strategy easily exceeds $4,000,000.00 as of September 6, 2023, after

accounting including fixed costs like salaries, licensing for publicly available marketing tools, customer surveys, website analytics, and time spent developing and optimizing methods for compiling our marketing strategy(ies).

30. Bullion Exchange's marketing strategy also incorporates advanced data analytics, and predictive modeling to forecast market trends and consumer behavior, which we use to determine which products to purchase, how to price our products, and how to advertise and market our products to reach customers most likely to buy those products. In short, our marketing strategy is not merely a collection of tools, but a sophisticated synthesis of multiple data sources including proprietary customer data, competitive analysis, market research, and historical sales data, all processed and analyzed for Bullion Exchange's exclusive benefit.

31. By combining publicly available sales and marketing data with our own internal sales data and analytics, Bullion Exchange has developed its own unique marketing strategy that has enabled it to become one of the largest online retail sellers of gold coins, bullion, precious metals, bills, numismatics, and other collectible items.

32. Although Bullion Exchange and Bullion Shark may both use publicly available search engine optimization tools, it is highly unlikely that we will use these tools in the same way. Our companies certainly have different internal sales data and analytics given the fact that Bullion Exchange has several times the volume of sales compared to Bullion Shark, giving greater value to Bullion Exchange's internal sales data compared to Bullion Shark's internal sales data.

33. If both companies had access to the same data and deployed the same off the shelf marketing strategy, there would be no need for Bullion Shark to have asked Ovodova to provide them with a Marketing Presentation that would boost their online sales by twenty-five (25%) percent. (Adamo Decl. (ECF 33) at ¶ 46). If this were possible without using Bullion Shark's

marketing strategy, Ovodova would not have needed to make a copy of Bullion Exchange's marketing strategy to use as a template for Bullion Shark's new marketing strategy.

34. By all accounts, Bullion Exchange's marketing strategy is a valuable trade secret that has the potential to give Bullion Shark an unfair competitive advantage over Bullion Exchange.

### G. BULLION EXCHANGE WILL BE IRREPARABLY HARMED IF PRELIMINARY INJUNCTIVE RELIEF IS NOT GRANTED

35. The specificity and exclusivity of Bullion Exchange's customer lists and marketing strategy mean that monetary compensation alone is insufficient as a remedy. The loss of control over these trade secrets deprives Bullion Exchange of the exclusive opportunity to maintain its competitive position, leading to potential market share erosion and lost business opportunities that are difficult, if not impossible, to quantify.

36. As noted above, Bullion Exchange's customer list has over 384,000 customers who have purchased products from Bullion Exchange. Bullion Exchange anticipates that many of these customers will be repeat customers. The frequency at which these customers may purchase from Bullion Exchange again, however, is difficult to project. Some customers may return in days or weeks, while others may wait years to make their next purchase. As a result, Bullion Exchange cannot definitively state which customers have not repurchased from Bullion Exchange since its trade secrets were misappropriated, nor can it determine which customers it may have lost to Bullion Shark without the benefit of discovery. Nevertheless, there is a strong likelihood that customers have been or will be lost if use of Bullion Exchanges' trade secrets is not enjoined.

## CONCLUSION

37. In summary, Bullion Shark and Bullion Exchange are both online retailers selling gold, silver, and platinum bars and coins to retail buyers, with overlapping market segments, geographic scopes of sales, marketing strategies, and product offerings. Bullion Exchange and Bullion Shark are undeniably direct competitors in the online retail market for bullion, bars, ingots, rare coins, and other collectibles. Bullion Shark has gained (and continues to gain) significant benefits from Ovodova's misappropriation of Bullion Exchange's marketing strategy and customer lists.

38. Since both Ovodova and Bullion Shark deny having copies of the Bullion Exchange's customer lists, issuing an order temporarily restraining and preliminarily enjoining them from using, selling, disseminating, or otherwise exploiting these assets will not adversely affect their businesses. Such an order would, however, preserve the status quo in the event the Defendants' representations prove to be false or misleading.

**WHEREFORE**, I respectfully request that the Court grant Plaintiff's motion for a temporary restraining order and preliminary injunction.

I declare under penalty of perjury that all of the forgoing is true and correct.

Dated: April 19, 2024
New York, NY

*Ernest Gozenput*
_____
Ernest Gozenput

# Reply Declaration of Eric Gozenput (041924) (rev1)

Final Audit Report                                           2024-04-19



## "Reply Declaration of Eric Gozenput (041924) (rev1)" History

- Document created by Stephen Turman (sturman@turmanlegal.com)
  2024-04-19 - 9:07:19 PM GMT

- Document emailed to eric gozenput (eric@bullionexchanges.com) for signature
  2024-04-19 - 9:08:07 PM GMT

- Email viewed by eric gozenput (eric@bullionexchanges.com)
  2024-04-19 - 9:08:11 PM GMT

- Document e-signed by eric gozenput (eric@bullionexchanges.com)
  Signature Date: 2024-04-19 - 9:10:40 PM GMT - Time Source: server

- Agreement completed.
  2024-04-19 - 9:10:40 PM GMT

Adobe Acrobat Sign