**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

BULLION EXCHANGE LLC,

                Plaintiff,

        v.

BULLION SHARK, LLC, and EKATERINA
OVODOVA,

              Defendants.

Case No. 24-CV-00467 (DG)

---

**REPLY MEMORANDUM OF LAW IN FURTHER SUPPORT OF THE PLAINTIFF'S MOTION FOR AN ORDER TEMPORARILY RESTRAINING AND PRELIMINARILY ENJOINING DEFENDANTS EKATERINA OVODOVA AND BULLION SHARK, LLC FROM USING PLAINTIFF'S TRADE SECRETS AND COMPELLING TURNING OVER AND DESTROYING ALL COPIES OF PLAINTIFF'S TRADE SECRETS**

---

**TURMAN LEGAL SOLUTIONS PLLC**
Stephen E. Turman, Esq.
626 RXR Plaza, 6th Floor
Uniondale, NY 11556
Ph: (516) 266-6106
Email: sturman@turmanlegal.com

*Counsel for Plaintiff Bullion Exchange LLC*

# TABLE OF CONTENTS

TABLE OF CONTENTS..................................................................................................... i

TABLE OF AUTHORITIES……………………………………………………………….ii

I.      PRELIMINARY STATEMENT .......................................................................... 1

II.     STATEMENT OF FACTS ................................................................................... 2

III.    LEGAL ARGUMENT .......................................................................................... 4

   A.   STANDARD OF REVIEW ............................................................................... 4

   B.   BULLION EXCHANGE IS ENTITLED TO INJUNCTIVE RELIEF AGAINST
        OVODOVA BECAUSE SHE MISAPPROPRIATED ITS TRADE SECRETS .......... 5

   C.   BULLION EXCHANGE IS ALSO ENTITLED TO A PRELIMINARY
        INJUNCTION AGAINST THE BULLION SHARK AND OVODOVA UNDER THE
        INEVITABLE DISCLOSURE DOCTRINE .............................................................. 8

        1. Bullion Shark and Bullion Exchange are Direct Competitors............................ 10

        2. Ovodova's Position as "Head of eCommerce" for Bullion Shark
        is Virtually Identical to the Position of "Director of Marketing" She
        Held at Bullion Exchange ....................................................................................... 13

        3. Bullion Exchange's Trade Secrets Would be Invaluable to Bullion Shark........ 14

        4. The Rare Coin and Precious Metals Industry is Highly Competitive ............... 15

   D.   BULLION EXCHANGE WILL SUFFER IRREPARABLE HARM IF THIS COURT
        DOES NOT GRANT INJUNCTIVE RELIEF .......................................................... 17

   E.   LIKELIHOOD OF SUCCESS ON THE MERITS ................................................... 18

CONCLUSION............................................................................................................... 20

**<u>TABLE OF AUTHORITIES</u>**

Page(s)

Cases

*AUA Priv. Equity Partners, LLC v. Soto*,
　Case No. 17-CV-8035, 2018 WL 1684339 (S.D.N.Y. Apr. 5, 2018) ........................................ 5, 6
*Balance Point Divorce Funding LLC v. Scrantom*,
　978 F. Supp. 2d 341 (S.D.N.Y. 2013) ................................................................................ 8
*Citigroup Glob. Mkts., Inc. v. VCG Special Opportunities Master Fund Ltd.*,
　598 F.3d 30 (2d Cir. 2010) ................................................................................................ 4
*Computer Assocs. Int'l v. Bryan*,
　784 F. Supp. 982 (E.D.N.Y. 1992) ................................................................................ 18
*Estee Lauder Cos. v. Batra*,
　430 F. Supp. 2d 158 (S.D.N.Y. 2006) ......................................................................... 18
*ExpertConnect, L.L.C. v. Fowler*,
　No. 18-cv-4828, 2019 U.S. Dist. LEXIS 114931, at *15–16 (S.D.N.Y. July 10, 2019) ............... 5
*Faiveley Transp. v Wabtec Corp.*,
　559 F3d 110 (2d Cir 2009) ............................................................................................. 17
*FMC Corp. v. Taiwan Tainan Giant Indus. Co.*,
　730 F.2d 61 (2d Cir. 1984) ............................................................................................ 18
*Geritrex Corp. v. Dermarite Indus., LLC*,
　910 F.Supp. 955 (S.D.N.Y. 1996) ................................................................................. 17
*Global Telesystems, Inc. v. KPNQwest, N.V.*,
　151 F.Supp.2d 478 (S.D.N.Y. 2001) ......................................................................... 9, 10
*Grand River Enter, Six Nations. Ltd v. Pryor*,
　481 F.3d 60 (2d Cir. 2007) ............................................................................................ 17
*Guthrie Clinic v. Convergence CT, Inc.*,
　No. 4:23-CV-01396, 2023 U.S. Dist. LEXIS 198338 (M.D. Pa. Nov. 3, 2023) ......................... 11
*Jackson Dairy, Inc. v. H.P. Hood & Sons, Inc.*,
　596 F.2d 70 (2d Cir. 1979) .............................................................................................. 4
*KCG Holdings, Inc. v. Khandekar*,
　No. 17-CV-3533, 2020 WL 1189302 (S.D.N.Y. March 12, 2020) ......................................... 8
*Kraus USA, Inc. v. Magarik*,
　No. 17-CV-6541, 2020 WL 2415670 (S.D.N.Y. May 12, 2020) ............................................ 5
*Lodging Sol., LLC v. Miller*,
　19-CV-10806, 2020 WL 6875255 (W.D. Pa. June 12, 2019) ……………………………………6, 11
*Lumex, Inc. v. Highsmith*,
　919 F. Supp. 624 (E.D.N.Y. 1996) ......................................................................... 8, 9, 18
*Mickey's Linen v. Fischer*,
　No. 17-CV-2154, 2017 WL 3970593 (N.D. Ill. September 8, 2017) ....................................... 6
*OnyxRenewable Pnts L.P. v. KAO*,
　22-CV-3720, 2023 WL 405019 (S.D.N.Y. Jan. 25, 2023)…………………………………………7
*Payment Alliance International, Inc. v. Ferreira*,
　530 F. Supp. 2d 477 (S.D.N.Y. 2007) ........................................................................... 8, 9
*Spinal Dimensions, Inc. v. Chepenuk*,
　No. 07-CV-4805, 2007 WL 2296503 (N.Y. 2007) ........................................................... 9

