UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| BULLION EXCHANGE LLC, | Case No. 24-CV-00467 |
| Plaintiff, | |
| | **FIRST AMENDED COMPLAINT** |
| v. | |
| BULLION SHARK, LLC and EKATERINA OVODOVA, | [Demand for a Jury Trial] |
| Defendants. | |

Plaintiff Bullion Exchange LLC ("Bullion Exchange" or "Plaintiff"), by and through its attorneys, Turman Legal Solutions PLLC, brings this Complaint against Defendants Bullion Shark, LLC ("Bullion Shark") and Ekaterina Ovodova ("Ovodova") (collectively, the "Defendants"), and states as follows:

## PRELIMINARY STATEMENT

1.      This is an action for injunctive relief and damages arising from Defendants' willful and unlawful misappropriation of Bullion Exchange LLC's ("Bullion Exchange") confidential information and trade secrets. These trade secrets include proprietary customer lists, marketing strategies, and other sensitive business information critical to Bullion Exchange's competitive standing in the online retail market for bullion, rare coins, precious metals, and other collectibles.

2.      Bullion Exchange and Bullion Shark LLC ("Bullion Shark") are direct competitors that operate in the online retail space selling rare coins, precious metals, bullion, numismatics, and other collectibles to customers across the United States through their respective websites and third-party marketplaces, including eBay.

3.      Between December 29, 2018, and September 15, 2023, Defendant Ekaterina Ovodova was employed by Bullion Exchange as its Director of Marketing, a trusted management

position within the company. In this role, Ovodova had access to Bullion Exchange's highly confidential, proprietary information, including its Customer Lists and Marketing Strategy.

4.       Despite her duty to maintain the confidentiality of Bullion Exchange's proprietary information and trade secrets, Ovodova misappropriated these trade secrets between August 23 and September 15, 2023, for her own personal benefit and to benefit Bullion Shark, her new employer. This complaint alleges causes of action against the Defendants for misappropriation of trade secrets under the Defend Trade Secrets Act (DTSA) and New York common law, unfair competition, breach of fiduciary duty, aiding and abetting breach of fiduciary duty, breach of contract, and unjust enrichment. Bullion Exchange seeks injunctive relief, compensatory damages, consequential damages, restitution, attorneys' fees, and costs, and all other appropriate remedies available under the DTSA and New York state law.

5.       Based on the forgoing and set forth herein, Bullion Exchange alleges causes of action against the Defendants for: (i) their misappropriation of trade secrets under 18 U.S.C. § 1836 *et seq*. (known as the Defend Trade Secrets Act ("DTSA")); (ii) New York common law causes of action for the misappropriation of trade secrets; (iii) unfair competition; (iv) breach of fiduciary duty; (v) aiding and abetting breach of fiduciary duty; (vi) breach of contract; and (vi) unjust enrichment. Bullion Exchange seeks injunctive relief, compensatory damages, consequential damages, restitution, attorneys' fees, and costs, and all other appropriate remedies available under the DTSA and New York state law.

## THE PARTIES

6.       Plaintiff Bullion Exchange is a Delaware limited liability company with its principal place of business located in New York, NY.   It operates both brick and mortar and online sales portals that trade, buy, and sell rare coins, bullion, and precious metals.

7.     Defendant Bullion Shark is a New York limited liability company with its principal place of business located at 400 Post Road, Suite 103, Westbury, New York, 11590. Bullion Shark is a direct competitor of Bullion Exchange.

8.     Defendant Ovodova is, upon information and belief, a resident of New York that is currently employed by Bullion Shark as its Head of eCommerce.

## JURISDICTION AND VENUE

9.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 because Bullion Exchange brings claims under 18 U.S.C. § 1836 *et seq*. (the Defend Trade Secrets Act (the "DTSA"), which is a federal statute.  The Court has supplemental jurisdiction over Bullion Exchange's state law claims pursuant to 28 U.S.C. § 1367.

10.     This Court has personal jurisdiction over all parties because, at all relevant times, they either reside in or conduct business in the state of New York.

11.     Venue is proper in this District under 28 U.S.C. § 1391(b)(1) and (2) because Bullion Shark's office is located in this District and a substantial portion of the events giving rise to the claims occurred in this District.

## FACTUAL BACKGROUND

### A.  Bullion Exchange and Bullion Shark are Direct Competitors

12.     Bullion Exchange is a limited liability company formed under the laws of New York in or around 2012 for the purpose of selling rare coins, bullion, precious metals, numismatics, and other collectibles online and in its brick and mortar location in New York City.

13.     Bullion Exchange's online sales are its greatest source of revenue.  It operates a number of websites, including www.bullionexchanges.com, and also transacts business through

its eBay store and other online marketplaces. Using these online storefronts, Bullion Exchange transacts business with customers throughout the United States.

14. As of October 31, 2023, Bullion Exchange generated more than one million (1,000,000) sales of rare coins, bullion, and precious metals on eBay alone and has over 34,000 followers on eBay.

15. Bullion Shark has been in business for approximately eleven (11) years. Like Bullion Exchange, Bullion Shark also operates websites, including www.bullionsharks.com, and an eBay store where it buys, sells and trades rare coins, bullion, precious metals, notes, bills, trading cards, and other collectibles to customers throughout the United States.

16. Bullion Exchange and Bullion Shark both sell a wide variety of gold, silver and platinum coins, bars, rounds, and bullion, which vary in price based on the metal content, the age of the coin, the coin's provenance, and its grade/condition. This competitive overlap is evident from a comparison of the top-selling products on both Bullion Exchange and Bullion Shark's websites. In fact, some of the most popular products sold by both companies on their respective websites are the same or substantially, including Double Eagle coins, Gold Eagle coins, Maple Leaf coins, Morgan Dollars, Peace Dollars, Platinum Eagle coins, and Silver Eagle coins—all available in both proof and uncirculated condition from various years from both companies.

17. Bullion Exhange and Bullion Shark also both sell modern numismatic issues, ancient coins, shipwreck coins, and classic U.S. and foreign coins.

