

**BONDAR LEGAL P.C.**

3 E EVERGREEN RD., UNIT 101 PMB 530
NEW CITY, NY 10956

479 STATE RT 17 STE 6 #3019,
MAHWAH, NJ 07430

(845) 200-3992

EUGENE@BONDARLEGAL.COM

BONDARLEGAL.COM

May 2, 2025

<u>**VIA ECF**</u>
Hon. James M. Wicks, Magistrate Judge
United States District Court
Eastern District of New York
100 Federal Plaza, Courtroom 1020
Central Islip, New York 11722

   Re: *Bullion Exchange LLC v. Bullion Shark LLC and Ekaterina Ovodova*
     Case No.: 2:24-cv-00467-SJB-JMW
     **Letter Brief in Further Support of Motion to Amend**

Dear Judge Wicks:

As you may know, this firm represents Plaintiff Bullion Exchange LLC ("Plaintiff") in the above-referenced case against Defendants Bullion Shark, LLC ("Bullion Shark") and Ekaterina Ovodova ("Ovodova"; and collectively, "Defendants"). Pursuant to the Court's directive during the oral argument on the Motion held April 25, 2025 (the "Oral Argument"), Plaintiff respectfully submits this letter brief in further support of its Motion to Amend the Complaint (the "Motion"). This brief supplements the papers previously filed and statements made at the Oral Argument in support of the Motion, and addresses the issues identified by the Court, including procedural posture, good cause for amendment, and the sufficiency of the new and amended claims.

 I. Introduction

The proposed Second Amended Complaint ("SAC") makes three key changes: it removes the conversion claim, adds a new claim for tortious interference with business relations, and includes additional factual allegations to support and streamline existing claims, based on evidence obtained in discovery after the scheduling deadline. The SAC does not assert new legal theories beyond the added tortious interference claim. At the Oral Argument, the Court noted that pre-existing claims remain subject to forthcoming Rule 12 motions and that only the amendments are at issue on the Motion. The Court also clarified that the deadline for amendment had passed under the operative scheduling order and that Plaintiff's motion would be evaluated under the heightened "good cause" standard set forth in Rule 16(b)(4). *See Sacerdote v. New York Univ.*, 9 F.4th 95, 115 (2d Cir. 2021). Further, the Court also addressed the new and amended claims, including the trade secret allegations and tortious interference claim, and the propriety of Plaintiff's alternative claims for breach of fiduciary duty and breach of the covenant of good faith and fair dealing.

 II. The "Good Cause" Standard

Under Second Circuit precedent, the primary consideration in determining whether good cause exists is the diligence of the moving party. *Callahan v. Cnty. of Suffolk*, 96 F.4th 362, 370 (2d Cir.

2024). Specifically, the moving party must demonstrate that, despite their diligent efforts, they could not reasonably meet the deadline set in the scheduling order. *Holmes v. Grubman*, 568 F.3d 329, 335 (2d Cir. 2009). Although diligence is the focus, courts may also consider other factors, such as whether the amendment will cause prejudice to the opposing party. *Kassner v. 2nd Ave. Delicatessen Inc.*, 496 F.3d 229, 244 (2d Cir. 2007). "A party is not considered to have acted diligently where the proposed amendment is based on information that the party knew, or should have known, in advance of the motion deadline." *Mass. Bay Ins. Co. v. Seneca Ins. Co.*, 697 F. Supp. 3d 196, 201 (S.D.N.Y. 2023). Therefore, good cause is established where the movant has diligently pursued amendment and no undue delay or prejudice is shown.