ii

*Syntel Sterling Best Shores Mauritius Ltd. v. The TriZetto Grp., Inc.*,
  68 F.4th 792 (2d Cir. 2023) ................................................................. 5
*Zirvi v. Flatley*,
  433 F. Supp. 3d 448 (S.D.N.Y. 2020) .................................................. 5

Statutes

18 U.S.C. § 1836(b)(3) .......................................................................... 5
18 U.S.C. § 1836 ..................................................................................11
18 U.S.C. § 1836(b)(3)(A)..................................................................... 19
18 U.S.C. § 1839(5)(A) ........................................................................... 5

# I.    PRELIMINARY STATEMENT

Plaintiff Bullion Exchange LLC ("Bullion Exchange") respectfully submits this Reply Memorandum of Law in further support of its motion for a Temporary Restraining Order ("TRO") and Preliminary Injunction against Defendants Bullion Shark, LLC ("Bullion Shark") and Ekaterina Ovodova ("Ovodova") (collectively, the "Defendants").  Central to this dispute is the Defendants' calculated misappropriation of Plaintiff's highly sensitive and commercially valuable marketing strategies and customer lists.  These trade secrets were unlawfully copied, downloaded, and transmitted by Defendant Ovodova shortly before and after she accepted the position of "Head of eCommerce" for Bullion Shark and on the eve of her resignation from Bullion Exchange.  These facts present textbook examples of trade secret misappropriation under the Defend Trade Secrets Act (DTSA) and applicable New York state law.

Bullion Exchange substantively meets the legal criteria for the issuance of a TRO and a preliminary injunction under the DTSA and New York state law by demonstrating: (i) substantial likelihood of irreparable harm; (ii) a probable success on the merits of its DTSA and state law claims; (iii) that the balance of hardships decisively tips in favor of Bullion Exchange; and (iv) that granting the preliminary injunction serves the public interest.  Bullion Exchange relies on the arguments set forth in its original moving papers, including the Memorandum of Law (ECF No. 12), which establishes a likelihood of success with respect to all other causes of action—points notably unaddressed by the Defendants.

## II.   STATEMENT OF FACTS[1]

### A.   DIRECT COMPETITION BETWEEN BULLION EXCHANGE AND BULLION SHARK

Contrary to the Defendants' assertions, Bullion Exchange and Bullion Shark are direct competitors in the highly competitive rare coin and precious metals industry. (Gozenput Reply Decl. (ECF No. 39) at ¶¶ 7-19).  While direct competition is not a prerequisite for trade secret misappropriation, it highlights the potential for irreparable harm in this case. The evidence, including website screenshots, shows that Bullion Shark and Bullion Exchange sell substantially similar, if not identical, products, use similar business models, and market to the same customer base.   By any objective standard, these two companies are direct competitors.  (Gozenput Reply Decl. (ECF No. 39) at ¶¶ 2-16, Exhs. A-G).  This direct competition underscores the importance of protecting trade secrets and the potential for irreparable harm.

### B. EKATERINA OVODOVA'S MISCONDUCT

On or about August 24, 2023, Ovodova misappropriated Bullion Exchange's marketing strategy, which qualifies as a protectable trade secret based on its proprietary compilation and analysis of data.  (Gozenput Decl. (ECF No. 8) at ¶¶ 28-37; Gozenput Reply Decl. (ECF No. 39) at ¶¶ 27-34).  Ovodova's misappropriation was not merely a breach of her contractual and fiduciary duties but also a violation of trade secret laws.  She used Bullion Exchange's marketing strategy to formulate a parallel marketing strategy for Bullion Shark, egregiously breaching her contractual

---

[1] The facts underpinning this motion are detailed in the Declarations of Ernest Gozenput (dated January 18, 2024), Steven Kogan (dated November 27, 2023), and Stephen E. Turman, Esq. (dated January 22, 2024), and the Reply Declaration of Ernest Gozenput (dated April 19, 2024), with relevant Exhs. attached thereto. This Reply Memorandum, including this statement of facts, is intended to address the false and misleading allegations set forth in the declarations submitted by Ovodova (ECF No. 30) and Andrew Adamo (ECF No. 33), both dated April 5, 2024, as reflected in the Reply Declaration submitted by Ernest Gozenput, dated April 19, 2024. These documents are all incorporated by reference herein and collectively dismantle the Defendants' narrative and provide substantial evidence supporting Bullion Exchange's motion for injunctive relief.

duties and duty of loyalty to Bullion Exchange, while also misappropriating Bullion Exchange's trade secrets for her own and Bullion Shark's benefit. (Gozenput Decl. (ECF No. 8) at ¶¶ 30-33; Gozenput Reply Decl. (ECF No. 39) at ¶ 33).

### C.     COMPLICITY OF BULLION SHARK

In August 2023, Bullion Shark, through its own actions and those of third-party intermediaries, explicitly engaged Ovodova to replicate her successful marketing strategies from Bullion Exchange to substantially enhance their own business metrics. (Adamo Decl. (ECF No. 33) at ¶¶ 45-46)(Ovodova Decl. (ECF No. 30) at ¶¶ 31-49). This demonstrates Bullion Shark's awareness, active participation, and encouragement of Ovodova's misappropriation of Bullion Exchange's trade secrets, making Bullion Shark equally culpable.