18. Bullion Exchange and Bullion Shark are direct competitors.

**B. Bullion Exchange's Customer Lists**

19. As of September 6, 2023, Bullion Exchange has compiled customer lists (the "Customer Lists") from more than 384,000 customers that Bullion Exchange sold products

between 2012 and September 2023, including those customer's names, email addresses, home addresses, telephone numbers, and key sales information and other data useful for generating future sales from those customers.

20.    Between 2012 and September 2023, Bullion Exchange invested time, energy, and more than $10,000,000 in sales and marketing campaigns and promotions to generate sales to those customers whose personal information can be found on the Customer Lists.   Bullion Exchange enjoys a history of transacting business with the customers identified in the Customer Lists, many of whom are repeat customers that have engaged in multiple sales transactions with Bullion Exchange.

21.    Bullion Exchange enjoys and benefits from the goodwill it has with the customers identified on the Customer Lists.

22.    Bullion Exchange regularly uses its Customer Lists to create direct and indirect marketing campaign to generate sales from its past customers.

23.    The information found in the Customer Lists is not available to the general public, including Bullion Exchange's competitors and cannot be found in any public sources nor can this information be recreated by Bullion Exchange's competitors.

24.    Bullion Exchange's competitors, including Bullion Shark, would have to invest years of time, significant human resources, and at least $10,000,000.00 to compile a customer list of the size, quality, and value of Bullion Exchange's Customer Lists.

**C.  Bullion Exchange's Marketing Strategy**

25.    Bullion Exchange's Marketing Strategy is also a valuable trade secret.   It is a compilation of Bullion Exchange's internal proprietary sales data, data collected from sales analytics collected from Bullion Exhange's website(s), its eBay account, other third-party sales

portals (e.g., Walmart, Amazon Marketplace), customer relation databases, combined with industry sales data, product trends, and other publicly available data acquired by Bullion Exchange using its license with third party market research providers, and search engine optimization platforms, including AHREFs[1]. The Marketing Strategy also includes data and information that identifies key Bullion Exchange employees and staff and how its employees and staff are organized and allocated responsibility to maximize Bullion Exchange's operational efficiency to maximize sales and minimize overhead.

26.     The protectable proprietary nature of Bullion Exchange's Marketing Strategy lies in "how" the specific analysis, application, and decision-making framework is used to convert public and proprietary sales data and research into actionable business intelligence. It is the product of trial and error, which has been continuously updated and refined by Bullion Exchange as search engine algorithms, customer tastes, and the availability of new products and sales portals develop and change.

27.     This unique integration of disparate data points into a coherent and strategic Marketing Strategy is a proprietary process that gives Bullion Exchange a competitive advantage.

28.     A competitor would gain an unfair advantage from the head start Bullion Exchange's Marketing Strategy would provide, without having to invest the year of time, labor, and at least $10,000,000.000 in marketing and advertising campaigns to achieve the sales results Bullion Exchange benefits from.

---

[1] Ahrefs is an essential tool for businesses that market their products and services online. It is used to improve their website's search engine optimization (SEO) performance. Ahrefs offers a comprehensive set of features that help users understand their current SEO standing, identify areas for improvement, and modify their websites, metadata, and other information to improve rankings based on updated search engine algorithms. Ahrefs also provides businesses with tools that help them gain insights into competitors' marketing strategies and optimize their own marketing strategies for selling products and services. This is achieved by tracking popular or trending topics and products, which can then be used to attract organic traffic and improve the performance of backlinks with other websites.

29.     The Marketing Strategy is not publicly available and cannot be reproduced by Bullion Exchange's competitors using publicly available information alone.

30.     Although Bullion Exchange and Bullion Shark may both use publicly available search engine optimization tools and market research tools, Bullion Exchange's use of this data, combined with its own proprietary sales and market data, to maximize sales volume and revenue is a unique and protectable trade secret.

**D.  Bullion Exchange Safeguards its Trade Secrets**

31.      Bullion Exchange retained the services of an online security specialist to design a data security system and establish protocols necessary to safeguard its trade secrets, networks, and computer workstations from internal and external attacks.

32.     In particular, Bullion Exchange invested in the construction of a secure, encrypted physical server that is maintained in its New York City office to protect its business data and information at a cost of several hundred thousand dollars.

33.     Bullion Exchange's employees are required to work in Bullion Exchange's office where their activity can be monitored and recorded.  To the extent employees are able to access the secure network remotely, that access is limited to a virtual desktop environment that can be monitored by Bullion Exchange's management and network security consultant.   This virtual desktop environment prevents employees from downloading, saving, or printing data from Bullion Exchange's secure network on their personal computers and local printers.

34.     In addition to implementing the electronic measures and policies to protect its trade secrets and other confidential information, Bullion Exchange restricts access to its trade secrets on its internal network to those key employees that require access to this data to perform the essential functions of their job.

35.     In addition, all Bullion Exchange's employees are required to sign its Employee Handbook and a separate Theft Policy, whereby employees acknowledge their duty to protect Bullion Exchange's confidential information and trade secrets.  Bullion Exchange's employees agree and understand their failure to protect this information may result in severe penalties, including termination and other legal consequences.

**E.  Ovodova's Employment with Bullion Exchange**

36.     On or about February 9, 2015, Bullion Exchange hired Ovodova to work in its shipping department—which is an entry-level position within the company.

### a.  *Ovodova's Agreements with Bullion Exchange*

37.     On October 28, 2015, Ovodova signed Bullion Exchange's Employee Handbook.

38.     Pursuant to Section 6.2 of the Employee Handbook, Ovodova acknowledged and agreed that: "[n]o previous or current employee may disclose or give access to confidential Company information, in any way or at any time, unless otherwise authorized by Management."

39.     Bullion Exchange's Employee Handbook creates a binding contract between Bullion Exchange and Ovodova.

40.     On or about October 28, 2015, Ovodova also executed an acknowledgement of Bullion Exchange's Employee Theft Policy, wherein Ovodova recognized that  Bullion Exchange will not tolerate monetary or property theft of any type, including the unauthorized use of Bullion Exchange's services, facilities, products, or company materials—none of which can be removed from Bullion Exchange's offices without the company's consent.