Here, as previously argued, Plaintiff acted with due diligence, ensuring that the amendment was sought at the earliest practical opportunity. Nor could Plaintiff have effectively amended its pleading by the deadline. Pursuant to the Scheduling Order dated March 26, 2024, the deadline for motions to add new parties or amend pleadings expired June 26, 2024[1]. Plaintiff served its first round of discovery requests on May 13, 2024, but did not receive Defendants' initial responses until July 8, 2024, after the amendment deadline had passed. These responses, though voluminous, were deficient and redacted, requiring supplemental disclosure and impeding Plaintiff's chance at amending any sooner. Plaintiff's prior counsel served Defendants a deficiency letter on July 17, 2024. Thereafter, the parties started mediation on June 21, 2024, and a stay was in place from September 13, 2024, until December 12, 2024. Plaintiff's counsel was substituted on November 21, 2024. Plaintiff then sought leave at the conference held on January 13, 2025, just one month after the stay was lifted. Additionally, after that conference, Plaintiff sought Defendants' consent to file the SAC and made a strategic decision not to send a second deficiency letter, as it was contemplated that the scope of discovery would be altered after the SAC is filed. These facts confirm Plaintiff acted with reasonable diligence under the circumstances, as the material facts supporting the SAC's new factual allegations were revealed during discovery and not available to Plaintiff before the deadline. Courts have found good cause in similar situations involving post-deadline amendments based on newly discovered information. *See, e.g., Farsura v. QC Terme United States Corp.*, 342 F.R.D. 373 (S.D.N.Y. 2022) (finding good cause existed for amendment based on information obtained through depositions eight months after the deadline); *Indus. Tech. Ventures, L.P. v. Pleasant T. Rowland Revocable* Trust, 280 F.R.D. 86 (W.D.N.Y. 2012) (finding movant acted reasonably and with good cause in awaiting the completion of discovery before asserting the new allegations eleven months later).

Additionally, granting Plaintiff leave to amend will not cause Defendants to suffer prejudice. "When considering whether the opposing party may be prejudiced, courts consider whether the new claim would: (1) require the opponent to expend significant additional resources to conduct discovery and prepare for trial; (2) significantly delay the resolution of the dispute; (3) prevent the plaintiff from bringing a timely action in another jurisdiction." *CWS Invs., Inc. v. Manners*, No. 23-cv-2188 (NJC) (JMW), 2025 U.S. Dist. LEXIS 43035, at *16-17 (E.D.N.Y. Mar. 8, 2025). Here, no dispositive motions have been filed; no depositions taken. Defendants have not even responded to the operative pleading. The new tortious interference claim arises from the same

---

[1] It should be noted that it is procedurally curious that the deadline for motions to amend pleadings would be strictly fixed before all parties have filed their initial pleadings. Applying the Rule 16(b)(4) "good cause" standard under these circumstances essentially deprives both sides of the more permissive Rule 15(a)(2) standard should they later seek to amend after exhausting amendment as of right pursuant to Rule 15(a)(1).

operative facts and will not expand the scope of discovery. Nor is there unfair surprise, as Defendants have long known about the issues in this dispute.

Furthermore, the Court has already granted two extensions to the Conference Order, with no objection from Defendants, underscoring the lack of prejudice. Moreover, the timing of the amendment aligns with the most recent extension to the Conference Order, which sets the fact discovery deadline to August 29, 2025, providing ample time to complete discovery, which further supports a finding of good cause while reinforcing that Defendants will suffer no prejudice. *Cf. id.* at *18-19 ("[T]he totality of circumstances warrants a finding of prejudice if the amendment is made considering this case is approaching two years since its commencement, the close of all discovery occurred six months ago, and the addition of affirmative defenses would require a reopening of discovery…. Specifically, discovery … may be significant because [the amendment] requires … a high standard to prove."). Weighing the good cause shown for not complying with the deadline against the lack of prejudice or undue delay to Defendants, the circumstances favor Plaintiff. *See, e.g., Indus. Tech. Ventures, L.P.* at 93 (finding no prejudice under good cause standard even where amendment would necessitate additional discovery but was sought during discovery).