### D.     UNLAWFUL TRANSFER AND COVER-UP

On September 1, 2023, Ovodova was offered and accepted a position as "Head of eCommerce" for Bullion Shark, which is substantially the same as the position of "Director of Marketing" that she held with Bullion Exchange. (Adamo Decl. (ECF No. 33) at ¶¶ 45-46; Ovodova Decl. (ECF No. 30) at ¶ 52. On September 6, 2023, Ovodova capitalized on her insider position to illegally download and transmit over 384,000 customer records to her personal email, and she immediately attempted to erase any digital footprint of her actions. (Gozenput Decl. (ECF No. 8), at ¶ 36; Kogan Decl. (ECF No. 9) at ¶ 14). Ovodova's subsequent denial and contradictory admissions about these activities expose significant credibility issues and suggest a deliberate attempt to obstruct justice and prevent Bullion Exchange from discovering her deceitful actions. (Ovodova Decl. (ECF No. 30) at ¶¶59-61; Gozenput Reply Decl. (ECF No. 39) at ¶¶ 20-23). Ovodova's claim about using the customer lists to train an AI chatbot is false, as Bullion Exchange

never approved such a project.  (Ovodova Decl. (ECF No. 30) at ¶¶ 54-55; Gozenput Reply Decl. (ECF No. 39) at ¶¶ 17-19).

### E.  RESIGNATION UNDER FALSE PRETENSES

Ovodova's resignation on September 7, 2023, was shrouded in deception. In particular, Ovodova misrepresented her future employment to avoid immediate termination and the discovery of her unlawful actions.  (Ovodova Decl. (ECF No. 30) at ¶¶ 59-61; Gozenput Decl. (ECF No. 8) at ¶ 26; Gozenput Reply Decl. (ECF No. 39) at ¶¶ 20-23).  She lied about joining a non-competitor, knowing that Gozenput would have immediately terminated her if he knew the truth.  (Gozenput Reply Decl. (ECF No. 39) at ¶ 23).  This deception allowed Ovodova and Bullion Shark to gain a head start on misappropriating and utilizing Bullion Exchange's trade secrets.  Ovodova's actions were calculated, leveraging her knowledge of internal processes and strategic plans, to benefit Bullion Shark and cause direct harm to Bullion Exchange's competitive position.  This evidence unequivocally illustrates that both Ovodova and Bullion Shark engaged in a systematic effort to misappropriate trade secrets, justifying the need for the proposed injunctive relief.

### III.  LEGAL ARGUMENT

### A.  STANDARD OF REVIEW

Injunctive relief is appropriate where the party seeking the injunction shows "(a) irreparable harm and (b) either (1) likelihood of success on the merits or (2) sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly toward the party requesting the preliminary relief." *Citigroup Glob. Mkts., Inc. v. VCG Special Opportunities Master Fund Ltd*., 598 F.3d 30, 35 (2d Cir. 2010)(quoting *Jackson Dairy, Inc. v. H.P. Hood & Sons, Inc.*, 596 F.2d 70, 72 (2d Cir. 1979)).

To prevail on a claim under the DTSA, "a party must show an unconsented disclosure or use of a trade secret by one who (i) used improper means to acquire the secret, or, (ii) at the time of disclosure, knew or had reason to know that the trade secret was acquired through improper

means, under circumstances giving rise to a duty to maintain the secrecy of the trade secret, or derived from or through a person who owed such a duty." *Kraus USA, Inc. v. Magarik*, No. 17-CV-6541, 2020 WL 2415670, at *4 (S.D.N.Y. May 12, 2020); *accord Zirvi v. Flatley*, 433 F. Supp. 3d 448, 464 (S.D.N.Y. 2020), *aff'd*, 838 F. App'x 582 (2d Cir. 2020). The DTSA further provides that "acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means" constitutes "misappropriation." 18 U.S.C. § 1839(5)(A).

**B.   BULLION EXCHANGE IS ENTITLED TO INJUNCTIVE RELIEF AGAINST OVODOVA BECAUSE SHE MISAPPROPRIATED ITS TRADE SECRETS**

The undisputed facts demonstrate that Ovodova misappropriated Bullion Exchange's trade secrets by acquiring and using them without authorization, entitling Bullion Exchange to injunctive relief under the DTSA and New York trade secret misappropriation law. Courts in the Second Circuit have consistently held that an employee copying trade secret information for purposes unrelated to her employment in violation of a confidentiality agreement constitutes misappropriation under the DTSA's acquisition prong. *See ExpertConnect, L.L.C. v. Fowler*, No. 18-cv-4828, 2019 WL 3004161, at *8, 2019 U.S. Dist. LEXIS 114931, at *15–16 (S.D.N.Y. July 10, 2019); *AUA Priv. Equity Partners, LLC v. Soto, Case No. 17-CV-8035,* 2018 WL 1684339, at *7 (S.D.N.Y. Apr. 5, 2018).

The DTSA identifies "three theories of misappropriation: (i) *acquisition*, (2*) disclosure*, or (3) *use*." *AUA Priv. Equity Partners, LLC,* 2018 WL 1684339, at *3 (emphasis added). The DTSA specifically authorizes courts to "grant an injunction to prevent any *actual* or *threatened* misappropriation. . . ." 18 U.S. Code § 1836(b)(3) (emphasis added); *see also Syntel Sterling Best Shores Mauritius Ltd. v. The TriZetto Grp., Inc.*, 68 F.4th 792, 808 (2d Cir. 2023) ("the DTSA empowers a federal court to grant an injunction to prevent *actual or threatened* misappropriation of trade secrets") (emphasis added). Moreover, employees who "abscond with their employers' trade secrets, even in the absence of any subsequent use or disclosure" have been held to have

improperly acquired such information. *AUA Priv. Equity Partners LLC*, 2018 WL 1684339, at *6; *see also Lodging Sols. LLC v. Miller*, 19-CV-10806, 2020 WL 6875255, at *3 ("Courts in this District have held that an employee copying trade secret information for purposes unrelated to her employment in violation of a confidentiality agreement constitutes misappropriation under the DTSA's acquisition prong.").