41.     Bullion Exchange's Employee Theft Policy also creates a binding contract between Bullion Exchange and Ovodova.

### b.  *Ovodova's Rise with Bullion Exchange*

42.     Over the next several years, Ovodova took an interest in graphic design and marketing.  To encourage her growth as an employee, Bullion Exchange moved her from the shipping department to its marketing department.

43.     On or about January 9, 2017, Ovodova was promoted to the position of Head of Graphic Design for Bullion Exchange, which is a mid-level position within the marketing department.

44.     On or about December 29, 2018, Bullion Exchange promoted Ovodova to the position of Director of Marketing, which is a high level, management position.   As Director of Marketing, Ovodova answered directly to the company's Chief Executive Officer, Ernest Gozenput.

45.     As Bullion Exchange's Director of Marketing, Ovodova was responsible for developing and executing comprehensive marketing strategies to drive online sales and brand growth.  She lead Bullion Exchange's marketing team, managed its digital marketing campaigns across various channels, including search engine optimization (SEO) strategies, pay-per-click (PPC) campaigns, referral programs, affiliate marketing strategies, email, and social media compaigns, and leveraged data analytics to optimize performance.   Ovodova was also responsible for overseeing the marketing budget (with the oversight of Bullion Exchange's officers and directors), ensuring brand consistency, and collaborating with other departments to align marketing efforts with Bullion Exchange's overall business goals.

46.     As a member of Bullion Exchange's management team and as the head of its marketing department, Ovodova required and was given access to Bullion Exchange's Customer Lists, market research, sales data, vendor contracts, marketing strategies, and other sensitive and confidential trade secrets necessary to enable her to to perform the essential functions of her job.

47.     At all relevant times, Ovodova understood that Bullion Exchange's Customer Lists and Marketing Strategy were valuable trade secrets and the exclusive property of Bullion Exchange.

**F. Ovodova Violates Her Duties and Obligations to Bullion Exchange with Bullion Shark's Support and Encouragement**

48.     On August 23, 2023, Ovodova met with Nicholas Adamo and Andrew Adamo, the founders of Bullion Shark, to discuss Ovodova's prospective employment as Head of eCommerce for that company.

49.     Upon information and belief, as Head of eCommerce, Ovodova would provide Bullion Shark with substantially the same services that she was providing to Bullion Exchange and carry the same responsibilities that she had as Director of Marketing for Bullion Exchange.

**G. Ovodova Misappropriates the Marketing Strategy for Bullion Shark's Benefit**

50.     On or about April 23, 2023, Bullion Shark either directly or through a third-party, asked Ovodova to prepare a marketing strategy that would help drive customer traffic to Bullion Shark.

51.     At the time Bullion Shark made this request of Ovodova, it knew that Ovodova was still employed as Director of Marketing for Bullion Exchange.

52.     On August 23, 2023, Ovodova agreed to prepare a marketing strategy for Bullion Shark.

53.     On or about August 24, 2023, Ovodova accessed the Google Drive account provided to her by Bullion Exchange to make a copy of Bullion Exchange's Marketing Strategy.

54.     Between August 24 and 25, 2023, Ovodova used the Marketing Strategy as a template to create a "new" marketing strategy (the "BS Marketing Strategy") for Bullion Shark, which was substantially similar and, in most respects, virtually identical to the Marketing Strategy.

55.     In fact, when creating the BS Marketing Strategy, Ovodova simply changing the name "Bullion Exchange" in the document to "Bullion Shark", while leaving Bullion Exchange's confidential and proprietary information unchanged.

56.     For sections of the BS Marketing Strategy that relate to specific products sold by Bullion Exchange, Ovodova used Bullion Exchange's search engine optimization (SEO) tools to create and optimize links to Bullion Shark's products for use with Bullion Shark's website. Ovodova inserted the links she prepared for Bullion Shark into the BS Marketing Strategy in place of links to Bullion Exchange's products.

57.     Bullion Shark and Ovodova knew or should have known that Ovodova had no right or authority to use Bullion Exchange's Marketing Strategy, along with its proprietary information, licenses for third party services, and its office and facilities to create the BS Marketing Strategy for Bullion Shark.

58.     Ovodova provided the BS Marketing Strategy to Bullion Shark at some point between August 25, 2023 and September 1, 2023.

59.     The BS Marketing Strategy gave Bullion Shark a competitive advantage over Bullion Exchange even if Bullion Shark had chosen not to hire Ovodova.

60.     On September 1, 2023, Bullion Shark offered Ovodova the position of Head of eCommerce, which she accepted that same day.

61.     As the current Head of eCommerce for Bullion Shark, Ovodova is now helping Bullion Shark implement the BS Marketing Strategy.

**H. Ovodova Misappropriates Bullion Exchange's Customer Lists For Bullion Shark**

62.     To further aid Bullion Shark and to benefit herself, on September 6, 2023, Ovodova made unauthorized copies of Bullion Exchange's Customer Lists using her workstation in Bullion Exchange's New York City office.

63.     In particular, Ovodova exported Bullion Exchange's two largest Customer Lists from Bullion Exchange's Constant Contact account to .csv files that can be opened using Microsoft Excel,  Google Sheets, and other compatible software.

64.     Ovodova saved these two (2) .csv files to the desktop of her Bullion Exchange workstation located in Bullion Exchange's New York City office.

65.     Ovodova then attached those two (2) .csv files to an email she created using her Bullion Exchange email account (katia@bullionexchanges.com).

66.     On September 6, 2023, Ovodova used her Bullion Exchange email account to send the two .csv files containing the Customer Lists to her personal email account (eovodova@gmail.com).

67.     Immediately after sending the email with Bullion Exchange's Customer Lists attached, Ovodova attempted to permanently delete her sent emails from her Bullion Exchange account, thereby attempting to conceal her misconduct.

68.     The Customer Lists that Ovodova downloaded and emailed to herself contain the contact information for more than 384,000 customers that transacted business with Bullion Exchange between 2012 and September 6, 2023.