### III.  Sufficiency of Trade Secret Claims

Plaintiff has sufficiently pled the trade secret claims under both the DTSA and New York common law, and the proposed amendments to these claims are therefore not futile. Defendants concede that the Customer Lists constitute trade secrets for pleading purposes. However, Bullion Shark argues it did not misappropriate the Customer Lists. Conversely, Defendants dispute the Marketing Strategy as a trade secret but remain notably nearly silent as to the allegations of its misappropriation, failing to explicitly deny acquiring it. Plaintiff respectfully submits that the Customer Lists[2] and the Marketing Strategy are adequately alleged as protectable trade secrets, and that the SAC pleads in detail how they were misappropriated for Defendants' competitive advantage. For the sake of brevity, the focus here is on the unresolved and contested elements of the claims, not the points already conceded.

The SAC describes several instances of misappropriation of the Customer Lists. It alleges that Ovodova, while still employed by Plaintiff and before starting her employment with Bullion Shark, accessed and downloaded Plaintiff's Customer Lists. SAC ¶¶ 83–88. Based on evidence, Plaintiff reasonably infers that the Customer Lists were subsequently transferred and used for re-targeting purposes shortly after Ovodova began her role as Head of eCommerce at Bullion Shark. SAC ¶¶ 102–116. Notably, Bullion Shark had no digital marketing infrastructure or active re-targeting campaigns before Ovodova's arrival, but began implementing a strategy mirroring Plaintiff's proprietary approach soon thereafter, utilizing Plaintiff's SEO tools with proprietary algorithms to create and optimize links to Bullion Shark's products for inclusion on Bullion Shark's website. SAC ¶¶ 62, 97. Despite Defendants' objection to this inference, it is well-settled that a plaintiff may rely on circumstantial evidence of "use" to support a trade secret claim at the pleading stage. See *OmniProphis Corp. v. Vanteon Corp.*, 2024 U.S. Dist. LEXIS 126181, at *6–7 (W.D.N.Y. July 17, 2024) ("At the pleading stage, allegations of improper use can flow from circumstantial evidence alone. Courts have recognized that circumstantial evidence is acceptable, indeed even expected, in trade secret misappropriation cases"). As noted at the hearing, the timing—

---

[2] Designated terms in Plaintiff's moving Memorandum of Law retain the same meaning herein.

Ovodova's immediate implementation of retargeting strategies, the adoption of the same targeting structure and campaign sequencing used by Plaintiff, and the spike in marketing activity following her hire—raises a plausible inference that Bullion Shark gained access to and used the misappropriated Customer Lists. These facts establish misappropriation by Ovodova and a causal link showing Bullion Shark's acquisition and use of Plaintiff's confidential data in violation of DTSA and common law.

Defendants assert that the Marketing Strategy is not a protectable trade secret. Plaintiff does not contend that the PowerPoint presentation (*i.e.*, "BS Marketing Plan") alone constitutes a trade secret. Rather, the SAC pleads that the Marketing Strategy embodied in the BS Marketing Plan reflects the culmination of proprietary inputs developed over years of market research, testing, and based on confidential data inputs, strategic keyword selection, search engine algorithms and predictive modeling refined over years of commercial experience, used internally to drive its e-commerce performance. SAC ¶¶ 26–28. The SAC notes that Plaintiff has invested more than $4 million in its development, demonstrating the significant economic value derived from its confidentiality. SAC ¶ 29. Courts routinely hold that such marketing strategies, when derived from confidential internal processes, may qualify as trade secrets. See *Testing Servs., N.A., Inc. v. Pennisi*, 443 F. Supp. 3d 303, 340 (E.D.N.Y. 2020); *Oneida Group Inc. v. Steelite Int'l U.S.A., Inc.*, 2017 U.S. Dist. LEXIS 206717 (E.D.N.Y. Dec. 15, 2017).