Ovodova's actions constitute both acquisition and use of Bullion Exchange's trade secrets. By copying the proprietary marketing strategy and downloading customer lists to her workstation and personal email account, Ovodova acquired the trade secrets without authorization. Furthermore, by using the marketing strategy to create a plan for Bullion Shark and by sending the customer lists to her personal email, Ovodova used the trade secrets in a manner that would inevitably enable her to better compete with Bullion Exchange. For this reason, among others, courts have observed that *misappropriation is regularly proved by circumstantial evidence, and that such evidence does not fail to state a DTSA claim as a matter of law. See Mickey's Linen v. Fischer,* No. 17-CV-2154, 2017 WL 3970593, at *12 (N.D. Ill. September 8, 2017)*. The circumstantial evidence in this case, including Ovodova's attempts to conceal her actions by deleting emails, browser history, and Google Drive data, strongly supports a finding of misappropriation. This evidence suggests that Ovodova knew her actions were improper and sought to hide them from Bullion Exchange.

Here, the undisputed facts make out a textbook claim for misappropriation by Ovodova via acquisition. Ovodova, without authority, made a copy of Bullion Exchange's proprietary marketing strategy on or about August 24, 2023, which she then used to create a marketing strategy for Bullion Shark intended to increase its sales by at least twenty-five (25%) percent. (Adamo Decl. (ECF No. 33) at ¶ 46). Ovodova also downloaded copies of Bullion Exchange's customer lists to her office workstation on September 6, 2023, and then used her office email account to send the customer lists to her personal email account, thus removing the customer lists from Bullion Exchange's exclusive control. (Kogan Decl. (ECF No. 9) at ¶ 13). Ovodova then deleted her sent emails, browser history, and Google Drive data in an unsuccessful attempt to conceal her

action. (Kogan Decl. (ECF No. 9) at ¶¶ 13-14; Ovodova Decl. (ECF No. 30) at ¶ 56). Ovodova's attempt to conceal the email she sent to her personal account containing copies of Bullion Exchange's customer lists is sufficient to raise an inference of conscious improper acquisition. *See Onyx Renewable Ptns LP v. Kao*, 22-CV-3720, 2023 WL 405019 at *5 (S.D.N.Y. Jan. 25, 2023)("allegations that Defendant undertook subsequent actions to conceal his access to trade secrets, such as by clearing his browser history and using private browsing . . . are themselves sufficient to raise an inference of conscious improper acquisition.")

The actions taken by Ovodova between August 24, 2023 and September 15, 2023, are clear violations of Section 6.2 of Bullion Exchange's Employee Handbook, which was signed by Ovodova and clearly states: "[n]o previous or current employee may disclose or give access to confidential Company information, in any way or at any time, unless otherwise authorized by Management." (Gozenput Decl. (ECF No. 8) at ¶ 18, Exh. 1). Ovodova's actions also violated Bullion Exchange's Employee Theft Policy that she signed on October 28, 2015, wherein she acknowledged:

> Bullion Exchanges will not tolerate monetary or property theft of any type. ***We consider property theft to include the unauthorized use of Company services or its facilities, as well as the taking of any products or company materials***. No item purchased or supplied by Bullion Exchanges should ever be removed from the Company Premises without the expressed authorization of the managing partners, Eric Gozenput & Ben Tseytlin. Employees that violate this policy will be subject to discipline up to and including possible dismissal and prosecution.

(Gozenput Decl. (ECF No. 8) at ¶ 19, Exh. 2) (emphasis added). Ovodova's violations of Bullion Exchange's Employee Handbook and Employee Theft Policy demonstrate that she acquired and used the trade secrets through improper means. By copying and removing confidential information without authorization, Ovodova breached her duty to maintain the secrecy of Bullion Exchange's trade secrets, satisfying the improper means requirement of the DTSA.

Bullion Exchange has also provided sufficient evidence to establish a likelihood of proving misappropriation of its trade secrets by Ovodova via "use". The DTSA's definition of "use"

includes any effort to avail oneself of a trade secret.  *See KCG Holdings, Inc. v. Khandekar,* No. 17-CV-3533, 2020 WL 1189302 at \*11 (S.D.N.Y. March 12, 2020); *see also Balance Point Divorce Funding LLC v. Scrantom*, 978 F. Supp. 2d 341, 353 (S.D.N.Y. 2013)(finding a plausible inference of use was raised where "knowledge of [the trade secret] would enable [the defendant] inevitably to better compete with [the plaintiff]").  Ovodova used Bullion Exchange's proprietary marketing strategy to create a plan for Bullion Shark intended to increase its sales by at least twenty-five (25%) percent. Moreover, by sending Bullion Exchange's customer lists to her personal email account, Ovodova positioned herself to use this confidential information to compete with Bullion Exchange. At this stage of the case, before Bullion Exchange has the benefit of discovery, these facts are sufficient to raise a plausible inference of use under the DTSA.  *See Balance Point Divorce Funding LLC*, 978 F. Supp. 2d at 353.

### C.   BULLION EXCHANGE IS ALSO ENTITLED TO A PRELIMINARY INJUNCTION AGAINST THE BULLION SHARK AND OVODOVA UNDER THE INEVITABLE DISCLOSURE DOCTRINE

In the Second Circuit, courts may grant preliminary injunctions based on the inevitable disclosure doctrine, even in the absence of evidence that the employee has actually conveyed trade secrets to the new employer.  The key factors considered by courts in applying this doctrine include: (i) the extent to which the new employer is a direct competitor of the former employer; (ii) whether the employee's new position is nearly identical to their old one; (iii) the extent to which the trade secrets at issue would be valuable to the new employer; and (iv) the nature of the industry and its trade secrets. *See Payment Alliance International, Inc. v. Ferreira*, 530 F. Supp. 2d 477, 482 (S.D.N.Y. 2007).  Applying these factors to the facts of this case demonstrates that Bullion Exchange is entitled to a preliminary injunction against Bullion Shark and Ovodova.