69.     As Director of Marketing for Bullion Exchange, Ovodova had authority to use Bullion Exchange's Customer Lists for Bullion Exchange's benefit, but she did not have permission to send copies of the Customer Lists to her personal email account or otherwise remove

these Customer Lists from Bullion Exchange's secure network, which is a violation of established company policy and Bullion Exchange's Employee Handbook and Employee Theft Policy.

70.     There is no justifiable reason for Ovodova to email herself copies of our Customer Lists ever, let alone the day before she gave Bullion Exchange notice of her resignation.

**I.     Ovodova Resigns From Bullion Exchange**

71.     On or about September 7, 2023, Ovodova informed Bullion Exchange that she would be resigning from her position as Director of Marketing for Bullion Exchange, effective September 15, 2023.

72.     On September 7, 2023, Ovodova specifically told Bullion Exchange she would be taking a marketing position with a company outside of the rare coin, bullion, and precious metals industry.

73.     Ovodova's resignation as Director of Marketing for Bullion Exchange became effective on September 15, 2023.

**J.     Bullion Exchange Discovers that Ovodova is Working in Bullion Shark's Marketing Department**

74.     In October 2023, Bullion Exchange discovered that Ovodova had updated her LinkedIn profile to reflect her new employment as Head of eCommerce for Bullion Shark, one of Bullion Exchange's direct competitors.

75.     Ovodova lied to Bullion Exchange about her new employer on September 7, 2023, to conceal the fact she was leaving to accept a position with one of Bullion Exchange's direct competitors.

76.     This discovery prompted Bullion Exchange to conduct an investigation to determine whether Ovodova had taken any material containing trade secrets and other confidential information from Bullion Exchange before her employment ended with the company.

77. This investigation led to Bullion Exchange's discovery of Ovodova's misconduct.

78. In October 2023, Bullion Exchange discovered that Ovodova deleted all of the contents from the Google Drive account provided to her by Bullion Exchange and all of the emails that she sent from her Bullion Exchange account in August and September 2023.

**K. Bullion Exchange Has Been Irreparably Harmed by the Defendants' Actions**

79. As the current Head of eCommerce for Bullion Shark, Ovodova is now using the misappropriated Customer Lists and Marketing Strategy to divert Bullion Exchange's customers to Bullion Shark and deprive Bullion Exchange of the sales and good will it has with those customers.

80. In addition to using the Customer Lists to market Bullion Shark's products to Bullion Exchange's customers, the Customer Lists also independent value to other competitors in the rare coin, bullion, and precious metals industry.

81. Bullion Shark and/or Ovodova could easily sell Bullion Exchange's Customer Lists to other competitors of Bullion Exchange—if they have not done so already. Should this occur, it would be extremely difficult for Bullion Exchange to discover this misconduct and prevent further harm and economic loss.

82. Defendants' conduct has caused and continues to cause Bullion Exchange irreparable harm. Bullion Exchange will continue to be irreparably harmed until the Defendants are enjoined from using, disseminating, and benefiting from the Customer Lists and Marketing Strategy to gain an unfair advantage over Bullion Exchange and profit at Bullion Exchange's expense.

**COUNT I**

**Misappropriation of Trade Secrets Under The DTSA**

**18 U.S.C. § 1836 *et seq.***

**(Against Both Defendants)**

83.     Bullion Exchange realleges and incorporates all preceding paragraphs of this Complaint as if set forth at length herein.

84.     Bullion Exchange and Bullion Shark both use websites they own and other online sales platforms, including eBay, to buy, sell, and trade rare coins, bullion, precious metals, bills, and numismatics to customers throughout the United States.

85.     Bullion Exchange and Bullion Shark are direct business competitors.

86.     Bullion Exchange is the owner of valuable trade secrets, as defined by 18 U.S.C. § 1839(3), including:

    a.  Customer Lists, which are proprietary Customer Lists containing the contact information of over 384,000 customers who have purchased products from Plaintiff since the late 1990s; and

    b.  Marketing Strategy, which is a unique and proprietary marketing strategy that include advanced data analytics, predictive modeling, and a sophisticated integration of publicly available data with Plaintiff's internal sales data and analytics. These strategies are continuously refined and updated to optimize sales outcomes and provide Plaintiff with a competitive advantage.

87.     The Customer Lists, Marketing Strategy and other trade secrets owned by Bullion Exchange derive independent economic value from not being generally known or readily ascertainable to Bullion Exchange's competitors, including Bullion Shark.

88.     Bullion Exchange takes reasonable measures to protect the secrecy of these trade secrets.  In particular, Bullion Exchange implemented advanced digital security protocols to limit and control employee access to trade secrets.  Working in conjunction with these security software

solutions is a secure hardware infrastructure that was built for Bullion Exchange to prevent bad actors from penetrating its internal network.

89.      Bullion Exchange also limits employee access to trade secrets to those employees that require such access to perform the essential functions of their jobs.   Bullion Exchange employees without permission to access Bullion Exchange's trade secrets are locked out of any files that contain confidential information or any other information trade secrets that are not necessary for that employee to perform their duties for Bullion Exchange.

90.      Bullion Exchange also limits employees' remote access to its secure network to a virtual desktop environment that can be monitored by the Bullion Exchange at all times.   This virtual desktop environment allows employees to remotely access their desktops at work but prohibits employees from downloading documents and data to their personal computers outside of Bullion Exchange's secure network.

91.      Bullion Exchange also has policies in place to protect its trade secrets from employee misconduct.   In particular, Bullion Exchange requires that its employees sign its Employee Handbook and Employee Theft Policy that expressly warns employees of the severe consequences that may result from the misuse or theft of Bullion Exchange's property, including is trade secrets and other confidential information.

92.      As Director of Marketing for Bullion Exchange, Ovodova was provided with access to Bullion Exchange's Customer Lists, marketing research, marketing strategies and other sensitive data which she needed to fulfill her duties and responsibilities to Bullion Exchange.

93.      Bullion Exchange's Customer Lists and Marketing Strategy are trade secrets as that term is defined in 18 U.S.C. § 1839(3).

94. On August 23, 2023, Ovodova met with Bullion Shark's management to discuss an open position to work as Head of eCommerce for Bullion Shark.