Even combinations of otherwise public elements may qualify as a trade secret where, as here, the compilation itself provides a competitive advantage. *Integrated Cash Mgmt. Servs., Inc. v. Digital Transactions, Inc.*, 920 F.2d 171, 174 (2d Cir. 1990). Furthermore, Plaintiff has taken reasonable measures to maintain the secrecy of both its Customer Lists and Marketing Strategy. The SAC details technological safeguards and strict internal access protocols and expresses confidentiality obligations. SAC ¶¶ 31–38. Plaintiff also employs dedicated security specialists, restricts remote access, limits access to limited employees, and monitors employee activity to prevent unauthorized dissemination of sensitive information. SAC ¶¶ 33-34. And employees are further bound by strict confidentiality provisions in the Employee Handbook and Theft Policy, expressly prohibiting the disclosure of Plaintiff's proprietary information. SAC ¶¶ 36-38.

Nevertheless, whether the strategy qualifies as a trade secret is a question of fact, which should not be resolved at this stage. *Catalyst Advisors, L.P. v. Catalyst Advisors Invs. Glob. Inc.*, 602 F. Supp. 3d 663, 674 (S.D.N.Y. 2022); *Recovery Racing III LLC v. Brown*, 2021 U.S. Dist. LEXIS 262614, at *24 (E.D.N.Y. Oct. 28, 2021).

Thus, Plaintiff has pled the nature of the Trade Secrets with sufficient specificity and how they were misappropriated. The BS Marketing Strategy is merely the tangible summary of this strategic process—the "output," not the "recipe." Likewise, attaching the BS Marketing Strategy does not disclose the trade secret more than displaying a Coca-Cola can reveal the beverage's formula. The fact that the BS Marketing Strategy was attached as an exhibit does not waive Plaintiff's claim. Accordingly, the SAC pleads a plausible trade secret claim under federal and state law and satisfies the relevant pleading standards. See *Ashcroft v. Iqbal*, 556 U.S. 662 (2009); *Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007); *Mtivity, Inc. v. Office Depot, Inc.*, 525 F. Supp. 3d 433, 446 (E.D.N.Y. 2021).

IV. *Sufficiency of Tortious Interference Claim*

Plaintiff's SAC sufficiently pleads a claim for tortious interference with business relations and is therefore not futile. Following the standard articulated in *Catskill Dev., L.L.C. v. Park Place Entm't Corp.*, 547 F.3d 115, 132 (2d Cir. 2008), to state a claim a plaintiff must adequately allege that: "(1) the plaintiff had business relations with a third party; (2) the defendant interfered with those business relations; (3) the defendant acted for a wrongful purpose or used dishonest, unfair, or improper means; and (4) the defendant's acts injured the relationship." In the case at bar, Plaintiff had longstanding business relationships with the 384,000 customers identified in the Customer Lists. SAC ¶¶ 17–25, 206. Ovodova was aware of those relationships in her role as Plaintiff's Director of Marketing, in which she had full access to Plaintiff's customer data, internal communications, and targeting methodologies. SAC ¶¶ 41–49, 206-207. Bullion Shark knew of Ovodova's prior employment, including her access to this data, as evidenced by communications with outside recruiters expressing concern about potential non-compete agreement and the timing of Ovodova's hiring and marketing rollout. SAC ¶¶ 51-73, 102–104. Defendants intentionally interfered with those relationships by acquiring, misappropriating, and using Plaintiff's Customer Lists for their own benefit. SAC ¶¶ 102–118, 161, 207-209; Exs. 10–16. Ovodova obtained the Customer Lists through improper means—namely, unauthorized access and use of Plaintiff's confidential business materials—conduct that also supports the independent torts of misappropriation and breach of fiduciary duty. SAC ¶¶ 83–101, 207-210; Exs. 8, 9. As recognized in *GWG MCA Cap., Inc. v. Nulook Cap., LLC*, 2024 U.S. Dist. LEXIS 144910, at *12 (E.D.N.Y. Aug. 14, 2024), such conduct—when it rises to an independent tort—qualifies as the type of "improper means" required to support a claim for interference. *See also Amaranth LLC v. J.P. Morgan Chase & Co.*, 71 A.D.3d 40 (1st Dept. 2009) (finding unfair competition or breach of fiduciary duty as improper means).