For example, in *Lumex, Inc. v. Highsmith*, 919 F. Supp. 624 (E.D.N.Y. 1996), the plaintiff's former employee held a high-level position as an engineer, with knowledge of his former employer's trade secrets.  The former employee left the plaintiff to accept an equivalent position with one of plaintiff's direct competitors. *See id.* at 631.  The plaintiff brought an action against

both the former employee and his new employer seeking a preliminary injunction enforcing a six (6) month non-compete agreement even though there was no evidence that the former employee misappropriated any trade secrets or gave those trade secrets to its new employer. *See id.* at 631-32. Nevertheless, the court granted a preliminary injunction based on the concept of inevitable disclosure, reasoning that the employee's knowledge of trade secrets and the similarity of the two companies' products made disclosure inevitable. *See id.* at 643.

Similarly, in *Payment Alliance International, Inc.*, 530 F. Supp. 2d 477, 482 (S.D.N.Y. 2007), the court found that plaintiff's former employee left plaintiff to take a position with a direct competitor and was in possession of his former employer's trade secrets. Having found that the former employee was in possession of trade secret information, the court considered whether, the former employee's new employment creates a risk that disclosure of his former employer's trade secrets is inevitable. *See id.* The court considered the following factors in its analysis: (i) the extent to which the new employer is a direct competitor of the former employer; (iii) whether the employee's new position is nearly identical to his old one, such that he could not reasonably be expected to fulfill his new job responsibilities without utilizing the trade secrets of his former employer; (iv) the extent to which the trade secrets at issue would be valuable to the new employer; and (v) the nature of the industry and its trade secrets. *See id.* (citing *Spinal Dimensions, Inc. v. Chepenuk*, No. 07-CV-4805, 2007 WL 2296503 at **6-7 (N.Y. 2007)). Upon consideration of these factors:

> **[t]he Court finds that Ferreira's employment with Cynergy creates the risk that disclosure of PAI's trade secrets is inevitable. Here, it is undisputed that Ferreira left PAI to work for a direct competitor. It is also undisputed that Ferreira's employment at Cynergy will be in a similar capacity. Thus, even if Ferreira acted with the best of intentions, "he may unintentionally transmit information gained through his association with [PAI] during his day to day contact"** with his new employer. *Global Telesystems, Inc. v. KPNQwest, N.V.,* 151 F.Supp.2d 478, 482 (S.D.N.Y. 2001). Ferreira argues and a representative at Cynergy attests that Cynergy is not interested in the COLT system. (Ordonez Aff. at ¶¶ 7-9) However, the Court credits Mr. Sahrmann's assertion that this system is a significant improvement in

the area of new account processing and is not persuaded by Cynergy's professed lack of interest. (Sahrmann Decl. at ¶ 18). **_Furthermore, the confidential information in Ferreira's possession about PAI's customers and marketing strategies would undeniably be of value to one of its direct competitors_**.

*Id.* at 483 (emphasis added).

Here, the rare coin and precious metal industry is highly competitive, with companies constantly seeking to gain an edge over their rivals. (Gozenput Reply Decl. (ECF No. 39) at ¶¶ 24-25). In such an industry, trade secrets related to marketing strategies, customer lists, and other proprietary information are particularly valuable. The competitive nature of this industry and the value placed on trade secrets further support the application of the inevitable disclosure doctrine in this case. Applying these factors to the facts here should lead the Court to the same conclusions reached by the courts in *Lumex* and *Payment Alliance* because: (i) Bullion Exchange and Bullion Shark are direct competitors; (ii) Ovodova's position as Head of eCommerce for Bullion Shark is identical in all but name to her old position as Director of Marketing for Bullion Exchange; (iii) Bullion Exchange's marketing strategy and customer lists would be valuable to Bullion Shark; and (iv) the rare coin and precious metal business is highly competitive.

The facts of this case closely mirror those in Lumex and Payment Alliance, where courts granted preliminary injunctions based on the inevitable disclosure doctrine. Bullion Exchange and Bullion Shark are direct competitors, Ovodova's new position is nearly identical to her old one, the trade secrets at issue are highly valuable to Bullion Shark, and the rare coin and precious metal industry is known for its competitiveness and the importance of trade secrets. Taken together, these factors overwhelmingly support the application of the inevitable disclosure doctrine and the issuance of a preliminary injunction against Bullion Shark and Ovodova.

### 1.    Bullion Shark and Bullion Exchange are Direct Competitors

Bullion Shark alleges that the products and services it sells target a fundamentally different customer base from that of Bullion Exchange. (Adamo Decl. (ECF No. 33) at ¶¶ 67-68). In particular, Bullion Shark claims that its business model focuses primarily on sales of rare coins to

numismatic collectors interested in the historical nature and value of coins, while Bullion Exchange targets investors interested in coins and bullion for its metallurgic value. (Adamo Decl. (ECF No. 33) at ¶¶ 66-68).