95. On or about August 23, 2023, Bullion, either directly or through a third party, asked Ovodova to prepare a marketing strategy that Bullion Shark could use to increase sales and improve its market position.

96. Although Ovodova was still employed as Director of Marketing for Bullion Exchange, she agreed to prepare the BS Marketing Strategy for Bullion Shark.

97. Between August 24 and 25, 2023, Ovodova used Bullion Exchange's marketing strategy as a template to create the BS Marketing Strategy. In particular, she made a copy of Bullion Exchange's marketing strategy on the Google Drive provided to Ovodova by Bullion Exchange. Ovodova then replaced "Bullion Exchange" with "Bullion Shark" or "Shark" throughout the document, leaving Bullion Exchange's market research and data points unchanged.

98. Where the Marketing Strategy includes data optimized for products found on Bullion Exchange's website, Ovodova used Bullion Exchange's search engine optimization tools to create optimized links for Bullion Shark's products. Ovodova inserted the optimized links for Bullion Shark's products into the BS Marketing Strategy in place of the links for Bullion Exchange's products.

99. Between August 25, 2023 and September 1, 2023, Ovodova gave the BS Marketing Strategy to Bullion Shark.

100. On September 1, 2023, Bullion Shark offered Ovodova the position as its Head of eCommerce, along with a substantial salary increase. Ovodova immediately accepted Bullion Shark's offer.

101.    On September 6, 2023, Ovodova downloaded the Customer Lists to her workstation in Bullion Exchange's office.   Ovodova then used her company email account to send Bullion Exchange's Customer Lists to her personal email account without Bullion Exchange's knowledge or consent.

102.    After emailing Bullion Exchange's Customer Lists to her personal email account, Ovodova immediately attempted to permanently delete all sent emails from her sent email folder for August and September 2023 in effort to conceal her misconduct.

103.    Ovodova's actions on September 6, 2023, were a clear violation of Bullion Exchange's Employee Handbook, Theft Policy, and the trust it placed in Ovodova as a fiduciary to Bullion Exchange.

104.    On September 7, 2023, Ovodova gave Bullion Exchange notice of her resignation, which became effective on September 15, 2023.

105.    At the time she gave her notice of resignation, Ovodova falsely informed Bullion Exchange that she would be taking a marketing position outside of Bullion Exchange's industry.

106.    At all relevant times, Bullion Shark and Ovodova knew or should have known that the Bullion Exchange's Marketing Strategy and Customer Lists where valuable trade secrets.

107.    Upon information and belief, Ovodova, as Head of eCommerce for Bullion Shark, is now using the BS Marketing Strategy and Customer Lists to drive business to Bullion Shark and improve Bullion Shark's brand recognition and market share.

108.    Bullion Shark and Ovodova are both benefiting from Ovodova's misappropriation of Bullion Exchange's trade secrets.

109. As a direct and proximate result of the Defendants' misappropriation of Bullion Exchange's trade secrets, Bullion Exchange has been irreparably harmed and will continue to be irreparably harmed unless injunctive relief is granted in Bullion Exchange's favor.

110. Under the DTSA, Bullion Exchange is entitled to a judgment: (i) enjoining Defendants from any actual or threatened misappropriation of Bullion Exchange's trade secrets and prohibiting Defendant's unauthorized use and/or disclosure of Bullion Exchange's trade secrets pursuant to 18 U.S.C. § 1836(b)(3)(A); (ii) directing Defendants to immediately return all trade secrets Defendants' misappropriated from Bullion Exchange and destroy any remaining copies, notes or derivatives created from those trade secrets pursuant to 18 U.S.C. § 1836(b)(2)(A); (iii) awarding Bullion Exchange compensatory damages for actual losses and unjust enrichment caused by Defendants' misappropriation of Bullion Exchange's trade secrets pursuant to 18 U.S.C. § 1836(b)(3)(B); (iv) awarding Bullion Exchanges exemplary damages against Defendants equal to two (2) times the amount of compensatory damages awarded for Defendants' willful and malicious misappropriation of Bullion Exchange's trade secrets pursuant to 18 U.S.C. § 1836(b)(3)(C); (v) awarding Bullion Exchange interest, including pre-judgment interest; and (vi) awarding Bullion Exchange reasonable attorneys' fees and costs pursuant to 18 U.S.C. § 1836(b)(2)(A).

## COUNT II

### Misappropriation of Trade Secrets Under New York Common Law

### (Against Both Defendants)

111. Bullion Exchange realleges and incorporates all preceding paragraphs of this Complaint as if set forth at length herein.

112.    Under New York common law, Bullion Exchange invested considerable time, effort, and money to create its Customer Lists and Marketing Strategy which are contain proprietary information that is not known to the general public and cannot be recreated using generally available public information.

113.    The Customer Lists and Marketing Strategy are both trade secrets under New York law. Bullion Exchange's trade secrets derive independent economic value from not being generally known or readily ascertainable by proper means by others who could obtain value from the use or disclosure of this information.

114.    Bullion Exhange takes reasonable precautions to protect and secure its trade secrets, including the Customer Lists and Marketing Strategy.

115.    Defendants have misappropriated trade secrets owned by Bullion Exchange, including Customer Lists, marketing research, and other confidential business information and trade secrets.

116.    As a direct result, Bullion Exchange has been damaged and suffered irreparable harm under New York common law.

117.    Bullion Exchange is entitled to injunctive relief, damages (including exemplary damages), an award for attorneys' fees, and interest (including pre-judgement interest) against Defendants.

## COUNT III

### Unfair Competition Under New York Common Law

### (Against Both Defendants)

118.    Bullion Exchange realleges and incorporates all preceding paragraphs of this Complaint as if set forth at length herein.

119.    Defendants improperly acquired and used Bullion Exchange's trade secrets to gain an unfair competitive advantage over Bullion Exchange.

120.    In particular, Ovodova used her position as Bullion Exchange's Director of Marketing to make unauthorized copies of the Marketing Strategy and Customer Lists and remove those trade secrets from Bullion Exchange's control by emailing herself copies of these trade secrets to her personal email account from her office account provided by Bullion Exchange.