The SAC also adequately pleads causation. Ovodova's statement—"for now I'll keep my secrets" (SAC ¶ 64)—reflects her intent to use confidential information for competitive advantage. The dramatic increase in customer records on Bullion Shark's platform shortly after her hire (SAC ¶¶ 108–109, 117–118; Ex. 12) supports the inference that Plaintiff's customer data was repurposed without consent. Plaintiff also alleges that email campaigns targeting those customers began shortly after the lists were transferred and that Defendants had not engaged in such campaigns before Ovodova joined. SAC ¶¶ 102–107, 117. As a direct result, Plaintiff experienced a measurable decline in customer engagement, revenue, and market share. SAC ¶¶ 110–114, 119–121, 211. These factual allegations, taken together, draw a clear and plausible line from Defendants' misconduct to the damage suffered by Plaintiff, satisfying the causation requirement under both *Iqbal* and *Twombly*. *See IME WatchDog, Inc. v. Gelardi*, No. 22-cv-1032 (PKC) (JRC), 2024 U.S. Dist. LEXIS 177765, 2024 WL 4350498, at *29-30 (E.D.N.Y. Sep. 30, 2024) (holding that Plaintiff's tortious interference with business relations claim could proceed where defendants targeted specific customers that they identified using the confidential information and trade secrets obtained through improper means).

Most importantly, this claim could not have been brought before the June 26, 2024, amendment deadline because the underlying evidence was unavailable. As explained at the Oral Argument, the Defendants' document production was heavily redacted, and no privilege log was provided. The relevant emails and metadata establishing how Defendants deployed the customer lists, particularly Exhibits 10 through 16, were not disclosed before the deadline. Exhibit 12, among

others, remains partially redacted, obstructing Plaintiff's ability to plead with specificity earlier. Plaintiff has acted diligently and in good faith upon receipt of this material, satisfying the "good cause" standard for untimely amendments. These facts justify both the timing of the amendment and the addition of this meritorious claim, which is supported by the underlying tortious conduct already pled as improper means. Accordingly, the SAC states a plausible claim for tortious interference with business relations under Rule 12(b)(6) and should be permitted.

V.      *Propriety of Alternative Claims*

Plaintiff's claims for breach of fiduciary duty and breach of the implied covenant of good faith and fair dealing are not duplicative of the breach of contract claim and are properly pled in the alternative. Under Second Circuit and New York law, "[c]laims are considered duplicative only where they arise from the same facts and do not allege distinct damages." *NetJets Aviation, Inc. v. LHC Commc'ns, LLC*, 537 F.3d 168, 175 (2d Cir. 2008).

Plaintiff asserts a claim against Ovodova for breach of fiduciary duty. Under New York law, a fiduciary relationship "exists between two persons when one of them is under a duty to act for or to give advice for the benefit of another upon matters within the scope of the relation." *EBC I, Inc. v. Goldman Sachs & Co.*, 5 N.Y.3d 11, 19 (N.Y. 2005). Such a relationship "is grounded in a higher level of trust than normally present in the marketplace." *Id.* Employees owe a distinct common-law duty of loyalty to their employers, which prohibits them from, among other misconduct, improperly using or disclosing their employer's confidential or proprietary information, particularly by providing it to a competitor. See NetJets Aviation, Inc. v. LHC Commc'ns, LLC, at 175. While not every employee owes a fiduciary duty, such duties can arise from key positions of management, control, or influence, particularly where an employee has access to confidential information or plays a critical role in the business's operations or strategy. *See CBS Corp. v. Dumsday*, 268 A.D.2d 350, 353 (1st Dept. 2000) (finding fiduciary duty where employee was high-level executive with significant control over business segment); *Western Elec. Co. v. Brenner*, 41 N.Y.2d 291, 295 (N.Y. 1977) (discussing employee duties of loyalty and not to disclose confidential information).