First, the DTSA does not limit relief for trade secret misappropriation laws to instances where trade secrets are misappropriated by direct competitors only. *See* 18 U.S.C. § 1836 *et seq.*; *see also Guthrie Clinic v. Convergence CT, Inc.*, No. 4:23-CV-01396, 2023 U.S. Dist. LEXIS 198338 (M.D. Pa. Nov. 3, 2023)("Turning first to the competition argument, the statutes do not limit trade secret claims to instances of direct competition. Instead, whether the alleged misappropriating party has a 'use for the confidential information' is critical."); *Pittsburgh Logistics Sys. v. LaserShip, Inc.*, 18-CV-1382, 2019 U.S. Dist. LEXIS 98470, at *34 (W.D. Pa. June 12, 2019)(also holding that the DTSA is not limited to misappropriation by direct competitors). Even assuming the Defendants' claim that Bullion Shark and Bullion Exchange are not direct competitors (even though they are), Bullion Exchange's customer lists could be improperly used by the Defendants to market their products and services to Bullion Exchange's customers and would have immense value to Bullion Exchange. The misappropriation of Bullion Exchange's trade secrets by Ovodova and their use by Bullion Shark would give the defendants an unfair competitive advantage, allowing them to target Bullion Exchange's customers and undermine its market position. This potential harm further underscores the need for a preliminary injunction to protect Bullion Exchange's legitimate business interests.

Second, Bullion Exchange and Bullion Shark are, in fact, direct competitors. (Gozenput Reply Decl. (ECF No. 39) at ¶¶ 2-12). As outlined in the Reply Declaration of Ernest Gozenput, both companies market and sell a variety of gold, silver, and platinum coins and other products, including but not limited to American Eagles, Peace Dollars, Morgan Dollars, Platinum Eagles, in

addition to various antique coins, all of which are staples in the investment-grade coin market, which values coins based on ***both*** numismatic value and the metallurgic value.  (Gozenput Reply Decl. (ECF No. 39) at ¶¶ 4-12).

In addition, a comparative analysis of the websites and product listings of both companies reveals substantial similarities in the products offered.  Notably, both companies offer substantially similar products whose value is influenced by both the metal content and the numismatic appeal, thus targeting the broader market of precious metals consumers and collectors alike.  (Gozenput Reply Decl. (ECF No. 39) at ¶¶ 4-10).  The argument that different valuation bases (rarity versus metal content) preclude direct competition fails to recognize the integrated nature of the collectibles and investment markets, where consumers often engage with multiple facets of the market based on evolving investment interests and market conditions.

 Bullion Exchange and Bullion Shark both engage in the retail purchase and sale of precious metals and collectible coins, which inherently place them in competition for the sale of the same products.  Moreover, both companies use their online presence, social media platforms, websites, and online auction sites (*e.g.*, eBay) to market and sell their products to the same customer base across the same geographic region (*i.e.*, the United States).  (Gozenput Reply Decl. (ECF No. 39) at ¶¶ 11-12).  In today's digital age, a company's online presence and marketing strategies are crucial to its success and competitiveness. By utilizing the same online platforms and targeting the same customer base, Bullion Exchange and Bullion Shark are directly competing for market share, regardless of any alleged differences in their primary focus.  By any reasonable, objective measure, Bullion Exchange and Bullion Shark are direct competitors.

At all relevant times Ovodova knew that Bullion Shark and Bullion Exchange are direct competitors.  (Gozenput Reply Decl. (ECF No. 39) at ¶¶ 13-16).  Bullion Exchange's Director of

Marketing, Ovodova was responsible for placing advertising buys with Google Ads and other online advertising resources targeting searches for Bullion Exchange's competitors to ensure that Bullion Exchange's site is listed above those competitors for search results returned to potential customers. (Gozenput Reply Decl. (ECF No. 39) at ¶¶ 13-16, Exh. G). In performing this task, Ovodova specifically placed advertising orders targeting Bullion Shark with Google Ads, YouTube, Instagram, and other online and social media forums. Ovodova even borrowed marketing ideas and strategies from Bullion Shark's website to use for Bullion Exchange. (*See id.*). Ovodova's intimate knowledge of Bullion Shark's status as a direct competitor, gained through her work as Bullion Exchange's Director of Marketing, further highlights the inevitability of trade secret disclosure in her new role at Bullion Shark. Her past actions targeting Bullion Shark and borrowing their marketing strategies demonstrate a clear understanding of the competitive landscape and the potential value of Bullion Exchange's trade secrets to Bullion Shark.

### 2. Ovodova's Position as "Head of eCommerce" for Bullion Shark is Virtually Identical to the Position of "Director of Marketing" She held at Bullion Exchange

Ovodova's new position as "Head of eCommerce" for Bullion Shark is substantially similar, if not identical to the position of "Director of Marketing" which she held as an employee for Bullion Exchange. As Bullion Exchange's Director of Marketing, Ovodova was responsible for: (i) managing Bullion Exchange's marketing department; (ii) creating marketing and advertising campaigns to drive online sales; (iii) overseeing the Bullion Exchange's online presence; and (iv) developing strategies to increase customer engagement and revenue through digital channels. As set forth in the Adamo Declaration, Bullion Shark was recruiting Ovodova to serve as its "Head of eCommerce." (Adamo Decl. (ECF No. 33) at ¶ 34). Adamo even asked Ovodova to prepare a "Marketing Plan Presentation" in order to evaluate whether Ovodova

actually had the ability to serve as its Head of eCommerce, including the ability to prepare a marketing strategy that would allow Bullion Shark to achieve a 25% increase in its online business. (Adamo Decl. (ECF No. 33) at ¶¶ 45-47).

The fact that Bullion Shark required Ovodova to demonstrate her skills in preparing a marketing strategy to drive online growth strongly indicates that her new role as "Head of eCommerce" encompasses the same core responsibilities she held as "Director of Marketing" at Bullion Exchange. In both positions, the primary focus is on developing and executing strategies to increase online sales and customer engagement. Furthermore, in today's digital landscape, the roles of a "Director of Marketing" and a "Head of eCommerce" are often interchangeable, as both positions require a deep understanding of online marketing strategies, customer behavior, and digital technologies to drive business growth. The similarities between Ovodova's responsibilities in both roles are not merely coincidental; they reflect the industry-wide trend of integrating marketing and e-commerce functions to optimize online performance.