121.    Ovodova then attempted to delete computer records and files, including her sent emails, to conceal her misconduct the day before she informed Bullion Exchange she would be resigning.

122.    When she gave notice of her resignation to Bullion Exchange, Ovodova falsely informed Bullion Exchange that she would be taking a marketing position with a company outside of Bullion Exchange's industry.   This was a further attempt by Ovodova to conceal Bullion Shark's misconduct as well as her own misconduct.

123.    Defendants have engaged in unfair competition under New York common law through their misappropriation of Bullion Exchange's trade secrets and confidential information.

124.    Defendants are using Bullion Exchange's confidential information and trade secrets to market Bullion Shark's products and services to Bullion Exchange's customers.

125.    As a direct and proximate result of Defendants' unlawful conduct, Bullion Exchange has lost current sales to its past customers identified in the Customer Lists, the good will of those customers, as well as business opportunities from new potential customers that would have purchased products from Bullion Exchange through the misappropriation of the Marketing Strategy.

126. Bullion Exchange is entitled to injunction relief and damages against Defendants for its losses, exemplary damages, pre- and post-judgment interest, and attorneys' fees in amounts to be determined at trial.

## COUNT IV

### Breach of Fiduciary Duty—Faithless Servant Doctrine

### (Against Defendant Ovodova)

127. Bullion Exchange realleges and incorporates all preceding paragraphs of this Complaint as if set forth at length herein.

128. Bullion Exchange trusted Ovodova and promoted her to the position of Director of Marketing in 2018, which is an upper-level management position within the company.

129. As Director of Marketing for Bullion Exchange, Ovodova had access to Bullion Exchange's Customer Lists, Marketing Strategy, and other trade secrets that were necessary for Ovodova to perform the essential duties of her employment.

130. Ovodova owed Bullion Exchange a fiduciary duty and duty of loyalty to protect its trade secrets and confidential information.

131. Ovodova knew or should have known that that the Customer Lists and Marketing Strategy were valuable trade secrets that took Bullion Exchange years to compile at considerable cost and effort.

132. Ovodova knew or should have known the Customer Lists and Marketing Strategy would have substantial value to Bullion Exchange's competitors.

133. Ovodova breached her fiduciary duties to Bullion Exchange by, among other things, making unauthorized copies of Bullion Exchange's trade secrets, including the Customer Lists and Marketing Strategy.

134. Ovodova also breached her fiduciary duties to Bullion Exchange by giving copies of the Customer Lists and Marketing Strategy to Bullion Shark.

135. Ovodova breached her duty of loyalty to Bullion Exchange by: (a) using its resources, trade secrets and proprietary market research to create a marketing strategy for Bullion Shark; and (b) by stealing Bullion Exchange's Customer Lists.

136. Bullion Exchange is entitled to injunctive relief against Ovodova, compensatory damages in an amount to be determined, and to the disgorgement of salary and benefits paid to Ovodova during the time she was a faithless servant to Bullion Exchange.

## COUNT V

### Aiding and Abetting Breach of Fiduciary Duty

### (Against Defendant Bullion Shark)

137. Bullion Exchange realleges and incorporates all preceding paragraphs of this Complaint as if set forth at length herein.

138. As Bullion Exchange's Director of Marketing, Ovodova held a position of trust and had access to Bullion Exchange's Customer Lists and Marketing Strategy, which she knew or should have known were valuable trade secrets.

139. As Bullion Exchange's Direct of Marketing, Ovodova owed Bullion Exchange a fiduciary duty to protect Bullion Exchange's trade secrets from disclosure to competitors.

140. Bullion Shark knew or should have known that Ovodova, as Director of Marketing for Bullion Exchange, owed a fiduciary duty and duty of loyalty to Bullion Exchange.

141. Bullion Shark also knew Ovodova had access to Bullion Exchange's Customer Lists and Marketing Strategy.

142.     Bullion Shark provided substantial assistance to Ovodova by encouraging her to make unauthorized copies of Bullion Exchange's Customer Lists and Marketing Strategy in August or September 2023.

143.     On August 23, 2023, Bullion Shark asked Ovodova to prepare the BS Marketing Strategy before it would offer her the position as its Head of eCommerce.

144.     Although Bullion Shark and Ovodova both knew or should have known Ovodova owed Bullion Exchange a fiduciary duty and duty of loyalty to act in its best interest at all times, Ovodova used Bullion Exchange's Marketing Strategy as the template used to create the BS Marketing Strategy that she gave to Bullion Shark.

145.     Upon information and belief, Bullion Shark also encouraged Ovodova to misappropriate the Customer Lists before she gave Bullion Exchange notice of her resignation.

146.     As Bullion Shark's Head of eCommerce, Ovodova is now using the BS Marketing Strategy and Customer Lists that she misappropriated from Bullion Exchange to drive Bullion Exchange's past and prospective customers to Bullion Shark.

147.     Bullion Shark knowingly induced, participated in, or enabled Ovodova's breach of her fiduciary duties to Bullion Exchange by acquiring Bullion Exchange's trade secrets and confidential information from Ovodova and encouraging Ovodova to work for Bullion Shark while she was employed as Director of Marketing for Bullion Exchange.

148.     As a direct result of Bullion Shark aiding and abetting and Ovodova's breach of her fiduciary duties to Bullion Exchange, Bullion Exchange has suffered damages and has been irreparably harmed.  Bullion Exchange is entitled a judgment against Bullion Shark awarding Bullion Exchange a permanent injunction against Bullion Shark  barring its continued use of the Customer Lists and Marketing Strategy, awarding it compensatory damages in an amount to be

determined, but not less than $10,000,000.00, exemplary damages in an amount to be determined, interest in an amount to be determined, pre- and post-judgment interest, and attorneys' fees and costs.

## COUNT VI

### Unjust Enrichment

### (Against Both Defendants)

149.     Bullion Exchange realleges and incorporates all preceding paragraphs of this Complaint as if set forth at length herein.

150.     By misappropriating Bullion Exchange's trade secrets and confidential information, Defendants have unjustly enriched themselves at Bullion Exchange's expense.