Here, the SAC pleads facts establishing that Ovodova's role as Plaintiff's Head of Marketing transcended that of a mere employee. Plaintiff alleges that Ovodova was entrusted with significant responsibility and discretion over Plaintiff's marketing strategy, customer data, and confidential business information. SAC ¶¶ 39–49. Ovodova violated this trust by making unauthorized copies of Trade Secrets and using them to benefit a competitor, Bullion Shark, while still employed by Plaintiff. SAC ¶¶ 83–116. She was not merely an employee executing tasks; she was a key executive formulating and directing a core function of Plaintiff's business. *See CBS Corp.*, 268 A.D.2d at 353. This position of trust and confidence, coupled with her access to highly sensitive and confidential information, gave rise to a fiduciary duty to act in Plaintiff's best interest and not to use her position or confidential information for her own or a competitor's gain.

The SAC further alleges specific actions by Ovodova that constitute a breach of this duty, distinct from any alleged breach of contract or misappropriation under trade secret law, and which give rise to separate damages, including those recoverable under the "faithless servant" doctrine, such as forfeiting compensation and disgorging ill-gotten profits. *See Twin City Fire Ins. Co. v. Arch Ins. Group, Inc.*, 143 A.D.3d 533 (1st Dept. 2016); *Visual Arts Found., Inc. v. Egnasko*, 91 A.D.3d

578 (1st Dept. 2012). These include, *inter alia*, downloading Customer Lists and confidential marketing data while still employed by Plaintiff and in her fiduciary role (SAC ¶¶ 83-101), and then using this confidential information to directly compete with Plaintiff immediately upon her departure to Bullion Shark. SAC ¶¶ 102-116. These alleged actions were taken while she occupied a position of trust and leveraged information and relationships gained directly through that position, breaching her duty of loyalty and good faith owed as a key executive. Therefore, the SAC provides a sufficient factual basis to plead that Ovodova owed and breached a fiduciary duty to Plaintiff, and this claim is not futile.

Similarly, the breach of the implied covenant of good faith and fair dealing is not redundant of the breach of contract claim. New York law permits such claims where a party's misconduct, even if not in direct violation of an express contract term, nevertheless destroys the other party's ability to enjoy the fruits of the contract. *See 511 W. 232nd Owners v. Jennifer Realty Co.*, 98 N.Y.2d 144, 153 (2002). The covenant of good faith and fair dealing may stand as an independent cause of action where it is based on specific, bad faith conduct distinct from express obligations and "does not depend on a breach of the contract." *Anexia v. Horizon Data Solutions Ctr.*, No. 657444/2019, 2022 N.Y. Misc. LEXIS 1471, 165 N.Y.S.3d 831, at *3 (Sup. Ct. N.Y. Cnty. Apr. 21, 2022) (Reed, J.). While overlapping conduct is possible, the implied covenant claim here is based on specific alleged bad faith actions by Defendants that were intended to frustrate Plaintiff's rights under the Employee Handbook and deprive Plaintiff of the benefits it reasonably expected from that agreement, going beyond a mere failure to perform an express contractual duty.