The position of "Head of eCommerce" is the same or equivalent to the position of "Director of Marketing" at Bullion Exchange. The defendants' attempt to distinguish between the two roles is merely a superficial effort to obscure the fact that Ovodova's new position at Bullion Shark will inevitably lead to the disclosure and use of Bullion Exchange's trade secrets, causing irreparable harm to the plaintiff.

### 3. Bullion Exchange's Trade Secrets Would be Invaluable to Bullion Shark

Bullion Shark and Bullion Exchange both understand the value and importance of their respective marketing strategies and customer lists. Bullion Exchange and Bullion Shark both consider their marketing strategies and customer lists valuable trade secrets and they both invested considerable time, resources, and money to develop their marketing strategies and customer lists.

Both companies also used a combination of legal agreements, internal policies, and procedures, as well as software and other technology base safeguards to protect their trade secrets, including their marketing strategies and customer lists. (Adamo Decl. (ECF No. 33) at ¶¶ 8-33; Gozenput Decl. (ECF No. 8) at ¶¶ 8-16; Kogan Decl. (ECF No. 9) at ¶¶ 3-4, 15; Gozenput Reply Decl. (ECF No. 39) at ¶¶ 25, 32-34). These approaches reflect a high level of diligence appropriate for the protection of critical business assets like customer lists, marketing strategies, and other trade secrets.

The extensive measures taken by both companies to safeguard their trade secrets underscore the immense value and competitive advantage that such information provides in the marketplace. Customer lists, for example, are a vital asset that enables targeted marketing, personalized customer service, and effective sales strategies. Similarly, marketing strategies encompass data-driven insights, industry best practices, and proprietary methodologies that give companies an edge over their rivals. The fact that Bullion Shark and Bullion Exchange both go to such lengths to protect their marketing strategies, customer lists, and other trade secrets is proof of the value this information would provide to their respective competitors. In a highly competitive industry like precious metals and collectible coins, access to a rival's trade secrets can significantly impact market share, revenue growth, and overall business success. The potential to gain an unfair advantage by exploiting a competitor's confidential information is a strong motivator for companies to engage in misappropriation.

### 4. The Rare Coin and Precious Metals Industry is Highly Competitive

The rare coin and precious metals industry, while potentially lucrative, is known for its highly competitive and cutthroat market dynamics. Metals like gold and silver create an inherently limited supply, but high demand from collectors and investors. This supply-demand imbalance

often leads to fierce competition between dealers and collectors vying to acquire specific rare items. The industry's attractiveness due to the high value and appreciative potential of these commodities draws a diverse array of participants, ranging from individual hobbyists to large-scale investment firms. This wide range of market entrants further intensifies competition as different players vie for the best possible assets to enhance their collections or investment portfolios, employing varied strategies and resources.

In such a highly competitive environment, companies fiercely protect their trade secrets, as they can provide a significant competitive edge. Customer lists, for example, are a valuable asset that can enable targeted marketing efforts, personalized customer service, and effective sales strategies. By leveraging customer data and preferences, companies can tailor their offerings and communications to better serve their clients and attract new business. Similarly, marketing strategies encompass data-driven insights, industry best practices, and proprietary methodologies that give companies a distinct advantage over their rivals.

Access to a competitor's trade secrets can significantly impact market share, revenue growth, and overall business success in the rare coin and precious metals industry. The potential to gain an unfair advantage by exploiting a rival's confidential information is a strong motivator for companies to engage in misappropriation. In this case, if Bullion Shark were to gain access to Bullion Exchange's customer lists and marketing strategies through Ovodova's actions, it would undoubtedly use this information to target Bullion Exchange's customers and undermine its competitive position.

In short, Bullion Shark and Bullion Exchange are in a highly competitive, cutthroat industry. If Bullion Shark has access to Bullion Exchange's customer lists directly or, if Ovodova were to use her access to Bullion Exchange's customer lists and marketing strategy to target

Bullion Exchange's customer base and, in the process, give Bullion Shark an unfair competitive advantage, Bullion Shark would greatly benefit from Ovodova's misappropriation of Bullion Exchange's trade secrets.

### D. BULLION EXCHANGE WILL SUFFER IRREPARABLE HARM IF THIS COURT DOES NOT GRANT INJUNCTIVE RELIEF

Bullion Exchange will suffer irreparable harm if this Court does not grant injunctive relief. To satisfy this requirement, Bullion Exchange must show that it will suffer "an injury that is neither remote nor speculative, but actual and imminent and one that cannot he redressed through a monetary award." *Id.* (quoting *Grand River Enter, Six Nations. Ltd v. Pryor*, 481 F.3d 60, 66 (2d Cir. 2007)). When considering the use of injunctive relief to protect rights in cases involving trade secret misappropriate, the Second Circuit Court of Appeals, in a pre-DTSA case, held:

> A rebuttable presumption of irreparable harm might be warranted in cases where there is a danger that, unless enjoined, a misappropriator of trade secrets will disseminate those secrets to a wider audience or otherwise irreparably impair the value of those secrets. Where a misappropriator seeks only to use those secrets —without further dissemination or irreparable impairment of value—in pursuit of profit, no such presumption is warranted because an award of damages will often provide a complete remedy for such an injury. Indeed, once a trade secret is misappropriated, the misappropriator will often have the same incentive as the originator to maintain the confidentiality of the secret in order to profit from the proprietary knowledge. As Judge Conner has observed, where there is no danger that a misappropriator will disseminate proprietary information, "the only possible injury that [the] plaintiff may suffer is loss of sales to a competing product . . . [which] should be fully compensable by money damages." *Geritrex Corp. v. Dermarite Indus., LLC,* 910 F.Supp. 955, 966 (S.D.N.Y. 1996) (Conner, J.).