151.     Defendants have used Bullion Exchange's trade secrets to gain unfair business advantages and receive financial benefits without giving compensation to Bullion Exchange.

152.     Defendants' enrichment at the expense of Bullion Exchange is unjust and inequitable.

153.     Bullion Exchange is entitled to restitution and disgorgement of all profits and benefits Defendants have unjustly obtained through use of Bullion Exchange's trade secrets and confidential information.

## COUNT VII

### Breach of Contract

### (Against Defendant Ovodova)

154.     Bullion Exchange realleges and incorporates all preceding paragraphs of this Complaint as if set forth at length herein.

155.     Defendant Ovodova entered into a binding contractual agreement with Bullion Exchange when she signed the Employee Handbook and the Employee Theft Policy on or about October 28, 2015.

156.     Pursuant to Section 6.2 of the Employee Handbook, Ovodova acknowledged and agreed that "[n]o previous or current employee may disclose or give access to confidential Company information, in any way or at any time, unless otherwise authorized by Management."

157.     The Employee Handbook and Employee Theft Policy explicitly prohibit the unauthorized use or removal of Bullion Exchange's confidential information and trade secrets.

158.     By signing the Employee Handbook and Employee Theft Policy, Ovodova acknowledged her duty to protect Bullion Exchange's confidential information and trade secrets and understood that failure to protect this information could result in severe penalties, including termination and legal consequences.

159.     The Employee Handbook and Employee Theft Policy created binding contractual obligations between Bullion Exchange and Ovodova.

160.     Defendant Ovodova breached these contractual obligations by misappropriating Bullion Exchange's confidential information and trade secrets, including its Customer Lists and Marketing Strategy, and using this information for her own benefit and the benefit of Bullion Shark.

161.     Specifically, Ovodova breached her contractual obligations by: a. Copying Bullion Exchange's Marketing Strategy from the Google Drive account provided to her by Bullion Exchange and using it to create a marketing strategy for Bullion Shark. b. Exporting Bullion Exchange's Customer Lists from Bullion Exchange's Constant Contact account, saving them as

.csv files, and emailing them to her personal email account without authorization. c. Attempting to permanently delete her sent emails to conceal her misconduct.

162.    As a direct and proximate result of Ovodova's breach of contract, Bullion Exchange has suffered and continues to suffer significant damages, including loss of business, profits, and goodwill.

163.    Bullion Exchange is entitled to compensatory damages for the actual losses incurred as a result of Ovodova's breach of contract in an amount to be determined at trial, pre- and post-judgment interest, and attorneys' fees and expenses.

<strong><u>COUNT VIII</u></strong>

<strong>CONVERSION</strong>

<strong>(Against Both Defendants)</strong>

164.    Bullion Exchange realleges and incorporates all preceding paragraphs of this Complaint as if set forth at length herein.

165.    Defendants unlawfully exercised control over Bullion Exchange's Customer Lists and Marketing Strategy without authorization.

166.    As a result of Defendants' conversion of these trade secrets, Bullion Exchange has suffered and will continue to suffer damages, including loss of business, profits, and goodwill.

167.    Bullion Exchange is entitled to compensatory and punitive damages for Defendants' conversion of its property.

168.    As a direct result of Bullion Shark and Ovodova's conversion of the Marketing Strategy and Customer Lists, Bullion Exchange has suffered damages and has been irreparably harmed.    Bullion Exchange is entitled a judgment against Bullion Shark awarding Bullion Exchange a permanent injunction against Bullion Shark and Ovodova barring their continued use

of the Customer Lists and Marketing Strategy, replevin, compensatory damages in an amount to be determined, but not less than $10,000,000.00, exemplary damages in an amount to be determined, pre- and post-judgment interest, and attorneys' fees and costs.

## COUNT IX

### Breach of Implied Duty of Good Faith and Fair Dealing

### (Against Defendant Ovodova)

169.    Bullion Exchange realleges and incorporates all preceding paragraphs of this Complaint as if set forth at length herein.

170.    Implied in the employment relationship between Bullion Exchange and Ovodova was a duty of good faith and fair dealing.

171.    Ovodova breached this duty by misappropriating Bullion Exchange's trade secrets, including the Customer Lists and Marketing, which is using for own benefit and the benefit of Bullion Shark, her new employer.

172.    As a result of Ovodova's breach, Bullion Exchange has suffered damages, including loss of business, profits, and goodwill.

173.    As a direct and proximate result of Ovodova's breach of her implied covenant of good faith and fair dealing, Bullion Exchange has suffered damages and has been irreparably harmed.  Bullion Exchange is entitled a judgment against Bullion Shark awarding Bullion Exchange compensatory damages in an amount to be determined, but not less than $10,000,000.00, consequential damages in an amount to be determined, pre- and post-judgment interest, and attorneys' fees and costs.

## RESERVATION OF RIGHTS

174. Bullion Exchange hereby specifically reserves the right to bring any and all other causes of action that it may maintain against any and all of the named Defendants and any other parties, including, without limitation, causes arising out of the same transaction(s) and occurrence(s) set forth herein, to the extent discovery in this action or further investigation reveals such further causes of action.

## DEMAND FOR A JURY TRIAL

175. Bullion Exchange hereby demands a trial by jury in this proceeding on all counts so triable.

**WHEREFORE**, Bullion Exchange LLC prays for judgment granting the relief set forth below against Defendants Bullion Shark, LLC, and Ekaterina Ovodova:

a. With respect to Bullion Exchange's First Count, as a result of the Defendants Ovodova and Bullion Shark's misappropriation of trade secrets in violation of the Defense of Trade Secrets Act of 2016 (18 U.S.C. § 1836 et seq.), Bullion Exchange is entitled to a judgment: (i) permanently enjoining Defendants from any actual or threatened misappropriation of Bullion Exchange's trade secrets and prohibiting Defendant's unauthorized use and/or disclosure of Bullion Exchange's trade secrets pursuant to 18 U.S.C. § 1836(b)(3)(A); (ii) permanently enjoining the Defendants from using, disseminating, or otherwise benefitting from the trade secrets they misappropriated from Bullion Exchange; (iii) directing Defendants to immediately return all trade secrets Defendants' misappropriated from Bullion Exchange and destroy any remaining copies, notes or derivatives created from those trade secrets pursuant to 18 U.S.C. § 1836(b)(2)(A); (iv) awarding Bullion Exchange compensatory damages for actual losses and unjust enrichment caused by Defendants' misappropriation of Bullion Exchange's trade secrets pursuant to 18 U.S.C. § 1836(b)(3)(B); (iv) awarding Bullion Exchanges exemplary damages against Defendants equal to two (2) times the amount of compensatory damages awarded for Defendants' willful and malicious misappropriation of Bullion Exchange's trade secrets pursuant to 18 U.S.C. § 1836(b)(3)(C); and (vi) awarding Bullion Exchange reasonable attorneys' fees and costs pursuant to 18 U.S.C. § 1836(b)(2)(A);

b. With respect to Bullion Exchange's Second Count, as a result of the Defendants Ovodova and Bullion Shark's misappropriation of trade secrets in violation of New York common law, Bullion Exchange is entitled to a judgment: (i) enjoining

Defendants from any actual or threatened misappropriation of Bullion Exchange's trade secrets and prohibiting Defendant's unauthorized use and/or disclosure of Bullion Exchange's trade secrets; (ii) directing Defendants to immediately return all trade secrets Defendants' misappropriated from Bullion Exchange and destroy any remaining copies, notes or derivatives created from those trade secrets; (iii) awarding Bullion Exchange compensatory damages in an amount to be determined at trial, but not less than $10,000,000.00.00; and (iv) awarding Bullion Exchange punitive damages in an amount to be determined at trial;

c. With respect to Bullion Exchange's Third Count, as a result of the Defendants' unfair competition, Bullion Exchange is entitled to a judgment: (i) permanently enjoining the Defendants Bullion Shark and Ovodova from continuing to possess, access, use, market and sell Bullion Exchange's trade secrets, including Bullion Exchange's Customer Lists and marketing strategy; (ii) directing Defendants Bullion Shark to return Bullion Exchange's Customer Lists and other trade secrets and destroy all copies of Bullion Exchange's Customer Lists and other trade secrets; (iii) awarding Bullion Exchange compensatory damages in an amount to be determined at trial, but in no case less than $10,000,000.00; (iv) disgorging all profits earned by Defendant Bullion Shark from its unauthorized use of Bullion Exchange's Customer Lists and other trade secrets; (v) awarding punitive damages to Bullion Exchange in an amount to be determined at trial; and (vi) awarding Bullion Exchange attorneys' fees and costs;

d. With respect to Bullion Exchange's Fourth Count, as a result of Defendant Ovodova's wrongful, willful, and malicious breach of her fiduciary duty and duty of loyalty, Bullion Exchange is entitled to: (i) damages in an amount to be determined at trial, but not less than $10,000,000.00.00; (ii) disgorgement of all salary, bonuses, benefits and compensation paid to Defendant Ovodova by Bullion Exchange for the period during which Ovodova was a faithless servant; and (iii) punitive damages in an amount to be determined at trial;

e. With respect to Bullion Exchange's Fifth Count, as a result of the Defendants' Bullion Shark's efforts to aid and abet Defendant Ovodova's breach of her fiduciary duty and duty of loyalty to Bullion Exchange, Bullion Exchange is entitled to a judgment: (i) permanently enjoining the Defendants Bullion Shark from continuing to possess, access, use, market and sell Bullion Exchange's trade secrets, including Bullion Exchange's Customer Lists; (ii) directing that Defendant Bullion Shark return the Customer Lists to Bullion Exchange and destroy all copies of Bullion Exchange's Customer Lists; (iii) granting Bullion Exchange compensatory damages against Defendant Bullion Shark in an amount to be determined at trial, but in no case less than $10,000,000.00, and (iv) granting Bullion Exchange an award for punitive damages in an amount to be determined at trial;

f. With respect to Bullion Exchange's Sixth Cause of Action, as a result of the Defendants' unjust enrichment at Bullion Exchange's expense, Bullion Exchange

is entitled to judgment: (i) awarding Bullion Exchange restitution from the Defendants, (ii) disgorging all profits and benefits Defendants have unjustly obtained through use of Bullion Exchange's trade secrets and confidential information; and (iii) imposing a constructive trust on all benefits the Defendants improperly received from the use of Bullion Exchange's trade secrets;

g. With respect to Bullion Exchange's Seventh Cause of Action for breach of contract against Defendant Ovodova, Bullion Exchange is entitled to compensatory damages for the actual losses incurred as a result of Ovodova's breach of contract in an amount to be determined at trial;

h. With respect to Bullion Exchange's Eighth Cause of Action for conversion against Defendants Bullion Shark and Ovodova, Bullion Exchange is entitled to: (i) a judgment against Bullion Shark awarding Bullion Exchange a permanent injunction against Bullion Shark and Ovodova barring their continued use of the Customer Lists and Marketing Strategy; (ii) replevin of Plaintiff's trade secrets; (iii) compensatory damages in an amount to be determined at trial, but not less than $10,000,000.00; and (iv) exemplary damages in an amount to be determined at trial;

i. With respect to Bullion Exchange's Ninth Cause of Action, as a result of Defendant Ovodova's breach of the implied covenant of good faith and fair dealing, Bullion Exchange is entitled a judgment against Ovodova for: (i) compensatory damages in an amount to be determined at trial, but not less than $10,000,000.00; and (ii) consequential damages in an amount to be determined at trial;

j. Awarding Bullion Exchange's reasonable attorneys' fees and costs;

k. for interest on any damages awarded, including pre-judgment interest; and

l. for such other and further relief as this Court deems just and proper.

Dated: Uniondale, New York
       May 17, 2024

**TURMAN LEGAL SOLUTIONS PLLC**
*Counsel for Plaintiff Bullion Exchange LLC*

By: *Stephen Turman*
        Stephen E. Turman
        626 RXR Plaza, 6th Floor
        Uniondale, New York 11556
        (516) 266-6101
        sturman@turmanlegal.com