Specifically, as detailed in the SAC, Plaintiff alleges that Defendants engaged in a concerted effort to misuse Plaintiff's Trade Secrets, which were provided under the framework of the Employee Handbook, for the express purpose of undermining Plaintiff's customer relationships and diverting business to Bullion Shark. SAC ¶¶ 83-101. Ovodova engaged in undisclosed concurrent employment with sellyourhomefast.com (SAC ¶ 82), and actively concealed her acceptance of a position at Bullion Shark while misrepresenting her intentions to Plaintiff. SAC ¶¶ 74–75, 77. These actions deprived Plaintiff of the opportunity to take protective measures and were compounded by her timely misappropriation of the Trade Secrets just days before her resignation. SAC ¶¶ 74, 83–88. This conduct, including the alleged misappropriation and direct targeting of Plaintiff's existing or prospective customers through means acquired via the contractual relationship, constitutes bad faith that actively worked to destroy Plaintiff's right to receive the benefit of its bargain: the ability to profit from its customer base. *See Elmhurst Dairy, Inc. v. Bartlett Dairy, Inc.*, 97 A.D.3d 781, 785 (2d Dept. 2012) (reinstating implied covenant claim where plaintiff alleged diversion of business in bad faith, separate from breach of contract). This alleged bad faith conduct is distinct from the breach of the express terms of the Employee Handbook, such as the terms regarding confidentiality or exclusivity. While the conduct may also violate those terms, the implied covenant claim focuses on Ovodova's alleged malicious intent to capitalize on the contractual relationship to directly harm Plaintiff's core business interests by subverting the very relationship the contract was intended to facilitate. *See, e.g., Richbell Info. Servs., Inc. v. Jupiter Partners, L.P.*, 309 A.D.2d 288, 302 (1st Dept. 2003) (implied covenant breached where party acted in bad faith to prevent the other from receiving benefits under contract); *Konecranes, Inc. v. Cranetech, Inc.*, 2005 WL 246916, at *3 (W.D.N.Y. Feb. 2, 2005) (finding that misappropriation of confidential information supported a claim for breach of implied covenant separate from breach of contract).

Additionally, that claim is pled in the alternative, particularly because the Employee Theft Policy—unlike the Employee Handbook—was not signed or incorporated into the operative contract and thus cannot form the sole basis for a contract claim. For these reasons, the futility challenge on this ground should therefore be rejected.

VI. *Leave to Replead*

At the Oral Argument, the Court noted an apparent inconsistency in SAC ¶¶ 108-109 concerning whether the customer data was "uploaded" to Sendlane, as alleged, versus "exported," as reflected in Exhibit 12. Plaintiff acknowledges and regrets the imprecise language in that paragraph and respectfully requests leave to replead the paragraph to correct this inaccuracy. Based on the foregoing arguments, good cause exists to allow this correction, as it arises from discovery documents that were heavily redacted and provided without a privilege log, limiting Plaintiff's ability to plead with greater specificity. Based on the surrounding context, including preceding and subsequent imports and exports referenced in Exhibit 12, Plaintiff reasonably inferred that the customer list was being transferred to a new platform for re-targeting purposes immediately following Ovodova's onboarding at Bullion Shark. Additional communications cited in SAC ¶¶ 62, 102–111 support the inference that Bullion Shark had no prior digital marketing infrastructure and began implementing Plaintiff's proprietary strategy, including customer re-targeting, only after Ovodova's arrival. While Plaintiff used "information and belief" in other portions of the SAC, omitting that qualifier in ¶ 108 was inadvertent. Plaintiff respectfully seeks leave to replead that paragraph to clarify the factual basis for its inference, maintain compliance with Rule 11, ensure the pleadings accurately reflect the available evidence, and guarantee adjudication on the merits. The proposed revised ¶¶ 108-109 (footnote omitted) are as follows:

> 108. Upon information and belief, Ovodova again misappropriated the Customer Lists, or a portion thereof, after she started employment at Bullion Shark by uploading them into Bullion Shark's software, Sendlane. Thereafter, on October 23, 2023, she exported two lists from the Customer Lists, which contained a total of Two Hundred Twenty-Three Thousand Five Hundred Forty-Seven (243,547) customers, from Sendlane. Attached hereto as Exhibit 12 is a copy of the screenshots illustrating the movement of customer lists to and from Sendlane.

> 109. Upon information and belief, this export included a significant portion of the Customer Lists, given that email marketing did not constitute a substantial portion of Bullion Shark's business model before Ovodova misappropriated the Trade Secrets.

VII. *Conclusion*

Accordingly, for the reasons stated previously and above, Plaintiff respectfully requests that the Court grant its motion for leave to file the Second Amended Complaint and for such other and further relief as the Court deems necessary under the circumstances.

Plaintiff thanks the Court for its time and attention to this matter.

Respectfully submitted,

_____/s/_____
Eugene Bondar
Bondar Legal P.C.

cc:   All counsel of record (via ECF)