*Faiveley Transp. v Wabtec Corp.*, 559 F3d 110, 118-19 (2d Cir 2009). Appropriately-tailored injunctions are necessary to protect plaintiffs from the effects of misappropriated trade secrets. *See id.*

Where cases involve the misappropriation of trade secrets, however, the Second Circuit has consistently held that ***irreparable harm is presumed when a trade secret is misappropriated***.

*See Lumex, Inc.*, 919 F. Supp. at 627; *see also FMC Corp. v. Taiwan Tainan Giant Indus. Co.,* 730 F.2d 61, 63 (2d Cir. 1984)("[a] trade secret once lost is, of course, lost forever" and such a loss "cannot be measured in money damages."); *Estee Lauder Cos. v. Batra*, 430 F. Supp. 2d 158, 174 (S.D.N.Y. 2006) ("Even where a trade secret has not yet been disclosed, irreparable harm may be found based upon a finding that trade secrets will inevitably be disclosed. . . ."); *Computer Assocs. Int'l v. Bryan*, 784 F. Supp. 982, 986 (E.D.N.Y. 1992)( for purposes of a motion for a preliminary injunction, loss of trade secrets is not measurable in terms of money damages and is thus considered irreparable harm as a matter of law).

Here, Ovodova has unquestionably misappropriated Bullion Exchange's customer lists and marketing strategy shortly before leaving to join Bullion Exchange's direct competitor, Bullion Shark, and she attempted to conceal her actions. Given the highly competitive nature of the rare coin and precious metals industry, the misappropriation of Bullion Exchange's trade secrets by Ovodova and their potential use by Bullion Shark poses a significant and imminent threat to Bullion Exchange's business interests.

It is apparent Ovodova has either already disclosed Bullion Exchange's trade secrets to Bullion Shark or inevitably will disclose Bullion Exchange's trade secrets, thereby giving Bullion Shark an unfair competitive advantage. The specific and exclusive nature of Bullion Exchange's customer lists and marketing strategies means that their misappropriation and use by a direct competitor like Bullion Shark would result in irreparable harm that cannot be adequately compensated by monetary damages alone.

## E. LIKELIHOOD OF SUCCESS ON THE MERITS

Bullion Exchange has demonstrated a strong likelihood of success on the merits of its trade secret misappropriation claims under the Defend Trade Secrets Act (DTSA) and state law. The evidence presented in this case clearly establishes that Bullion Exchange's customer lists and marketing strategies constitute protectable trade secrets, and that the Defendants have engaged in the unauthorized acquisition, use, and potential disclosure of these trade secrets.

The Plaintiff's likelihood of success on the merits is substantiated by the detailed evidence of trade secret misappropriation presented in this case. As discussed in the preceding sections, Bullion Exchange has invested significant resources in developing its customer lists and marketing strategies, which provide a substantial competitive advantage in the rare coin and precious metals industry. The company has also taken reasonable measures to maintain the secrecy of this information, including the use of confidentiality agreements, access restrictions, and other security measures (Adamo Decl. (ECF No. 33) at ¶¶ 8-33; Gozenput Decl. (ECF No. 8) at ¶¶ 8-16; Kogan Decl. (ECF No. 9) at ¶¶ 3-4, 15).

The core of this argument revolves around the Defendants' unauthorized acquisition and subsequent use or potential use of Plaintiff's customer lists, which indisputably qualify as trade secrets under the DTSA. The evidence shows that Ovodova, while still employed by Bullion Exchange, accessed, and downloaded the company's confidential customer lists and marketing strategies without authorization. Shortly thereafter, Ovodova left Bullion Exchange to join its direct competitor, Bullion Shark. Given the highly competitive nature of the industry and the immense value of the misappropriated trade secrets, it is highly likely that Ovodova has already disclosed or will inevitably disclose Bullion Exchange's trade secrets to Bullion Shark, thereby causing irreparable harm to Bullion Exchange's business interests.

Bullion Exchange is also likely to prevail on all of its causes of action against the Defendants. The DTSA provides for the entry of injunctive relief to prevent any actual or threatened misappropriation of trade secrets. 18 U.S.C. § 1836(b)(3)(A). Based on the compelling evidence of trade secret misappropriation presented in this case, Bullion Exchange has established a substantial likelihood of success on the merits of its claims under the DTSA and New York state trade secret misappropriation, along with the other causes of action as detailed in the Bullion Exchange's Memorandum of Law (ECF No. 12). Moreover, the balance of equities tips heavily in favor of granting injunctive relief to protect Bullion Exchange's trade secrets and prevent irreparable harm to its business. The Defendants, on the other hand, will suffer no legitimate

hardship from being enjoined from using or disclosing Bullion Exchange's trade secrets, as they have no right to exploit this confidential information in the first place.

<u>**CONCLUSION**</u>

In conclusion, Bullion Exchange has demonstrated a strong likelihood of success on the merits of its trade secret misappropriation claims, and the equities weigh decidedly in favor of granting injunctive relief to prevent irreparable harm to the Plaintiff's business interests. Accordingly, this Court should grant Bullion Exchange's motion and enter an order in a form substantially similar to the proposed form Order (ECF No. 7) granting such further relief as the Court deems just and proper. Bullion Exchange also reserves the right to petition the Court for a seizure order should Defendant fail to abide by the Orders of this Court pertaining to locating, isolating, and returning to Bullion Exchange its misappropriated material.

Dated: Uniondale, New York
      April 19, 2024

                                      **TURMAN LEGAL SOLUTIONS PLLC**

                              By: *Stephen Turman*
                                        Stephen E. Turman
                                      626 RXR Plaza
                                      Uniondale, NY 11556
                                      Ph: (516) 266-6101
                                      Email: sturman@turmanlegal.com

                                      *Counsel for the Plaintiff, Bullion Exchange LLC*